# Exhibit A

LAUREN I. SCHOLNICK (Bar No. 7776)
**STRINDBERG & SCHOLNICK, LLC**
675 East 2100 South, Suite 350
Salt Lake City, Utah 84106
Telephone: (801) 359-4169
Facsimile: (801) 359-4313
Email: lauren@utahjobjustice.com
Attorneys for Plaintiff

**IN THE THIRD JUDICIAL DISTRICT COURT**
**STATE OF UTAH, SALT LAKE COUNTY**

| | |
|---|---|
| **PAUL G. AMANN**,<br><br>Plaintiff,<br><br>vs.<br><br>**OFFICE OF THE UTAH ATTORNEY GENERAL, SEAN REYES,** and **BRIDGET ROMANO**, in their official and individual capacities,<br><br>Defendants. | **FIRST AMENDED COMPLAINT**<br>**(Jury Trial Requested)**<br><br>Case No.: 170903438<br><br>Judge Patrick Corum |

Plaintiff Paul Amann, ("Mr. Amann"), by and through counsel, hereby submits the following Amended Complaint against Defendant Office of the Utah Attorney General ("OAG"); Sean Reyes, Utah's Attorney General ("Mr. Reyes"); and Bridget Romano, Former Chief Civil Deputy Attorney General ("Ms. Romano"), (collectively "Defendants").

**NATURE OF CASE**

This is an action against OAG seeking redress for wrongful termination in violation of the Utah Protection of Public Employees Act, Utah Code Ann. § 67-21-1, *et seq*. (“the Whistleblower Act”) and for retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. (“Title VII”). It is also an action against Mr. Reyes and Ms. Romano, in their individual and official capacities, for violating his right to free speech in violation of 42 U.S.C. § 1983.

**PARTIES, JURISDICTION AND VENUE**

1. Mr. Amann is an individual residing in Salt Lake County, Utah.

2. Defendant OAG is an executive office within the state of Utah and at all relevant times was Plaintiff’s employer.

3. Defendant Sean Reyes is the Utah Attorney General since his appointment by Governor Gary Herbert on December 23, 2013. Upon information and belief, Reyes resides in Salt Lake County. He is being sued in both his individual and official capacities.

4. Defendant Bridget Romano was appointed Chief Civil Deputy Attorney General by Sean Reyes and was acting as such at all times relevant to the claims raised herein. Upon information and belief, Romano resides in Salt Lake County. She is being sued in both her official and individual capacities.

5. This Court has jurisdiction over the actions asserted in this matter under Utah Code Ann. § 78A-5-102(1).

6. Venue is proper in this Court under Utah Code Ann. § 78B-3-307 and § 67-21-4(2), because Salt Lake County is the county in which the causes of action arose.

7. Mr. Amann filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") in March 2017, alleging retaliation under Title VII for protected activity concerning harassment.

8. On January 9, 2018, the United States Department of Justice issued Mr. Amann a Notice of Right to Sue.

9. All administrative prerequisites have been met.

10. On March 22, 2017, Mr. Amann sent OAG a Notice of Claim pursuant to the Governmental Immunity Act of Utah, Utah Code Ann. § 63G-7-401 *et seq*., alleging that Mr. Amann was wrongfully terminated in violation of the Whistleblower Act (among other violations). OAG did not respond to the Notice of Claim, the time for doing so having expired and the initial Complaint asserting the Whistleblower claim was filed on May 30, 2017.

## GENERAL FACTUAL ALLEGATIONS

11. In August 1998, OAG hired Mr. Amann in the Child Protection Division ("CP Division"). It promoted him to representing the Internet Crimes Against Children ("ICAC") Task Force in April, 2003, and he transferred to the Children's Justice Division.

12. Mr. Amann was the most successful OAG prosecutor of felony crimes committed by child predators and child pornographers in the history of the state of Utah.

