IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| PAUL G. AMANN,<br><br>        Plaintiff,<br>v.<br><br>OFFICE OF THE UTAH ATTORNEY GENERAL, SEAN REYES, and BRIDGET ROMANO, in their official and individual capacities<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' PARTIAL MOTION TO DISMISS**<br><br><br>Case No. 2:18-cv-341<br><br>District Judge Jill N. Parrish |

   This matter comes before the court on defendants' Amended Partial Motion to Dismiss filed on July 11, 2018. (ECF No. 13). Plaintiff responded in opposition on July 31, 2018, (ECF No. 20), to which defendants replied on August 28, 2018, (ECF No. 31).[1] The court heard oral argument on this motion on February 13, 2019. On the basis of that hearing, the parties' memoranda, a careful review of relevant law, and for the reasons below, defendants' motion is granted in part and denied in part.

### I.  BACKGROUND

   This is an employment action asserting federal claims under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1983, alongside a state whistleblower claim under the Utah Protection of Public Employees Act ("UPPEA"). The operative First Amended Complaint was filed by Mr. Amann in state court on April 10, 2018, and is asserted against the Office of the Utah Attorney General ("OAG"), Attorney General Sean Reyes, and Bridget Romano, who,

---

[1] Plaintiff's Motion for Rule 11 Sanctions, (ECF No. 15), seeking sanctions against defendants for having brought this motion to dismiss, will be resolved by separate order.

during the relevant period, served as Utah's Solicitor General and as the OAG's Chief Civil Deputy.² Defendants removed the action to this court on April 24, 2018, invoking federal question jurisdiction pursuant to 28 U.S.C. § 1331. (ECF No. 2).

## A. FACTUAL ALLEGATIONS³

Beginning in August of 1998, plaintiff Paul G. Amann worked as a prosecutor in the Child Protection division of Utah's Office of Attorney General ("OAG"). In 2003, he was promoted to represent the Internet Crimes Against Children Task Force—a unit within the Children's Justice division—a role that earned him considerable accolades over the following decade, both internally and externally.

In April of 2013, Mr. Amann began reporting violations of state and federal law to the OAG's Chief Civil Deputy and Attorney General. The violations of law emanated from an allegedly improper romantic relationship between a paralegal, Cynthia Poulson, and Mr. Amann's supervisor, Craig Barlow. Mr. Amann reported that Ms. Poulson, whose position was federally funded, had been tasked with working on state cases in contravention of law, and further reported that she was being asked to do the work of an attorney. Mr. Amann also reported that the relationship bore indicia of, or created conditions amounting to, sexual harassment.

---

² Mr. Reyes and Ms. Romano are sued under § 1983 in both their individual and official capacities. "[A]n official-capacity suit against a state officer 'is not a suit against the official but rather is a suit against the official's office.'" *Hafer v. Melo*, 502 U.S. 21, 26 (1991) (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)). "As such, it is no different from a suit against the State itself." *Will*, 491 U.S. at 71. Thus, while a plaintiff may seek prospective injunctive relief against state officers in their official capacities to remedy an ongoing constitutional violation under *Ex Parte Young*, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Id.* Defendants, however, have failed to request dismissal of the official capacity suits against Mr. Reyes and Ms. Romano on these grounds.

³ The court must "accept the facts alleged in the complaint as true and view them in the light most favorable to the plaintiff." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016).

Mr. Amann alleges that the OAG retaliated against him for reporting the violations by transferring him from the Children's Justice Division to the Securities division, reducing his salary by 5%, and passing him over for a promotion. In December 2013, Mr. Amann reported the same violations of law to Mr. Reyes, Utah's then-incoming Attorney General. Mr. Amann also informed Mr. Reyes that Ms. Poulson—who had since apparently passed the bar and had been promoted to an attorney position—was employed under a contract that contained false statements regarding the amount of time she had practiced law. He also informed Mr. Reyes that Ms. Poulson was a convicted felon who had served time in state prison for, among other crimes, assaulting a law enforcement officer. Mr. Reyes refused to speak with Mr. Amann about these complaints.

In early 2014, Mr. Amann reported these violations to the Department of Human Resources Management ("DHRM"). In March of 2014, Mr. Reyes issued a directive to all employees of the OAG, stating that all employees who communicate "with media, or those claiming to be media, concerning the Attorney General's Office including policies, personnel, cases or any other [OAG] business that take place outside of this system are subject to immediate disciplinary actions up to and including termination."