13. Mr. Amann excelled in the role and was lauded for his performance both in and outside the office. Notably:

a. In 2007, he was awarded OAG Attorney of the Year;

b. In 2011, he was lead prosecutor for the ICAC when the Department of Justice named the unit the "Outstanding Local Prosecutor's Office";

c. In 2013, Prevent Child Abuse Utah named him "Child Advocate of the Year" – an award which no other Assistant Attorney General has ever won;

d. In 2014, Utah Public Employees Association gave him its Award of Excellence; and

e. On May 18, 2015, just five months prior to OAG suspending Mr. Amann, Mr. Amann's Division director awarded him two Superior Service Awards and two Appreciation Awards, and all four awards included financial bonuses.

14. In April 2013, Mr. Amann began, in good faith, reporting OAG violations of state and federal law and misuse of government funds. Thereafter, OAG retaliated against him because of his reports.

15. In April 2013, Mr. Amann learned that his supervisors, Kris Knowlton and Craig Barlow, planned to have a paralegal whose position was funded by ICAC (a federal grant program) work on state cases.

16. Allowing this paralegal (Cindy Poulson) to work on state cases violated

federal grant restrictions and further required her to do the work of an attorney.

17. Poulson was Barlow's love interest and Barlow sought to have her promoted within the Children's Justice Division.

18. Mr. Amann reported his concerns to OAG Civil Chief Kirk Torgensen and then-Attorney General ("AG") John Swallow.

19. Within weeks, OAG derailed Mr. Amann's career by moving him from his 10-year position representing the ICAC and transferring him, against his will, to the Securities Division, and cutting his salary by approximately 5%.

20. In December 2013, Mr. Amann again attempted to raise his concerns regarding the Division's violations of the law by contacting incoming AG Sean Reyes. In addition to informing Reyes about the violations above, Mr. Amann also told Reyes that OAG had given Poulson an employment contract for an attorney position, even though she was a convicted felon who had served time in the Utah State Prison for, among other crimes, assaulting a law enforcement officer. The employment contract also contained false statements, including that the paralegal had practiced law for three years, although she, herself, only claimed to have practiced law for less than a year before her employment application with OAG.

21. Mr. Reyes refused to speak with Mr. Amann.

22. As a result of the stonewalling, Mr. Amann reported his concerns to the Department of Human Resources Management ("DHRM") in early 2014.

23. On March 14, 2014, Mr. Reyes and the OAG issued a "gag order"

preventing OAG employees from publicly reporting corruption, stating:

> All communications with media, or those claiming to be media, concerning the Attorney General's Office including policies, personnel, cases or any other UAG business that take place outside of this system are subject to immediate disciplinary actions up to and including termination.

24. On May 15, 2014, Mr. Amann met with DHRM investigators to report the above-referenced violations within the Children's Justice Division. (DHRM is a client of OAG.)

25. Three days later, OAG announced new division directors. OAG passed Mr. Amann over for a promotion to division director although his qualifications, experience, performance, and tenure with the office well surpassed those whom OAG chose to appoint as director for both the divisions for which Mr. Amann applied.

26. In August 2014, Mr. Amann raised his concern to his Securities Division supervisor that an analyst for the Securities Division was violating § 61-1-21.5 of the Securities Act and acting in contravention of the recommendations of the 2008 Legislative Audit of the Utah Securities Division.

27. In August 2014, after an "investigation" which was tightly controlled by OAG, DHRM concluded its investigation into the Craig Barlow/Cindy Poulson matter and found no sexual harassment by Barlow (based on the willingness of Poulson and that it was merely a "physical romantic relationship"), but the investigation ignored how the relationship created a hostile work environment for others in the office.

28. Almost immediately thereafter, OAG, through its Securities Division Director, began scrutinizing Mr. Amann.

29. On October 8, 2014, OAG further retaliated against Ms. Amann by moving him to the Antitrust Division, again against his will, allegedly due to a co-worker "complaint" filed on September 25, 2014. The co-worker complaint was investigated jointly by OAG and DHRM and was dismissed as unsubstantiated on November 19, 2014.

30. Mr. Amann requested records regarding the investigation into the September 25th co-worker complaint. When those requests were denied, Mr. Amann filed GRAMA requests to DHRM to discern the basis for the September 25th complaint and to receive the report from the joint DHRM/OAG investigation. DHRM denied his requests.