In August of 2014, Mr. Amann reported violations of state law he observed in the Securities division. In October of 2014, Mr. Amann was transferred to the Antitrust division, having been informed that this transfer was the result of a co-worker's complaint about him. Mr. Amann requested records documenting the complaint and the consequent investigation but was rebuffed, at which point he sought to compel the production of the requested records through judicial process. After several appeals, a state court ordered the OAG to provide the records to

Mr. Amann, which revealed that Mr. Amann's supervisor had been soliciting damaging information about him prior to the co-worker's complaint.

In March and September of 2015, Mr. Amann met with the OAG's human resources director, as well as investigators from DHRM, to provide evidence of corruption in the OAG, and to support Assistant Attorney General R. Jason Hanks' claims of sexual harassment. Mr. Amann subsequently provided testimony in state Labor Commission proceedings initiated by Mr. Hanks regarding his sexual harassment allegations.

In July of 2015, Mr. Amann contacted legislative auditors, who subsequently interviewed him regarding corruption in the OAG as well as the OAG's failures to protect whistleblowers. In response to a request for more information from legislative auditors, Mr. Amann provided documents and a 12-page summary of corruption in the OAG. In September of 2015, the OAG copied Mr. Amann's office computer and conducted a forensic exam thereof, which would have revealed documents detailing Mr. Amann's communication with legislative auditors, as well as documents he had prepared in connection with Mr. Hanks' Labor Commission proceedings. One week after the OAG discovered these documents, Cynthia Poulson, at the request of the OAG, filed an internal complaint about Mr. Amann.

On October 8, 2015, Mr. Amann represented himself in state administrative proceedings in which he attempted to obtain evidence of an investigation into Mr. Amann that had been previously disclosed by the OAG's General Counsel, Parker Douglas.

On October 19, 2015, Mr. Amann was suspended indefinitely by Chief Civil Deputy Bridget Romano. Mr. Amann was not informed of the reason for suspension, and was ordered by Ms. Romano not to communicate with co-workers or clients, and not to access any state

databases. During and after the meeting in which Ms. Romano suspended Mr. Amann, two law enforcement officers were present.

In May of 2016, Mr. Amann received a subpoena duces tecum in connection with a state lawsuit initiated by Mr. Hanks. The OAG contacted Mr. Amann and offered to help him quash the subpoena. Mr. Amann declined the OAG's assistance. In June of 2016, the OAG ordered Mr. Amann to participate in a "*Garrity* interview"[4] scheduled for the same date and time as the hearing regarding Mr. Amann's subpoena in Mr. Hanks' case, thereby precluding Mr. Amann from attending the subpoena hearing. During the *Garrity* interview, the OAG asked Mr. Amann questions about Mr. Hanks' claims.

On August 17, 2016, Ms. Romano informed Mr. Amann that she had drafted a Notice of Intent to Terminate, but she declined Mr. Amann's request for the documents upon which the termination relied. On September 8, 2016, Ms. Romano mailed the Notice of Intent to Terminate to Mr. Amann. The notice contained two fabricated claims justifying Mr. Amann's termination, one of which was subsequently withdrawn by the Solicitor General, Tyler Green, on grounds that it was without basis.

On December 2, 2016, Mr. Amann was formally terminated. He initiated suit in state court exactly 180 days later on May 30, 2017.

## II. LEGAL STANDARD

Under Rule 12(b)(6), a defendant may move to dismiss a claim when the plaintiff fails to state a claim upon which relief can be granted. The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties may present at trial but to "assess whether the

---

[4] A *Garrity* interview arises when a government employer compels an interview with its employee in connection with an investigation into potential internal criminality, circumstances that implicate the Fifth Amendment's protection against self-incrimination. *See Garrity v. New Jersey*, 385 U.S. 493 (1967).

plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (quoting *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1108 (10th Cir. 1991) (citing *Scheuer v. Rhodes*, 416 U.S. 232 (1974)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff has alleged facts that allow "the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### III. ANALYSIS

Defendants request dismissal of Mr. Amann's whistleblower claim under the Utah Protection of Public Employees Act (the "UPPEA") for failure to strictly comply with the Utah Governmental Immunity Act's (the "UGIA") undertaking requirement. On Mr. Amann's Title VII retaliation claim, defendants seek an order limiting the actionable events to Mr. Amann's termination, arguing that all possible adverse actions that pre-date that event are time-barred. Finally, on Mr. Amann's § 1983 claim, Mr. Reyes seeks dismissal on grounds that he is entitled to qualified immunity, and Ms. Romano argues that she is entitled to qualified immunity from liability for any events that occurred before she was made Chief Civil Deputy in October of 2015. The court addresses each argument in turn.