31. He appealed to the DHRM Director, who denied the request, and later to the State Records Committee ("SRC").

32. OAG defended against Mr. Amann's GRAMA requests, acting as counsel to DHRM. Mr. Amann prevailed before the SRC, and OAG appealed to the Third District Court.

33. On March 23, 2015, Mr. Amann met with DHRM investigator Mike Tribe and OAG HR Director Susan May to provide evidence of corruption in the OAG, and to support Assistant AG R. Jason Hanks' ("Mr. Hanks") claims of sexual harassment and OAG's failure to protect Mr. Hanks.

34. Ms. May later determined that four episodes of Mr. Hanks being sexually harassed by another man in the office was not sufficiently "pervasive" for OAG to take action.

35. Mr. Hanks appealed that finding to the Utah Labor Commission and Mr. Amann then provided testimony to the Labor Commission.

36. After a series of GRAMA appeals by both OAG and Mr. Amann, Mr. Amann also filed a GRAMA suit on June 24, 2015.

37. In July 2015, the state court granted Mr. Amann's Motion for Summary Judgment and ordered OAG to produce certain documents Mr. Amann requested. Thus, Mr. Amann substantially prevailed against the OAG on both court cases.

38. In the documents obtained through the GRAMA process, Mr. Amann learned that his Securities Division Director, Che Arguello, had been soliciting damaging information regarding Mr. Amann from the Securities Division as part of an "investigation." That occurred on September 8, 2014, prior to the filing of any complaint against Mr. Amann.

39. In July, 2015, Mr. Amann contacted legislative auditors, who interviewed him and a fellow Assistant AG on July 13, 2015, concerning OAG corruption and lack of whistleblower protection for employees.

40. The legislative auditors asked for additional information regarding Mr. Amann's concerns. Mr. Amann provided them with documents on July 13, 2015, and on July 18, 2015, he provided them with 12-page summary of OAG corruption.

41. Additionally, Mr. Amann was named as a witness in a lawsuit brought by Mr. Hanks in Third District Court against OAG for sexual harassment of and retaliation against Mr. Hanks involving on-the-job sexual assaults that Mr. Hanks suffered.

42. On September 3, 2015, OAG mirror-imaged Mr. Amann's office computer hard drive and conducted a forensic exam of it. In that exam, OAG found many files in which Mr. Amann had been documenting corruption within the OAG office. For example:

a. OAG found and documented finding a file labeled "Notes for meeting with Auditors.7.8.2015.wpd";

b. In a folder titled "\Users\pamann\Documents\ANTI-TRUSTS\SCAM," OAG found and documented finding a file with the name "Memorandum to Auditors.pdf" dated July 27, 2015; and

c. Among numerous other documents in the SCAM folder, OAG also found and documented finding a document labeled, "Letter to Labor Commission for Hanks.pdf" dated May 20, 2015.

43. On September 10, 2015, one week after the forensic exam in which OAG found voluminous evidence that Mr. Amann was documenting corruption, sexual harassment and retaliation at OAG, Cynthia Poulson (at the request of OAG) filed an internal, written complaint.

44. In her complaint, Ms. Poulson reported that an anonymous tipster had sent a letter and court records to the organizer of a training Poulson attended. The anonymous tipster advised that Ms. Poulson was not allowed access to databases in her job at OAG's office and provided records of Ms. Poulson's criminal history.

45. Although Poulson's letter indicates that the anonymous tipster had

knowledge of Poulson's calendar and Mr. Amann did not, Defendants accused Mr. Amann of being the anonymous tipster. Defendants relied on Poulson's complaint to investigate, suspend, and 14 months later, terminate Mr. Amann.

46. On September 14, 2015, Mr. Amann met with Greg Hargis and Michelle Watts, DHRM investigators, to discuss corruption, sexual harassment, and retaliation for whistleblowing in OAG's office. He also provided details of OAG's failure to take action to protect Mr. Hanks from sexual harassment.

47. The interview came on the heels of a Legislative Audit that found OAG's then-current policy lacked sufficient provisions to protect whistleblowers who internally reported employee misconduct (a policy that remains unchanged).