A. UPPEA CLAIM

1. **Defendants' Motion to Dismiss the UPPEA Claim is Construed as a Motion for Reconsideration**

Before this action was removed to federal court, defendants moved the state court to dismiss Mr. Amann's UPPEA claim on grounds that he had failed to file a $300 undertaking simultaneously with the complaint. That motion was denied by the state court on February 28, 2018. (ECF No. 34-2).

In aid of judicial economy, removal to federal court does not vitiate proceedings conducted in the state tribunal. Rather, under 28 U.S.C. § 1450, "[a]ll injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court." Thus, this action arrived in federal court with an order "in full force and effect" denying defendants' motion to dismiss for failure to file an undertaking simultaneously with the complaint.

As the defendants rightly argue, this court may "treat the order as it would any such interlocutory order it might itself have entered." *See* ECF No. 22 at 3 (quoting *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1304 (5th Cir. 1988)). Thus, insofar as defendants seek dismissal of the UPPEA claim due to the allegedly untimely filing of the undertaking, the court construes defendants' motion to dismiss as a motion for reconsideration.[5]

---

[5] Defendants also raise a statute of limitations defense to the UPPEA claim, asking this court to enter a ruling limiting recovery flowing from any adverse action alleged to have occurred outside of the 180-day limitations period. Mr. Amann responds that he does not bring separate UPPEA claims for each adverse action, acknowledging that the only adverse action for which he can recover is his termination since he filed suit exactly 180 days after that event. Thus, the limitation sought is moot and not properly subject to a motion to dismiss. For the parties' benefit, the court notes that the Utah Supreme Court recently clarified the operation of the UPPEA's limitations period, holding that a UPPEA claimant may recover only those damages that are causally connected to events that occurred within the 180-day limitations period. *See Zimmerman v. University of Utah*, 417 P.3d 78, 85 (Utah 2018). This framework is to be contrasted with a Title VII claim alleging a hostile work environment—discussed below—in

"Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice."[6] *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). Defendants have not cited to an intervening change in controlling law, nor have they adduced evidence that was previously unavailable. Thus, the court will modify or vacate the order denying defendants' motion to dismiss only if doing so is necessary to correct clear error or prevent manifest injustice. For the reasons below, however, the court need not rely on this standard to find that the state court's order requires no revision.

2. **The State Court Order**

The crux of the motion to dismiss litigated before the state court centered around the appropriate interpretation of Utah Code § 63G-7-601, which reads:

> Actions governed by Utah Rules of Civil Procedure -- Undertaking required.
> (1) An action brought under this chapter shall be governed by the Utah Rules of Civil Procedure to the extent that they are consistent with this chapter.

---

which a single timely event can, under appropriate circumstances, render the entire series of events, even those outside of the limitations period, actionable as a single adverse action.

[6] Defendants' motion for reconsideration, directed as it is to a non-final order, is not explicitly provided for by the Federal Rules of Civil Procedure. Nevertheless, "[i]t is within the District Judge's discretion to revise [its] interlocutory orders prior to entry of final judgment." *See Anderson v. Deere & Co.*, 852 F.2d 1244, 1246 (10th Cir. 1988); Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). But whether brought as a motion authorized by Rules 59 or 60, or as a motion invoking the court's general discretionary authority to revise its own interlocutory orders, the standard is the same: a motion to reconsider "is not at the disposal of parties who want to 'rehash' old arguments." *Nat'l Bus. Brokers, Ltd. V. Jim Williamson Prods.*, 115 F. Supp. 2d 1250, 1256 (D. Colo. 2000) (citation omitted). "Rather, as a practical matter, to succeed in a motion to reconsider, a party must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." *Id.* (internal brackets and quotation marks omitted); *see Christensen v. Park City Mun. Corp.*, No. 2:06-cv-202-TS, 2011 WL 772434, at *1 (D. Utah Feb. 28, 2011) ("[T]he doctrine of judicial economy requires that reconsideration be limited to situations where the Court misapprehended the facts, a party's position, or the controlling law." (internal quotation marks omitted)).