48. On October 8, 2015, Mr. Amann represented himself in another SRC hearing, wherein he asked OAG to provide him with evidence of an ongoing investigation of Mr. Amann referenced on July 13, 2015 by OAG Chief Federal Deputy and General Counsel Parker Douglas. Mr. Hanks appeared at that hearing with Mr. Amann.

49. Thereafter, Mr. Amann attended a National Association of Attorneys General Antitrust conference in Arkansas for OAG.

50. The next day that Mr. Amann was in the office, October 19, 2015, Bridget Romano suspended Mr. Amann and placed him on administrative leave.

51. At that meeting, in the same building where Mr. Amann had his office, Ms. Romano, at Mr. Reyes' direction, had two OAG law enforcement officers present.

52. The law enforcement officers escorted Mr. Amann throughout the building after the meeting and while Mr. Amann communicated with his supervisor, Ron Ockey.

53. Also, a colleague of Mr. Amann's, Jenette Turner, also witnessed Mr. Amann being escorted from the office by the officers.

54. Both Mr. Ockey and Ms. Turner inquired if Mr. Amann were "ok" in light of this humiliating parade of him by law enforcement.

55. At the time, OAG did not provide Mr. Amann notice of what the allegations were against him. However, Ms. Romano did provide Mr. Amann with a written order not to communicate with co-workers or clients, or to access any state databases.

56. This resulted in Mr. Amann's isolation from his longtime friends and associates. OAG's written order barred him from his office, office email, client files and any state databases, and relegated him to employment purgatory.

57. Although Poulson complained against other OAG employees on September 10, 2015, OAG only acted against Mr. Amann.

58. During the next eight months, OAG took no action to investigate the alleged reasons for Mr. Amann's unwarranted leave.

59. On May 5, 2016, OAG advertised Mr. Amann's position and filled the position months before providing Mr. Amann with a Notice of Intent to Terminate, and prior to demanding Mr. Amann appear for a "Garrity interview."

60. Later in May 2016, Mr. Amann received a subpoena duces tecum from Mr.

Hanks for documents relating to Mr. Hanks' lawsuit against OAG.

61. OAG contacted Mr. Amann on June 17, 2016, and offered to help Mr. Amann respond to the subpoena in an effort to quash it.

62. Mr. Amann declined OAG's assistance on June 22, 2016. Although OAG pursued the motion to quash Mr. Amann's evidence or ability to respond to Mr. Hanks' subpoena, it did not prevail.

63. On June 23, 2016, OAG contacted Mr. Amann and ordered him to come to the office on June 28, 2016, for a "Garrity interview," the same date and time as the hearing on the subpoena Mr. Amann had been served in the Hanks case. Due to OAG's order, Mr. Amann could not attend the hearing.

64. At the June 28, 2016 interview, OAG again offered to "defend" against Mr. Hanks' subpoena. Mr. Amann again declined OAG's offer.

65. During the Garrity interview, OAG interrogated Mr. Amann about what he knew about Mr. Hanks' claims.

66. On August 4, 2016, Mr. Amann responded to Mr. Hanks' subpoena, stating that he could not respond to the subpoena until and unless he had access to his office and computer.

67. On August 17, 2016, Mr. Amann and his counsel met with Ms. Romano, who indicated she had drafted a Notice of Intent to Terminate. However, she refused Mr. Amann's counsel's request for any documents upon which OAG was relying.

68. On September 8, 2016, OAG mailed Ms. Romano's Notice of Intent to

Terminate to Mr. Amann.

69. At a November 23, 2016 hearing in Mr. Hanks' case, Mr. Amann appeared with Mr. Hanks and spoke on Mr. Hanks' behalf, indicating that he needed access to his office/computer to provide Mr. Hanks evidence.

70. As a result, the judge in Mr. Hanks' case ordered OAG to permit Mr. Amann access to his office/computer so he could provide the information Mr. Hanks requested in his subpoena. But OAG has not complied with that order.

71. On December 2, 2016, OAG terminated Mr. Amann from his position based on false allegations and precluded him from obtaining his personal possessions and information from his OAG office after that firing. OAG finally relinquished some of Mr. Amann's possessions in November, 2017, nearly a year after his termination, but it maintains possession of the remainder of Mr. Amann's possessions.