8

> (2) At the time the action is filed, the plaintiff shall file an undertaking:
> > (a) in the amount of $300, unless otherwise ordered by the court; and
> > (b) conditioned upon payment by the plaintiff of taxable costs incurred by the governmental entity in the action if the plaintiff fails to prosecute the action or fails to recover judgment.

Because Mr. Amann filed his undertaking 13 days after initiating suit, defendants moved the state court to dismiss his whistleblower claim for failure to file an undertaking "[a]t the time the action [was] filed[.]" § 63G-7-601(2). Defendants urged a rigid interpretation of the statute under which a failure to file the $300 undertaking simultaneously with the complaint requires dismissal. Mr. Amann argued for a purposive interpretation of the undertaking requirement—the purpose of which has been characterized by the Utah Supreme Court as a mechanism to deter nuisance suits. *See Hansen v. Salt Lake Cty.*, 794 P.2d 838, 841 (Utah 1990). Thus, Mr. Amann argued, the statute should be interpreted to permit the undertaking to be filed at any time before the government begins acting in its defense.

On the basis of the parties' memoranda and oral arguments, Utah's Third Judicial District Court denied defendants' motion to dismiss by telephone on February 27, 2018.[7] The state court rejected the interpretations urged by both parties, instead finding that the statute requires the undertaking to be filed "as soon as practical under the [filing] system in place."

---

[7] Defendants argue that the state court did not enter an order because its ruling was not reduced to writing in the form of an order delineating its Findings of Fact and Conclusions of Law until after this action was removed to federal court. But the transcript of the oral ruling reveals that the court definitively resolved the motion and adjudicated the parties' legal rights and responsibilities as they related to the undertaking. Thus, defendants' representation that the motion was still "under advisement" at the time of removal is without basis. (ECF No 13 at 2). Defendants further argue that the state court's refund of the plaintiff's undertaking was in error because it occurred after this action was removed. This too must be rejected. In its February 28, 2018 oral ruling, the state court found the $300 undertaking unnecessary and ordered that it be refunded. That the refund was not processed until after removal matters not one bit. That order remained "in full force and effect" upon removal, and this court finds no grounds to revise the state court's order in this respect. *See* 28 U.S.C. § 1450.

9

In denying defendants' motion to dismiss, the state court first noted that the Utah Supreme Court has consistently interpreted the undertaking requirement as non-jurisdictional.[8] *See Marziales v. Spanish Fork City*, 423 P.3d 1145, 1149 (Utah 2017) ("In contrast to other procedural requirements of the Governmental Immunity Act, failure to comply with [the undertaking provision] does not bar a suit."[9] (quoting *Hansen*, 794 P.2d at 840)). Next, the state court—having found that simultaneous filing of the undertaking and complaint was impossible under the state's Green Filing system—reasoned that a strict construction of subsection 601(2) "would raise serious due process concerns, inasmuch as the statute would set forth [a] requirement that the Court essentially makes an impossibility." (ECF No. 34-2 at 9).[10]

---

[8] Defendants suggest that an amendment enacted after *Hansen* and *Marziale* made the undertaking requirement jurisdictional, effectively abrogating those holdings to the contrary. Defendants appear to argue that, under the current version of 601(2), the $300 undertaking is an absolute requirement, and a court no longer plays any role in setting the amount of the undertaking. As a result, defendants contend that the current undertaking requirement is jurisdictional. The court need not address the logical gap in this argument because its premise fails in the first instance: subsection 601(2) still clearly contemplates that a court may alter, or even excuse, the undertaking requirement, declaring that "the plaintiff shall file an undertaking . . . in the amount of $300, unless otherwise ordered by the court[.]" (emphasis added).

[9] As the state court noted, the practical effect of this interpretation is not crystal clear. The Utah Supreme Court has suggested that at least one result is that a failure to timely file an undertaking is not properly the subject of a motion to dismiss, "although it may be appropriate to raise the issue by a motion analogous to one made under rule 12(k)." *Hansen*, 794 P.2d at 840. Rule 12(k) provides that "[i]f a plaintiff files to file an undertaking as ordered within 30 days of the service of the order, the court shall, upon motion of the defendant, enter an order dismissing the action." The parties disagree about, and the state court expressed puzzlement regarding, the significance of the rule 12(b) versus rule 12(k) distinction. Without delving into the procedural intricacies of Utah law, the court finds that rule 12(k) evinces a more forgiving approach to the undertaking requirement, permitting an opportunity to cure before dismissal is warranted. The fact that the Utah Supreme Court has identified rule 12(k) as the appropriate procedure through which to address defects involving the undertaking requirement militates against the interpretation advocated by defendants.