72. Ms. Romano fabricated two claims to support her Notice of Intent to Terminate Mr. Amann's employment. Of the two false allegations Ms. Romano provided for termination, Mr. Reyes' appointee, Tyler Green, acknowledged one of the claims was without basis and withdrew it.

**FIRST CAUSE OF ACTION**
***(Violation of the Whistleblower Act against OAG)***

73. Mr. Amann realleges and incorporates by reference all paragraphs set forth above.

74. The Utah Protection of Public Employees Act ("Act"), Utah Code Ann. § 67-21-1 *et seq.*, protects employees who communicate or object to

violations of a state or federal law, rule, or regulation. Specifically, Utah Code Ann. § 67-21-3(1)(a) states that a state government employer:

> may not take adverse action against an employee because the employee . . . communicates in good faith . . . a violation or suspected violation of a law, rule, or regulation adopted under the law of this state . . . or . . . the United States; or [reports] gross mismanagement; abuse of authority; or unethical conduct.

75. Utah Code Ann. § 67-21-3(2) states that "[a]n employer may not take adverse action against an employee because an employee participates or gives information in an investigation, hearing, court proceeding, legislative or other inquiry, or other form of administrative review held by the public body."

76. Utah Code Ann. § 67-21-3(3) states that "[a]n employer may not take adverse action against an employee because the employee has objected to or refused to carry out a directive that the employee reasonably believes violates a law of this state . . . or the United States."

77. Utah Code Ann. § 67-21-3(4) states that "[a]n employer may not implement rules or policies that unreasonably restrict an employee's ability to document":

> waste or misuse of public funds, property, or manpower; . . . a violation or suspected violation of any law, rule, or regulation; . . . or as it relates to a state government employer: . . . gross mismanagement . . . abuse of authority . . . or . . . unethical conduct.

78. As more specifically set forth above, Mr. Amann communicated in good faith OAG's: 1) violation of federal grant requirements; 2) waste and misuse of federal and state funds and personnel; 3) violations of both state and federal law; and 4)

managers' gross mismanagement, abuse of authority; and 5) managers' and employees' illegal and unethical conduct.

79. He also followed GRAMA to lawfully obtain documents and participated in hearings, court proceedings, and administrative reviews concerning these requests.

80. He participated in investigations by OAG, DHRM, Utah Labor Commission and legislative auditors.

81. He participated in court proceedings concerning Hanks' lawsuit against OAG by being listed as a witness, trying to comply with a subpoena of information, and by attending court hearings.

82. He documented waste or misuse of public funds, property, and violations or suspected violations of state laws, rules, and/or regulations.

83. OAG took adverse actions against Mr. Amann because of Mr. Amann's protected activity under the Whistleblower Act, by:

a. Effectively demoting him from his positions with the ICAC and Securities Divisions, effectuating a 5% pay decrease;

b. Effectively demoting him from the Securities Division to the Antitrust Division;

c. Unreasonably restricting Mr. Amann's access to documents and databases needed to defend himself against unsupported accusations and investigations;

d. Unreasonably restricting Mr. Amann's associations with his professional colleagues; failing and refusing to promote him to positions for which he was best qualified;

e. Suspending and later terminating him and thereby restricting his ability to document OAG violations; and

f. Terminating his employment.

84. OAG's actions constitute a violation of the Whistleblower Act and Mr. Amann has been injured as a result of OAG's actions. Mr. Amann is entitled to: back pay and benefits, seniority rights, reinstatement (or front pay and benefits in lieu of reinstatement), and interest (both pre and post-judgment).

85. As a further result of OAG's actions, Mr. Amann is also entitled to general damages due to his emotional distress and damage to his reputation, and loss of enjoyment of life

86. Mr. Amann is also entitled to recover his attorneys' fees and costs incurred in bringing this action.

**SECOND CAUSE OF ACTION**
***(Unlawful Retaliation in Violation of Title VII Against OAG)***

87. Mr. Amann alleges and incorporates by reference all of the paragraphs and allegations set forth above.

88. Mr. Amann engaged in protected activity under Title VII. On behalf of Mr. Hanks, Mr. Amann repeatedly and in good faith reported violations of Title VII to OAG, DHRM, and the Utah Labor Commission, and also in state court. He also participated as

a witness in investigations and legal proceedings relating to Mr. Hanks' claims of sexual harassment and retaliation.