[10] The state court also noted, and this court agrees, that subsection 601(2) and its predecessor "are a little confusing in that they both appear to anticipate some court action, yet don't really provide a mechanism for court action[.]" (ECF No. 34-2 at 11). This feature reinforces an interpretation of the statute that does not require strict compliance. Indeed, subsection 601(2) and its predecessor both contemplate that court action may be taken simultaneously with the filing of

Applying that interpretation, the state court found that Mr. Amann—having filed the undertaking thirteen days after his complaint—failed to file the undertaking as soon as practical under the circumstances. Thus, it concluded that he did not strictly comply with § 63G-7-601. But Mr. Amann orally moved for an extension of time to file the undertaking under Rule 6(b)(1)(B) of the Utah Rules of Civil Procedure, which permits a court to grant an extension of time "after the time has expired if the party failed to act because of excusable neglect." The state court granted his motion, finding excusable neglect based on:

> 1) the previously discussed issues with e-filing; 2) Plaintiff counsel's practical experience with filing, and her assertion that this is the procedure which she has followed and which has been allowed by the Courts; and 3) the language of Utah Code § 63G-7-601, both the amendment and the previous version appear to require action that is not physically possible.

(ECF No. 20-4 at 4). This decision to grant Mr. Amann's rule 6 motion rendered the filing of the undertaking timely. But the state court went one step further and ordered the then timely undertaking refunded to Mr. Amann, finding that the complaint—far from a frivolous nuisance suit—was "extremely well pled and supported." (ECF No. 34-2 at 12).

---

the undertaking, an impossibility under a strict construction of "[a]t the time the action is filed[.]" Defendants filed a notice of supplemental authority, (ECF No. 37-1), consisting of a recent Utah Court of Appeals opinion that addresses, in passing, the difference between the two versions of subsection 601(2). In *Zemlicka v. West Jordan City*, --- P.3d ---, 2019 UT App. 22, the court interpreted the previous version of subsection 601(2), and remarked that the amended version—applicable to the events in this case—"resolves the logistical impossibility created by the prior statute[.]" *See id.* at ¶ 3. But decisions of the Utah Court of Appeals are not binding on this court, and the court does not find this dictum persuasive because the plain language of the amended version clearly contemplates action that is logistically impossible. The amended version of subsection 601(2) provides that, "[a]t the time the action is filed, the plaintiff shall file an undertaking: (a) in the amount of $300, *unless otherwise ordered by the court*[.]" (emphasis added). Accordingly, payment of the $300 undertaking in the first instance is conditioned on the *non-occurrence* of a contrary court order. Thus, the logistical impossibility of obtaining a court ruling prior to the filing of a complaint and simultaneous undertaking clearly persists in the current version of the UGIA.

### 3. The State Court Order Does Not Require Revision

The defendants vigorously object to the state court's ruling extending Mr. Amann's time to file the undertaking. They argue that under Utah Supreme Court precedent, the UGIA's "comprehensive" undertaking requirement displaces Rule 6 of the Utah Rules of Civil Procedure. Because the state court did not fully analyze this issue in its ruling, the court reviews the relevant law in greater detail below.

Defendants rely on *Craig v. Provo City*, in which the Utah Supreme Court held that the UGIA is "all-encompassing *on the matters that it regulates in comprehensive detail*[.]" *Craig v. Provo City*, 389 P.3d 423, 427 (Utah 2016) (emphasis in original). Defendants argue that the UGIA's undertaking requirement is one such matter. The court is unpersuaded.

As an initial matter, the question presented in *Craig* was whether a separate, generally applicable savings statute could operate to revive a claim that was time-barred under the limitations period prescribed by the UGIA. In contrast, the question here involves the interaction between the UGIA and Rule 6 of the Utah Rules of Civil Procedure, a relationship addressed by the UGIA itself: "An action brought under this chapter shall be governed by the Utah Rules of Civil Procedure to the extent that they are consistent with this chapter." § 63G-7-601(1).