89. OAG took multiple adverse actions against Mr. Amann as a result thereof. These include, but are not limited to: transferring him from ICAC/Children's Justice Division to Securities; transferring him from Securities/Commercial Enforcement Division to Antitrusts/Markets and Financial Fraud Division; denying him promotions to Division Director; reducing his pay to less than his other fellow former supervisors; creating a hostile work environment for him; suspending him for 14 months; ordering him not to communicate with co-workers or clients and not to access any state databases during suspension; terminating his employment in December of 2016; retaining his personal possessions; stonewalling his GRAMA requests and then refusing to comply with SRC GRAMA orders; and providing false information about him to prospective employers to prevent him from obtaining employment.

90. OAG's retaliation and ultimate termination of Mr. Amann is causally linked to his protected activity.

91. Mr. Amann has been damaged as a result of OAG retaliation. He is entitled to recover all resulting damages including lost pay and benefits, future lost pay and benefits, and emotional distress damages.

92. Mr. Amann is also entitled to all reasonable attorney's fees and costs incurred in bringing this action.

**THIRD CAUSE OF ACTION**
**(*Violation of Free Speech in Violation of 42 U.S.C. § 1983***

***against Romano and Reyes in their official and individual capacities*)**

93. Mr. Amann alleges and incorporates by reference all of the paragraphs and allegations set forth above.

94. As set forth above, Mr. Amann spoke out on matters of public concern, as they affected the legal rights of the citizens of Utah and the transparency of one of its public agencies. Namely, Mr. Amann: 1) reported improper use of paralegals in violation of federal grant restrictions; 2) reported favorable treatment of the paralegal referenced above; 3) requested documents under state law and appealed the denial thereof; and 4) participated in a legislative audit into OAG corruption.

95. When Mr. Amann made these reports and requests, he was not acting pursuant to his official duties at OAG.

96. Mr. Amann's comments and actions were done in a manner which did not disrupt OAG's operations.

97. Accordingly, Mr. Amann's interest in communicating and commenting on these public matters outweigh OAG's interest in promoting the "efficiency" of the public services it provides.

98. Mr. Amann's protected speech was a substantial or motivating factor in the Defendants' decision to terminate his employment and take other adverse actions against him (further set forth in ¶ 89, above).

99. By terminating Mr. Amann and taking other adverse actions against him, Defendants violated Mr. Amann's rights as protected under the First Amendment to the

United States Constitution.

100. Defendants acted under the color of law.

101. Defendants' conduct violated a clearly established constitutional right of free speech of which a reasonable person should have known.

102. Mr. Amann has been injured by Defendants' conduct and has suffered and will continue to suffer losses. Pursuant to 42 U.S.C. § 1983, he is entitled to all available relief, including back pay, reinstatement and/or front pay, and actual and compensatory damages, as well as costs and attorney fees.

103. The individual Defendants' conduct was willful and intentional, malicious, and exhibits reckless or callous indifference to Mr. Amann's constitutional rights, thereby entitling him to punitive damages.

## REQUEST FOR JURY TRIAL

Mr. Amann requests that this matter be tried before a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Amann prays for the following relief:

1. For injunctive relief;
2. For reinstatement of Mr. Amann's OAG employment and/or front pay in lieu of reinstatement;
3. For the payment of lost wages, benefits, and seniority rights;
4. For reimbursement due to negative tax consequences from lump sum payments;

5. For compensatory damages;

6. For punitive damages as allowable;

7. For costs and attorneys' fees as allowed by law;

8. For pre- and post-judgment interest at the highest lawful rate;

9. For other and further relief as the Court deems just and proper in this case to make Mr. Amann whole.

DATED this 10th day of April, 2018.

**STRINDBERG & SCHOLNICK, LLC**

/s/ Lauren I. Scholnick
Lauren I. Scholnick
Attorney for Plaintiff