In *Marziales*, the Utah Supreme Court applied this directive to conclude that nothing in Rule 3 of the Utah Rules of Civil Procedure—providing that "[d]ishonor of a check or other form of payment does not affect the validity of the filing"—is inconsistent with the undertaking provision. *See* 423 P.3d at 1150. The court went on to consider whether *Craig* nevertheless barred application of rule 3 to the undertaking requirement. Answering in the negative, the court explained that the UGIA "does not generally displace all otherwise applicable law, but [that] it is 'comprehensive' and 'all-encompassing' on the 'matters that it regulates in comprehensive detail." *Id.* The court clarified that portions of the UGIA will be considered comprehensive when

they "specifically regulate an area and contain no language to support the idea that they should be supplemented." *Id.*[11]

There is little doubt that the UGIA's sparse undertaking section—which raises more questions than it answers—is not a portion of the UGIA that is regulated in comprehensive detail. Indeed, the undertaking portion facially contemplates that it be supplemented by other generally applicable laws in that it provides for court action simultaneous with the filing of the undertaking without creating a procedure to facilitate it.[12]

This conclusion is reinforced by *Marziales*' holding that rule 3 of the Utah Rules of Civil Procedure was applicable to the undertaking requirement, thereby implicitly finding that the undertaking requirement is not comprehensive. *Id.* Indeed, the *Marziales* court repeatedly distinguished the undertaking portion of the UGIA from the decidedly comprehensive and all-encompassing portion of the UGIA that governs a notice of claim. *See id.* ("We emphasize that our determination today that rule 3 is not displaced by the provisions of the [UGIA] extends only to the filing of an undertaking, not to the other prerequisites to filing an action under the [UGIA] such as a notice of claim.").

---

[11] At oral argument, defense counsel summarized *Craig* thusly: "*Craig* states that the governmental immunity act is comprehensive as to *everything that it discusses*." (emphasis added). As shown above, this is not what *Craig* states. Though the OAG would evidently prefer that the UGIA displace all law it could plausibly be construed to touch, *Craig's* clarification in *Marziales*—which explained that the UGIA "*does not* generally displace all otherwise applicable law, but [that] it is 'comprehensive' and 'all-encompassing' on 'the matters that it regulates in comprehensive detail'"—evidences a more circumscribed view of the preemptive scope of the UGIA than that espoused by the OAG.

[12] At oral argument, defense counsel represented that a UGIA plaintiff is required to make a separate motion before the court can alter or waive the undertaking requirement. But the court can find no provision for a special undertaking motion in the UGIA, and defendants could not explain why the purportedly "comprehensive" undertaking portion permits such a motion while displacing rule 6 of the Utah Rules of Civil Procedure. Under the OAG's reading, it seems, *Craig* requires displacement of any and all rules that operate adversely to the state.

In sum, an analysis of *Craig*'s framework for determining whether a portion of the UGIA is comprehensive, the Utah Supreme Court's application of that framework to the undertaking provision in *Marziales*, and the Utah Supreme Court's consistent interpretation of the undertaking requirement as non-jurisdictional all persuade the court that the undertaking requirement is perfectly compatible with Rule 6 of the Utah Rules of Civil Procedure. Thus, the state court's grant of an extension of time thereunder—rendering timely Mr. Amann's undertaking filed thirteen days after the filing of the complaint and six weeks before defendants were even served—requires no revision by this court.

Moreover, even if Rule 6 were incompatible with the UGIA's undertaking portion, subsection 601(2) unambiguously vests courts with the authority to vary the undertaking amount. Pursuant to that grant of discretion, the state court set the undertaking amount to zero, thereby "alleviating the plaintiff of the undertaking requirement in this case[.]" (ECF No. 34-2 at 12). This court finds no grounds to revise that ruling.

Defendants' motion to reconsider the state court's ruling denying its motion to dismiss the UPPEA claim for failure to file a timely undertaking is therefore denied.

## B. Title VII Claim

"Title VII makes it unlawful to retaliate against an employee for opposing practices made unlawful by the statute." *Hansen v. SkyWest Airlines*, 844. F.3d 914, 924 (10th Cir. 2016); 42 U.S.C. § 2000e-3(a). Mr. Amann alleges that he was retaliated against for reporting Title VII violations and participating in investigations and legal proceedings emanating from a co-worker's allegations of sexual harassment.

Before filing suit under Title VII, a plaintiff must file a charge with the Equal Employment Opportunity Commission (EEOC) either 180 or 300 days "after the alleged

unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). The parties agree that Mr. Amann was subject to the 300-day timeframe for filing his charge.

Defendants seek a ruling limiting recovery on Mr. Amann's Title VII claim to damages arising from his termination, which is the only event alleged to have occurred within 300 days of filing his charge. Mr. Amann responds that because the unlawful employment conduct he suffered was a hostile work environment comprised of a series of events, rather than discrete actionable harms, he may seek recovery for the OAG's entire course of conduct so long as at least one constituent component thereof occurred within 300 days of his EEOC filing.[13]

The Supreme Court in *National Railroad Passenger Corp. v. Morgan*, repudiating more permissive approaches that had arisen in the lower courts, held that Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period." 536 U.S. 101, 105 (2002). Nevertheless, *Morgan* made clear that if a Title VII plaintiff can establish an actionable hostile work environment claim, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability" if at least some portion of the conduct occurred within 300 days of filing the charge. *See id.* at 117. Thus, the critical question for purposes of this motion is whether Mr. Amann has adequately alleged the existence of a hostile work environment—a single unlawful employment practice comprised of a series of events—or whether he has alleged a number of discrete, individually actionable, adverse actions.

---

[13] Mr. Amann also alleges harms that occurred after he was terminated—*e.g.*, that the OAG provided false information to prospective employers. Post-termination conduct obviously cannot contribute to a hostile work environment, so the court will not consider it for purposes of that analysis. Defendants separately argue that Mr. Amann has not exhausted his administrative remedies as to the alleged adverse actions that occurred after his termination. But defendants' one-sentence argument on this point fails to comply with Rule 7(b)(B) of the Federal Rules of Civil Procedure, which requires movants to "state with particularity the grounds for seeking the order[.]" As a result, the court will not consider this perfunctory challenge. Defendants remain free to raise this argument at a later stage of these proceedings, provided they support it with the required analysis.

If it is the latter, the earliest event for which Mr. Amann filed a timely charge with the EEOC is his termination.

"Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify." *Id.* at 114. "Hostile environment claims are different in kind" in that "[t]heir very nature involves repeated conduct." *Id.* at 115. A hostile work environment will be found when repeated conduct is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation omitted).

"In determining whether an actionable hostile work environment claim exists, we look to 'all the circumstances,' including 'the frequency of the . . . conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* at 116 (quoting *Harris*, 510 U.S. at 23). The Tenth Circuit has provided two additional considerations to guide the analysis of when a series of acts will qualify as a single actionable hostile work environment practice. *See Hansen*, 844 F.3d at 923. First, whether the acts are "related by type, frequency, and perpetrator." *Id.* (quoting *Duncan v. Manager, Dep't of Safety, City & Cty. of Denver*, 397 F.3d 1300, 1309 (10th Cir. 2005)). And second, "whether the acts occurred when the employee 'was working in the same place.'" *Id.* (quoting *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008)). These factors are non-exclusive; "flexibility is useful in a context . . . as amorphous as hostile work environment." *Id.* (quoting *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2d Cir. 2010)).

In support of his hostile work environment claim, Mr. Amann alleges that, over the course of four years, he was transferred to different departments twice (the first of which resulted

in a 5% decrease in pay), denied a promotion, forbidden (along with all employees of the OAG) from speaking with news media, denied access to evidence of an investigation of which he was a subject, had his computer mirror-imaged, suspended (during which time he was forbidden from speaking with his co-workers), and ultimately terminated.

Although the hostile work environment analysis is a flexible one, these discrete acts cannot combine to create a claim for hostile work environment under any articulation of that phenomenon. Mr. Amann's main argument in support of a coherent hostile work environment claim is that each of the relevant events occurred during the tenure of Attorney General Reyes. But similarity of leadership cannot, without more, convert discrete events into a hostile work environment claim. Moreover, with the exception of two departmental transfers, the conduct alleged is not "related by type," and its frequency does not rise to the level of pervasive. *See Duncan*, 397 F.3d at 1309. Even granting all reasonable inferences in his favor, Mr. Amann has not alleged facts that plausibly suggest he experienced conduct "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment[.]" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation omitted). Instead, the events he alleges are much more like the discrete acts identified by the Supreme Court in *Morgan* as independently actionable. *See Morgan*, 536 U.S. at 114 ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.").

Thus, Mr. Amann's termination is the earliest "alleged unlawful employment practice" for which he may recover.[14]

---

[14] As Mr. Amann notes, nothing in Title VII "bar[s] an employee from using the [untimely] acts as background evidence in support of a timely claim." *See Morgan*, 536 U.S. at 113.

## C. § 1983 CLAIM

Mr. Reyes and Ms. Romano each assert a qualified immunity defense in response to Mr. Amann's § 1983 claim; Mr. Reyes from suit entirely and Ms. Romano from any claim predicated on events that occurred before she was made Chief Civil Deputy of the OAG in October of 2015.

But the court need not resolve the individual defendants' qualified immunity defenses because the complaint is deficient in a more fundamental respect. Specifically, the complaint does not contain sufficient allegations to provide fair notice to the individual defendants of the basis of the § 1983 claims against them. As a result, the complaint will be dismissed without prejudice, and Mr. Amann will be granted leave to amend to address the deficiencies identified herein.

Where multiple defendants are involved, "[i]t is particularly important . . . that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011) (quoting *Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1250 (10th Cir. 2008)); *see also Bulanda v. A.W. Chesterton Co.*, No. 11 C 1682, 2011 WL 2214010, at *2 (N.D. Ill. June 7, 2011) (dismissing complaint that made a number of generic allegations as to the defendants collectively); *Boykin Anchor Co. v. AT&T Corp.*, No. 5:10-CV-591-FL, 2011 WL 1456388, at *4 (E.D.N.C. Apr. 14, 2011) ("Plaintiff's attempt to treat all defendants as one 'corporate family' for purposes of this lawsuit is unfounded.").

In the §1983 context, where individual defendants are generally entitled to assert the defense of qualified immunity at the motion to dismiss stage—and successively thereafter, each time with an interlocutory appeal as of right—it is especially important that the complaint make specific allegations regarding who did what to whom. This is so because resolution of the

18

qualified immunity issue requires analysis of whether the alleged conduct of each individual defendant, taken as true, violates clearly established law. Generalized allegations that "defendants" took certain action frustrates that review.

Here, the operative complaint does not provide sufficient information to adequately apprise the individual defendants of the specific constitutional violation(s) underlying the § 1983 claims against them. While the complaint alleges multiple harms that may well violate Mr. Amann's First Amendment rights, they are often alleged to have been perpetrated by the collective "defendants," or by "the OAG."

As defendants rightly note, there can be no *respondeat superior* liability under § 1983. Thus, while Mr. Amann cannot be expected to know the full extent of the involvement of Mr. Reyes and Ms. Romano in the alleged First Amendment violations, his complaint must specifically allege conduct that will facilitate the court's resolution of whether the individual defendants' conduct violates clearly established First Amendment rights. Of course, those allegations will be entitled, as is required at the motion to dismiss stage, to the presumption of truth, and all reasonable inferences favorable to Mr. Amann will be granted. The qualified immunity analysis will be governed by the complaint alone. *See Sayed v. Virginia*, 744 F. App'x 542, 546 (10th Cir. 2018) (explaining that when qualified immunity is asserted in a Rule 12(b)(6) motion, courts "evaluate 'the defendant's conduct *as alleged in the complaint*'" (quoting *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (emphasis in original)).

At oral argument, Mr. Amann's counsel conceded that the complaint could more fully link the adverse action to the conduct of the individual defendants. The court agrees, and will thus dismiss the complaint without prejudice and grant Mr. Amann leave to amend his complaint to remedy the deficiencies articulated. If Mr. Amann's amended complaint gives rise to a good

faith argument by the individual defendants that the conduct alleged does not violate clearly established law, they may, of course, assert that defense in response.

## IV. ORDER

For the reasons articulated, defendants' amended partial motion to dismiss (ECF No. 13) is **GRANTED IN PART and DENIED IN PART.** Specifically:

1. Defendants' motion to dismiss Mr. Amann's UPPEA claim is denied.

2. Defendants' motion to limit recovery on Mr. Amann's Title VII claim is granted. The earliest event for which Mr. Amann may recover is his termination.

3. Mr. Amann's § 1983 claim is dismissed without prejudice; Mr. Amann is granted leave to amend the complaint in conformity with this order within **28 days of the date of this order.**

Signed February 28, 2019

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge