APRIL L. HOLLINGSWORTH (Bar No. 9391)
KATIE PANZER (Bar No. 16919)
**HOLLINGSWORTH LAW OFFICE, LLC**
1881 South 1100 East
Salt Lake City, Utah 84105
Telephone: 801-415-9909
april@aprilhollingsworthlaw.com
katie@aprilhollingsworthlaw.com
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DIVISION OF UTAH

| | |
|---|---|
| **PAUL G. AMANN,**<br><br>        Plaintiff,<br><br>vs.<br><br>**OFFICE OF THE UTAH ATTORNEY GENERAL, SEAN REYES, BRIDGET ROMANO, CRAIG BARLOW, SPENCER AUSTIN, TYLER GREEN, AND DANIEL WIDDISON,** in their official and individual capacities,<br><br>        Defendants. | **SECOND AMENDED COMPLAINT**<br><br>Case No. 2:18-CV-00341-JNP-DAO<br><br>Judge Jill N. Parrish<br>Magistrate Judge Daphne A. Oberg |

Plaintiff Paul G. Amann by and through counsel, hereby submits the following Amended Complaint against Defendants Office of the Utah Attorney General ("OAG"); Utah's Attorney General Sean Reyes ("Reyes"); Former Chief Civil Deputy Attorney General Bridget Romano ("Romano"); Criminal Deputy Craig Barlow

("Barlow"); Solicitor General Tyler Green ("Green"); and Assistant Attorney General Daniel Widdison ("Widdison"), (collectively "Defendants").

## **NATURE OF CASE**

This is an action against OAG seeking redress for wrongful termination in violation of the Utah Protection of Public Employees Act, Utah Code Ann. § 67-21-1, *et seq.* ("the Whistleblower Act"), for retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and for breach of contract for violating its own policies. It is also an action against Defendants, in their individual and official capacities, for violating his right to free speech and due process in violation of 42 U.S.C. § 1983.

## **PARTIES, JURISDICTION AND VENUE**

1.      Mr. Amann is an individual residing in Salt Lake County, Utah.

2.      Defendant OAG is an executive office within the state of Utah and at all relevant times was Plaintiff's employer.

3.      Defendant Sean Reyes is the Utah Attorney General since his appointment by Governor Gary Herbert on December 23, 2013. He is being sued in both his individual and official capacities.

4.      Defendant Bridget Romano was appointed Chief Civil Deputy Attorney General by Sean Reyes and was acting as such at all times relevant to the claims raised herein. Upon information and belief, Romano resides in Salt Lake County. She is being sued in both her official and individual capacities.

5.      Craig Barlow was the Division Chief of the Children's Justice Division when Reyes took office. In March 2016, Reyes appointed Barlow to "Criminal Deputy." Barlow acted as a member of the executive team at all times relevant to the claims herein. He is sued in his individual and official capacities.

6.      Spencer Austin is the Chief Criminal Deputy for OAG and was acting as such at all times relevant to the claims herein. He is sued in his individual and official capacities.

7.      Tyler Green is the Solicitor General for the OAG and was acting as such at all times relevant herein. He is sued in his individual and official capacities.

8.      Daniel Widdison is an Assistant Attorney General in the Litigation Division, who participated in and facilitated the acts complained of herein. He is sued in his individual and official capacities.

9.      This Court has jurisdiction over the actions asserted in this matter under 28 U.S.C. §§ 1331, 1441(a), and 1446, pursuant to the Defendant's removal of this action from the Third Judicial District Court, Salt Lake County, State of Utah, where it was originally filed.

10.     Venue is proper in this Court under pursuant to 28 U.S.C. § 1391, because the causes of action arose within this District.

11.     Mr. Amann filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") in March 2017, alleging retaliation under Title VII for protected activity concerning harassment.

12.     On January 9, 2018, the United States Department of Justice issued Mr.

Amann a Notice of Right to Sue.

13.     All administrative prerequisites have been met.

14.     On March 22, 2017, Mr. Amann sent OAG a Notice of Claim pursuant to the Governmental Immunity Act of Utah, Utah Code Ann. § 63G-7-401 *et seq.*, alleging that Mr. Amann was wrongfully terminated in violation of the Whistleblower Act (among other violations). OAG did not respond to the Notice of Claim, the time for doing so having expired and the initial Complaint asserting the Whistleblower claim was filed on May 30, 2017.

## GENERAL FACTUAL ALLEGATIONS

15.     In August 1998, OAG hired Mr. Amann as an attorney in the Child Protection Division ("CP Division"). It promoted him to representing the Internet Crimes Against Children ("ICAC") Task Force in April, 2003, and he transferred to the Children's Justice Division.

16.     In September 1999, OAG recognized Mr. Amann as having earned "career service status," which means that he was a merit employee who could only be terminated for cause. As such, as of 1999, Mr. Amann had a property interest in his employment with OAG.

17.     Mr. Amann was the most successful OAG prosecutor of felony crimes committed by child predators and child pornographers in the history of the state of Utah.

18.     Mr. Amann excelled in the role and was lauded for his performance both

in and outside the office. Notably:

    a.  In 2007, he was awarded OAG Attorney of the Year;

    b.  In 2008, he was nominated for the 2008 Governor's Award for Excellence, and in a letter of commendation to him, then-Attorney General Mark Shurtleff, wrote, "you are number one in my book."

    c.  In 2011, he was lead prosecutor for the ICAC when the Department of Justice named the unit the "Outstanding Local Prosecutor's Office";

    d.  In 2013, Prevent Child Abuse Utah named him "Child Advocate of the Year" – an award which no other Assistant Attorney General has ever won;

    e.  In 2014, Utah Public Employees Association gave him its Award of Excellence; and

    f.  On May 18, 2015, just five months prior to OAG suspending Mr. Amann, Mr. Amann's Division director awarded him two Superior Service Awards and two Appreciation Awards, and all four awards included financial bonuses.

19.    Mr. Amann's employment difficulties began in April 2013, under Attorney General John Swallow, when he began, in good faith, reporting OAG violations of state and federal law and misuse of government funds. Thereafter, OAG retaliated against him because of his reports, as explained below.

20.    Specifically, in April 2013, Mr. Amann learned that his supervisors, Kris

Knowlton and Craig Barlow, planned to have paralegal Cindy Poulson, a paralegal

whose position was funded by ICAC (a federal grant program), work on state cases in

violation of federal grant restrictions, and to do the work of an attorney.

21.     Mr. Amann reported his concerns about misuse of federal funds to OAG

Civil Chief Kirk Torgensen.

22.     On April 25, 2013, Mr. Amann was moved from ICAC to the Securities

Division. This opened up a position available for Poulson.

23.     Mr. Amann did not know it at the time he was moved, but Poulson was

Barlow's love interest, and Barlow sought to have her promoted within the Children's

Justice Division.

24.     On June 5, 2013, Barlow informed Mr. Amann that his pay would be

decreased by 5%. Mr. Amann would later learn that Barlow was looking for resources

to fund an attorney position for Poulson.

25.     Poulson was convicted felon who had served time in the Utah State

Prison for, among other crimes, assaulting a law enforcement officer.

26.     On the morning of December 23, 2013, Mr. Amann entered his office

and discovered that someone had slipped copies of several documents under his door,

The documents included copies of sexually suggestive communications between

Poulson and Barlow, indicating they were having an affair. The documents also

included a copy of Poulson's employment contract, dated July 30, 2013 and generated

by Barlow, which was for an indefinite time period and gave Poulson complete

employment protection. The contract stated that she had practiced law for three years

and that she was in good standing with the Utah State Bar, both of which are inaccurate.

27.     Mr. Amann immediately scanned the documents to himself and sent them to a friend who worked for the FBI.

28.     The same day, December 23, 2013, Sean Reyes was appointed to serve as the Utah Attorney General after John Swallow resigned.

29.     Reyes had ostensibly committed to cleaning up corruption in OAG, but when Mr. Amann informed him that he had matters he needed to discuss with him, Reyes refused to speak with him.

30.     On Saturday, December 28, 2013, Mr. Amann provided Lee Rech, Reyes' campaign communications director, access to the OAG Intranet site as she was fielding calls and doing interviews regarding a high profile case. Reyes never claimed this was inappropriate, but nearly three years later, in September 2016, Defendant Romano would claim this was an aggravating factor that supported terminating Mr. Amann.

31.     On January 2, 2014, the salacious emails between Barlow and Poulson were reported in the press.

32.     On January 9, 2014, reporter Lynn Packer published a story about Barlow's support of Poulson's promotion to attorney. The same day, OAG disclosed to Packer that it was opening an investigation into the "leaked emails and hiring standards," *not* into the inappropriate conduct of Barlow and Poulson.

33.     Later that month, OAG conducted an investigation into "the break in of

Poulson's office," focused on Mr. Amann. As part of that investigation, OAG copied Mr. Amann's hard drive of his computer and searched his office.

34.     In February 2014, after no one in the new OAG administration responded to his attempts to complain about his concerns about Barlow and Poulson, Mr. Amann reported his concerns to the Department of Human Resources Management ("DHRM") in early 2014.

35.     On February 21, 2014, DHRM interviewed another assistant attorney general, Jenette Turner, regarding the Barlow/Poulson affair.

36.     In March 2014, Mr. Amann interviewed with Spence Austin and Brian Tarbet for a Division Director position. Austin and Tarbet did not contact any of the 59 references Mr. Amann provided them in support of his candidacy.

37.     On March 11, 2014, Mr. Amann met with DHRM investigators regarding his complaints of corruption in OAG, including the harassment of whistleblower Jenette Turner. The following day, Mr. Amann sent the investigators the documents that had been placed under his door.

38.     On March 17, 2014, Mr. Reyes and the OAG issued a "gag order" preventing OAG employees from publicly reporting corruption, stating:

> All communications with media, or those claiming to be media, concerning the Attorney General's Office including policies, personnel, cases or any other UAG business that take place outside of this system are subject to immediate disciplinary actions up to and including termination.

39.     On March 25, 2014, reporter Lynn Packer reported on an affair Poulson was having with a different attorney (in addition to Barlow).

40.     On May 15, 2014, Jenette Turner was placed on administrative leave. Her tablet and cell phone were seized, and the following week, her office computer was seized.

41.     Three days later, on May 18, 2014, Reyes announced new Division Directors. Che Arguello was chosen as the Commercial Enforcement Director, and Greg Ferbrache as the Criminal Justice Division Director. Reyes passed Mr. Amann over for a promotion to Division Director although his qualifications, experience, performance, and tenure with the office well surpassed those whom he chose to appoint as Director for both the divisions for which Mr. Amann applied.

42.     On June 23, 2014, Jenette Turner was disciplined for speaking out about Poulson.

43.     In August 2014, after an "investigation" that was tightly controlled by OAG, DHRM concluded its investigation into the Craig Barlow/Cindy Poulson matter and found no sexual harassment by Barlow (based on the willingness of Poulson and that it was merely a "physical romantic relationship"). The investigation report ignored how the relationship created a hostile work environment for others in the office. Mr. Amann later obtained the unredacted original draft report from the investigation, which contained statements that Barlow has exposed OAG to liability due to his misconduct with Poulson and recommendations that Barlow and Poulson be sanctioned for IT violations. This information was removed from the final report.

44.     In early September 2014, Mr. Amann raised his concern to his Commercial Enforcement Division supervisor that an analyst for the Securities Division,

Skaggs, was violating § 61-1-21.5 of the Securities Act and acting in contravention of the recommendations of the 2008 Legislative Audit of the Utah Securities Division.

45.     Almost immediately thereafter, OAG, through Securities Division Director Keith Woodwell and Arguello, began scrutinizing Mr. Amann.

46.     On September 18, 2014, Spencer Austin emailed Reyes stating he would like to replace Mr. Amann.

47.     On September 25, 2014, Woodwell filed a complaint to DHRM on behalf of Skaggs against Mr. Amann, based on Skaggs' claim that Mr. Amann was "bullying" her. The same day, Austin authorized an investigation by DHRM into Woodwell/Skaggs' allegations against Mr. Amann.

48.     On October 9, 2014, Austin notified Mr. Amann that he was being moved from representing the Securities Division to the Antitrust Division, against his will, allegedly due to a co-worker "complaint" filed on September 25, 2014. (The complaint was investigated jointly by OAG and DHRM and dismissed as unsubstantiated on November 19, 2014.)

49.     On October 21, 2014, Mr. Amann requested records regarding the investigation into the September 25th co-worker complaint. Woodwell acknowledged receipt of Mr. Amann's request and promised compliance.

50.     On November 5, 2014, Woodwell refused to release the records. Mr. Amann then filed GRAMA requests to DHRM to discern the basis for the September 25th complaint and to receive the report from the joint DHRM/OAG investigation. DHRM denied his requests.

51.     Mr. Amann appealed to the DHRM Director, who denied the request, and Mr. Amann later appealed to the State Records Committee ("SRC").

52.     OAG defended against Mr. Amann's GRAMA requests, acting as counsel to DHRM.

53.     On January 6, 2015, Bridget Romano, then Solicitor General, and Brian Tarbet, then Civil Chief Deputy, met with Mr. Amann and informed him he was not eligible for recovery of the decrease in pay he lost when he was removed from ICAC. (Other managers who received decreases recovered the amounts and others, like Barlow and Tracy Tabet, never had their pay decreased, despite losing management positions.)

54.     On January 8, 2015, the State Records Committee ("SRC") ruled in favor of Mr. Amann's request for records regarding the September 25th complaint against him. OAG appealed this ruling to Third District Court.

55.     On April 1, 2015, Assistant Attorney General Mark Burns (Division Director over Highways and Utilities) caused Mr. Amann to be served by a constable with OAG's appeal of the SRC's ruling in his favor, in front of his colleagues, despite Mr. Amann having informed Burns that he would accept service.

56.     In April 2015, Mr. Amann met with Susan May, then the Director of Human Resources, and DHRM investigator Mike Tribe concerning a complaint made by his colleague, AAG Jason Hanks, that a coworker was sexually harassing Hanks. Mr. Amann provided evidence in support of Hanks' complaint. May later determined that the sexual harassment experienced by Mr. Hanks four times by another man in the office was not sufficiently "pervasive" for OAG to take action.

11

57.     Mr. Hanks appealed that finding to the Utah Labor Commission and Mr. Amann then provided testimony to the Labor Commission.

58.     On April 10, 2015, the OAG Division Directors approved a change to the policy manual to allow for challenges to BCI background checks by employees, like Poulson, who fail background checks.

59.     After a series of GRAMA appeals by both OAG and Mr. Amann, Mr. Amann also filed a GRAMA suit in Third District Court on June 24, 2015.

60.     Also on June 24, 2015, the Salt Lake Tribune published a story entitled, "AG's Office Needs Whistleblower Protection."

61.     In July 2015, the state court granted Mr. Amann's Motion for Summary Judgment and ordered OAG to produce certain documents Mr. Amann requested. Thus, Mr. Amann substantially prevailed against the OAG on both court cases.

62.     In the documents obtained through the GRAMA process, Mr. Amann learned that his Securities Division Director, Che Arguello, had been soliciting damaging information regarding Mr. Amann from the Securities Division as part of an "investigation" on September 8, 2014, prior to the filing of any complaint against Mr. Amann.

63.     On July 8, 2015, Mr. Amann met with legislative auditors, who interviewed him and  fellow AAG Jenette Turner concerning OAG corruption and lack of whistleblower protection for employees.

64.     The legislative auditors asked for additional information regarding Mr. Amann's concerns. On July 17, 2015, Mr. Amann provided them with 14 pages of bullet

points regarding OAG corruption and on July 27, 2015, he provided them with several documents regarding Poulson, including OAG's new policy regarding background checks.

65.     Additionally, in July 2015, Mr. Amann was named as a corroborating witness in a lawsuit brought by Mr. Hanks in Third District Court against OAG for sexual harassment of and retaliation against Mr. Hanks involving on-the-job sexual assaults that Mr. Hanks suffered.

66.     On August 21, 2015, Poulson sent a pardon application to the Utah Board of Pardons, in which she included a BCI certificate claiming she had no criminal history, which was false. Poulson apparently obtained the certificate by leaving out the date of birth from one of her aliases, Karen Openshaw, which was different from her actual birthdate.

67.     On August 23-28, 2015, Poulson went to a prosecutor training called the "National Computer Forensic Institute" in Alabama, provided by the Secret Service. At the training, Barry Page, Deputy Director of the National Computer Forensic Institute ("NCFI") of the Secret Service, purportedly approached Poulson with a letter and court records regarding her criminal history that he stated he had received in the mail.  OAG later terminated Mr. Amann based on an allegation that he sent the packet of documents to Page.

68.     On September 3, 2015, ICAC agents Alan Connor and Alan White surreptitiously searched Mr. Amann's office, mirror-imaged Mr. Amann's office computer hard drive, and conducted a forensic exam of his hard drive. Through that

exam, OAG found many files in which Mr. Amann had been documenting corruption within the OAG office. For example:

    a.  OAG found and documented finding a file labeled "Notes for meeting with Auditors.7.8.2015.wpd";

    b.  In a folder titled "\Users\pamann\Documents\ANTI-TRUSTS\SCAM," OAG found and documented finding a file with the name "Memorandum to Auditors.pdf" dated July 27, 2015; and

    c.  Among numerous other documents in the SCAM folder, OAG also found and documented finding a document labeled, "Letter to Labor Commission for Hanks.pdf" dated May 20, 2015.

69.    Also on September 3, 2015, Febrache requested access logs for the Heber Wells building for August 10 and 11, ultimately concluding that Mr. Amann had used his access card "after hours" on August 10, even though his logs from August 11 show those were his regular hours.

70.    On September 8, 2015, Mr. Amann and the entire Antitrust section was moved from under the direction of Spencer Austin to that of Bridget Romano.

71.    On September 10, 2015, one week after the forensic exam in which OAG found voluminous evidence that Mr. Amann was documenting corruption, sexual harassment and retaliation at OAG, Poulson (at the request of her supervisors) filed an internal, written complaint alleging "workplace harassment."

72.    In her complaint, Poulson reported that an anonymous tipster had sent a letter and court records to the organizer of a training Poulson attended. The anonymous

tipster advised that Ms. Poulson was not allowed access to databases in her job at OAG's office and provided records of Ms. Poulson's criminal history.

73.     Although Poulson's letter indicates that the anonymous tipster had knowledge of Poulson's calendar and Mr. Amann did not, Defendants initially investigated only Mr. Amann for making the anonymous tip.

74.     Unaware of that investigation, on September 14, 2015, Mr. Amann met with Greg Hargis and Michelle Watts, DHRM investigators, to discuss corruption, sexual harassment, and retaliation for whistleblowing in OAG's office. He also provided details of OAG's failure to take action to protect Hanks from sexual harassment. The interview came on the heels of a Legislative Audit that found OAG's then-current policy lacked sufficient provisions to protect whistleblowers who internally reported employee misconduct (a policy that remains unchanged).

75.     Mr. Amann attended an antitrust conference from September 27-30, 2015. Parker Douglas, OAG chief of staff, also attended, but did not communicate with Mr. Amann. Douglas disappeared early from the conference. When Mr. Amann returned to his hotel room from a session, he discovered his room (with his laptop inside) was left open.

76.     On October 8, 2015, Mr. Amann represented himself in another SRC hearing, wherein he asked OAG to provide him with evidence of an ongoing investigation of Mr. Amann referenced on July 13, 2015 by OAG Chief Federal Deputy and General Counsel Parker Douglas. Hanks appeared at that hearing with Mr. Amann.

77.     Thereafter, Mr. Amann attended a National Association of Attorneys

General Antitrust conference in Arkansas for OAG. Austin, who was no longer Mr. Amann's supervisor, left messages demanding a call back, but then did not answer Mr. Amann's return calls.

78.     The next day that Mr. Amann was in the office, October 19, 2015, Bridget Romano suspended Mr. Amann and placed him on administrative leave. Romano did not provide Mr. Amann with any notice of why he was being disciplined. Further, she ordered Mr. Amann to have no contact with any other OAG employees and not to access any state databases.

79.     At that meeting, in the same building where Mr. Amann had his office, Romano, at Reyes' direction, had two OAG law enforcement officers present, who then escorted Mr. Amann throughout the building after the meeting and while Mr. Amann communicated with his supervisor, Ron Ockey.

80.     Mr. Amann's coworkers, including Jenette Turner, and Ockey witnessed Mr. Amann being escorted from the office by the officers, later inquiring if Mr. Amann was "ok" in light of this humiliating parade of him by law enforcement.

81.     Romano's order to Mr. Amann that he not communicate with any of his colleagues at OAG isolated him from his longtime friends and associates. OAG's written order barred him from his office, office email, client files and any state databases, and relegated him to employment purgatory.

82.     On November 13, 2015, Mr. Amann submitted travel reimbursement forms for over $600 in expenses he had incurred on business travel, but OAG refused to reimburse him for nearly eight months.

83.     On December 17, 2015, Hanks, who had also complained about Poulson, was put on administrative leave. Two agents followed him home and seized his computer and digital storage devices despite his protests that the devices contained Hanks' personal property.

84.     During the next eight months after he was suspended, OAG took no action to investigate the alleged reasons for Mr. Amann's unwarranted leave.

85.     While Mr. Amann and Mr. Hanks were suspended and ordered to have no contact with each other, or access to state databases and state clients (like the Board of Pardons), Poulson had a Board of Pardons hearing. Poulson's bishop, a former member of the Board of Pardons, attended to promote Poulson, and she was granted her second "full and unconditional pardon" based on this hearing. Hanks had done a GRAMA request for BOP records relating to Poulson, and Romano later explained to Detective Dan Child (discussed below) how she prevented Hanks from getting the records.

86.     On May 5, 2016, OAG advertised Mr. Amann's position and filled the position months before providing Mr. Amann with a Notice of Intent to Terminate.

87.     On May 11, 2016, Romano notified Hanks that he needed to appear for a "Garrity interview."

88.     On May 29, 2016, Mr. Amann received a subpoena duces tecum from Mr. Hanks for documents relating to Mr. Hanks' lawsuit against OAG. OAG contacted Mr. Amann on June 17, 2016, and offered to help Mr. Amann respond to the subpoena in an effort to quash it.

89.     Mr. Amann declined OAG's assistance on June 22, 2016. Although OAG

pursued the motion to quash Mr. Amann's evidence or ability to respond to Mr. Hanks' subpoena, it did not prevail.

90.    On June 23, 2016, OAG contacted Mr. Amann and ordered him to come to the office on June 28, 2016, for a "Garrity interview," the same date and time as the hearing on the subpoena Mr. Amann had been served in the Hanks case. Due to OAG's order, OAG effectively prevented Mr. Amann from attending the hearing.

91.    At the June 28, 2016 Garrity interview, OAG again offered to "defend" against Mr. Hanks' subpoena. Mr. Amann again declined OAG's offer.

92.    During the Garrity interview, OAG interrogated Mr. Amann about what he knew about Mr. Hanks' claims.

93.    On August 4, 2016, Mr. Amann responded to Mr. Hanks' subpoena, stating that he could not provide records responsive to the subpoena until and unless he had access to his office and computer.

94.    In early August 2016, Assistant Attorney General Daniel Widdison reiterated to Hanks that he and Mr. Amann were not to have contact with each other.

95.    On August 17, 2016, Mr. Amann and his counsel met with Widdison and Romano, who indicated she had drafted a Notice of Intent to Terminate that she was sending to Reyes. Widdison and Romano refused Mr. Amann's counsel's request for any documents upon which OAG was relying to support termination. Widdison stated OAG would not provide the documents because "it will get used against" them.

96.    On September 8, 2016, Mr. Amann hand-delivered and emailed an ethics complaint against Reyes to Judge Peuhler with the Executive Branch Ethics Committee.

(Pursuant to Utah code, EBEC was required to take initial action within five days.)

97.     On September 9, 2016, Romano mailed a Notice of Intent to Terminate to Mr. Amann. Ms. Romano fabricated two claims to support her Notice of Intent to Terminate Mr. Amann's employment.

98.     Ostensibly, Mr. Amann was being terminated because of Poulson's September 2015 complaint. OAG refused to provide Mr. Amann with a copy of the complaint in September 2016, throughout his termination process, and for several years thereafter. To date, OAG has refused to provide the metadata associated with the complaint.

99.     On September 16, 2016, Mr. Amann sent a letter to Reyes denying all of the allegations in the Notice of Intent to Terminate and requesting a meeting with him. Reyes refused to meet with Mr. Amann and instead, assigned Solicitor General Tyler Green to meet with him.

100.    On October 2, 2016, Mr. Amann submitted a GRAMA request, seeking the documents referenced by Romano in the Notice of Intent to Terminate him. Widdison thereafter denied the GRAMA request, claiming the records are private and protected.

101.    On October 24, 2016, Mr. Amann sent a preservation/litigation hold letter to Reyes, and copied Chris Earl in OAG's IT Department, and Tyler Green, through USPS and email. OAG subsequently claims to have no records of this litigation hold letter.

102.    On October 27, 2016, Mr. Amann's attorney canceled the meeting with

Tyler Green because OAG had failed to provide the documents supporting the allegations against Mr. Amann in the Notice of Intent to Terminate and refused to allow Mr. Amann to record the meeting.

103.    On November 16, 2016, Mr. Amann appealed to Reyes Widdison's denial of Mr. Amann's GRAMA request.

104.    On November 18, 2016, Romano submitted a false declaration to Third District Court Ryan Harris, claiming Mr. Amann was allowed contact with fellow employees, despite the clear language of the administrative leave letter she had provided him that forbid any such contact.

105.    At a November 23, 2016 hearing in Mr. Hanks' case, Mr. Amann appeared with Mr. Hanks and spoke on Mr. Hanks' behalf, indicating that he needed access to his office/computer to provide Mr. Hanks evidence. As a result, the judge in Mr. Hanks' case ordered OAG to permit Mr. Amann access to his office/computer so he could provide the information Mr. Hanks requested in his subpoena. OAG has never complied with that order.

106.    On December 2, 2016, Green drafted a letter terminating Mr. Amann based on false allegations that he was harassing Poulson (although Green withdrew one of Romano's claims as being unsubstantiated). On December 5, 2016, OAG sent a certified letter to Mr. Amann informing him of his termination, and on December 7, 2016 (the 75th anniversary of D-Day), Widdison's and Green's secretaries sent simultaneous emails to Mr. Amann at 4:13 p.m. containing the termination letter.

107.    OAG precluded Mr. Amann from obtaining his personal possessions and

information from his OAG office after that firing. OAG finally relinquished some of Mr. Amann's possessions in November 2017, nearly a year after his termination, but it maintains possession of the remainder of Mr. Amann's possessions.

108.   On December 26, 2016, a Third District Court judge granted Mr. Amann records of the September 2014 complaint solicited by Arguello and Woodwell, authorized by Austin, and ultimately determined to be unfounded by DHRM (see Case No. 150901160).

109.   On January 13, 2017, Mr. Amann sent a letter to AAG Joni Jones requesting access to his office to retrieve records for Hanks' case and to obtain his personal possessions. When Jones did not respond, Mr. Amann sent a second letter to her on January 30, 2017. Romano responded to the letters on February 1, 2017, stating that he should be communicating with Widdison, not Jones. Mr. Amann has never been allowed access to his records.

110.   On February 2, 2017, Widdison submitted a brief to SRC implying Poulson's complaint from September 10, 2015 was written. Widdison further stated with respect to all packets, except the one sent to the Secret Service, that OAG "does not allege that [Mr. Amann] authored these packets, nor do they serve as part of the basis for the discipline imposed on him. Accordingly, he has no right to that information." (Contrarily, in discovery in this case, in December 2020, OAG claimed, "The packets relevant to Romano's investigation that led to Mr. Amann's termination are those that contain information about Cindy Poulson that were sent to Barry Page, her bishop, her stake president, the Board of Pardons, and her gym.")

111.    On February 9, 2017, at an SRC meeting, to prevent Mr. Amann from obtaining it, Widdison claimed that Poulson's complaint was not written, instead claiming it was "verbal," although Romano's Notice of Intent to Terminate of September 9, 2016, had claimed the complaint was written and Widdison's February 2, 2017 brief makes no mention of the complaint being verbal.

112.    On February 20, 2017, Austin commissioned an investigation of Mr. Amann by the Unified Police Department ("UPD") for "stalking" Poulson. UPD Detective Dan Child and Sgt. Mike Ikemiyashiro interviewed Poulson at UPD. Mr. Amann is the only named suspect in the stalking investigation.  The basis for the stalking allegation is the false claim that Mr. Amann sent packets which Widdison admitted OAG does not allege Mr. Amann authored.

113.    On February 21, 2017, SCR issued a ruling ordering OAG to provide "the packet" sent to Barry Page. Widdison falsely claimed the cover letter sent to Page was in the "taint review."

114.    After the SRC committee ordered OAG to turn over records to Mr. Amann, Widdison contacted Poulson and told her about the order, leading her to call the court clerk to request that her case be classified as private.

115.    On March 23, 2017, Poulson obtained an order marking her unsuccessful petition for expungement of her criminal history "Private." Widdison then filed a Petition for Judicial Review of SRC Order of February 21, 2017.

116.    Aware that Mr. Amann would be filing a lawsuit against OAG, Romano drafted legislation to change Utah's Governmental Immunity Act to change the

undertaking requirement to a mandatory payment of $300, unless otherwise ordered. The provision was meant to bar lawsuits from anyone who failed to pay the $300 undertaking contemporaneously with the lawsuit. The legislation passed, and OAG argued unsuccessfully (in state and federal court) that under the new provision, Mr. Amann's lawsuit should be dismissed. (That provision has since been changed.)

117.    On April 3, 2017, UPD Det. Dan Child wrote a search warrant for Mr. Amann's office.

118.    On April 5, 2017, Romano provided Det. Child the internal employment investigation file on Mr. Amann, including the transcript from his Garrity interview, which was a clear violation of Mr. Amann's constitutional rights.

119.    On April 6, 2017, Det. Child served a warrant on Mr. Amann's office at 11:30 pm, and seized Mr. Amann's personal possessions that were thereafter submitted to the UPD Crime Lab for DNA and fingerprint analysis.

120.    On May 8, 2017, Mr. Amann emailed Reyes to demand access to his office and his office computer. Reyes ignored Mr. Amann's request.

121.    On May 30, 2017, Mr. Amann filed the initial Complaint in this case, asserting the Whistleblower claim.

122.    On June 12, 2017, Romano sent Det. Child an email "requesting copies from the 'August 2015 packet about Ms. Cindy Poulson that was anonymously sent to Barry Page in AL.' She wished the packet be scanned both front and back and sent back to her because they turned over the original packet for this investigation [and didn't bother to save a copy.]" OAG apparently kept no record of the chain of custody on the

packet.

123.    Also on June 12, 2017, Det. Child discovered Mr. Amann's Garrity

interview in the documents Romano had given him and returned it to Romano.

124.    On September 13, 2017, Mr. Amann met with former Attorney General

Mark Shurtleff, who provided an affidavit stating he would not have hired Poulson if

he had known about her criminal history.

125.    In November 2017, OAG provided about half of Mr. Amann's personal

possessions. OAG has never provided his remaining possessions, including clothing,

his personal awards (like his finisher medals from running the Boston Marathon and

approximately 30 marathons), books, time logs, personal writings.

## FIRST CAUSE OF ACTION
### (Violation of the Whistleblower Act against OAG)

126.    Mr. Amann realleges and incorporates by reference all paragraphs set forth

above and below.

127.    The Utah Protection of Public Employees Act ("Act"), Utah Code Ann. § 67-

21-1 *et seq*., protects employees who communicate or object to violations of a state or federal

law, rule, or regulation. Specifically, Utah Code Ann. § 67-21-3(1)(a) states that a state

government employer:

> may not take adverse action against an employee because the employee . . .
> communicates in good faith . . . a violation or suspected violation of a law, rule,
> or regulation adopted under the law of this state . . . or  . . .  the United States; or
> [reports] gross mismanagement; abuse of authority; or unethical conduct.

128.    Utah Code Ann. § 67-21-3(2) states that "[a]n employer may not take adverse

action against an employee because an employee participates or gives information in an

investigation, hearing, court proceeding, legislative or other inquiry, or other form of

administrative review held by the public body."

129.   Utah Code Ann. § 67-21-3(3) states that "[a]n employer may not take adverse

action against an employee because the employee has objected to or refused to carry out a

directive that the employee reasonably believes violates a law of this state . . . or the United

States."

130.   Utah Code Ann. § 67-21-3(4) states that "[a]n employer may not implement rules

or policies that unreasonably restrict an employee's ability to document":

> waste or misuse of public funds, property, or manpower; . . . a violation or
> suspected violation of any law, rule, or regulation; . . . or as it relates to a state
> government employer: . . . gross mismanagement . . . abuse of authority . . . or  . .
> . unethical conduct.

131.   As more specifically set forth above, Mr. Amann communicated in good faith

OAG's: 1) violation of federal grant requirements; 2) waste and misuse of federal and state

funds and personnel; 3) violations of both state and federal law; and 4) managers' gross

mismanagement, abuse of authority, professional incompetence, disparate treatment; and 5)

managers' and employees' illegal and unethical conduct.

132.   He also followed GRAMA to lawfully obtain documents and participated in

hearings, court proceedings, and administrative reviews concerning these requests.

133.   He participated in investigations by OAG, DHRM, Utah Labor Commission, the

FBI, the Executive Branch Ethics Commission and legislative auditors.

134.   He participated in court proceedings concerning Hanks' lawsuit against OAG by

being listed as a witness, trying to comply with a subpoena of information, and by attending

court hearings.

135.    He documented waste or misuse of public funds, property, and violations or suspected violations of state laws, rules, and/or regulations.

136.    OAG took adverse actions against Mr. Amann because of Mr. Amann's protected activity under the Whistleblower Act, by:

a.    Effectively demoting him from his positions with the ICAC and Securities Divisions, effectuating a 5% pay decrease;

b.    Effectively demoting him from the Securities Division to the Antitrust Division;

c.    Unreasonably restricting Mr. Amann's access to documents and databases needed to defend himself against unsupported accusations and investigations;

d.    Unreasonably restricting Mr. Amann's associations with his professional colleagues; failing and refusing to promote him to positions for which he was best qualified;

e.    Suspending him for 14 months and later terminating him and thereby restricting his ability to document and report OAG and employee violations; and

f.    Terminating his employment.

137.    OAG's actions constitute a violation of the Whistleblower Act and Mr. Amann has been injured as a result of OAG's actions. Mr. Amann is entitled to back pay and benefits, seniority rights, reinstatement (or front pay and benefits in lieu of reinstatement), and interest (both pre and post-judgment).

138.    As a further result of OAG's actions, Mr. Amann is also entitled to general damages due to his emotional distress and damage to his reputation, and loss of enjoyment of life.

139.     Mr. Amann is also entitled to recover his attorneys' fees and costs incurred in bringing this action.

## SECOND CAUSE OF ACTION
### (Unlawful Retaliation in Violation of Title VII Against OAG)

140.     Mr. Amann realleges and incorporates by reference all of the paragraphs and allegations set forth above and below.

141.     Mr. Amann engaged in protected activity under Title VII. On behalf of Mr. Hanks, Mr. Amann repeatedly and in good faith reported violations of Title VII to OAG, DHRM, and the Utah Labor Commission, and also in state court. He also participated as a witness in investigations and legal proceedings relating to Mr. Hanks' claims of sexual harassment and retaliation as described above.

142.     OAG took multiple adverse actions against Mr. Amann as a result thereof. These include, but are not limited to: transferring him from ICAC/Children's Justice Division to Securities; transferring him from Securities/Commercial Enforcement Division to Antitrusts/Markets and Financial Fraud Division; denying him promotions to Division Director; reducing his pay to less than his other fellow former supervisors; creating a hostile work environment for him; suspending him for 14 months; ordering him not to communicate with co-workers or clients and not to access any state databases during suspension; terminating his employment in December of 2016; retaining his personal possessions through and including the date of this Second Amended Complaint; stonewalling his GRAMA requests, providing false information to the SRC, and then refusing to comply with SRC GRAMA orders; and providing false information about him to prospective employers to prevent him from obtaining employment.  Reyes, Austin and Romano also commissioned and cooperated with the investigation of a false claim that they knew to be false into an allegation of "stalking" against

Mr. Amann.  In doing so, the AG's office submitted the transcript of the Garrity Interview the

OAG compelled Mr. Amann to attend to law enforcement in support of criminal charges

against Amann and in direct violation of Mr. Amann's constitutional rights as expressed in the

*Garrity* ruling.

143.   OAG's retaliation and ultimate termination of Mr. Amann are causally linked to

his protected activities.

144.   Mr. Amann has been damaged as a result of OAG retaliation.  He is entitled to

recover all resulting damages including lost pay and benefits, future lost pay and benefits, and

emotional distress damages.

145.   Mr. Amann is also entitled to all reasonable attorney's fees and costs incurred in

bringing this action.

### THIRD CAUSE OF ACTION
**(Violation of Free Speech in Violation of 42 U.S.C. § 1983 against OAG
and all individual Defendants in their official and individual capacities)**

146.   Mr. Amann alleges and incorporates by reference all of the paragraphs

and allegations set forth above.

147.   As set forth above, Mr. Amann spoke out on matters of public concern,

as they affected the legal rights of the citizens of Utah and the transparency of one of

its public agencies. Namely, Mr. Amann: 1) reported improper use of paralegals in

violation of federal grant restrictions; 2) reported favorable treatment of the paralegal

referenced above; 3) requested documents under state law and appealed the denial

thereof; and 4) participated in a legislative audit into OAG corruption.

148.   When Mr. Amann made these reports and requests, he was not

acting pursuant to his official duties at OAG.

149.    Mr. Amann's comments and actions were done in a manner which did not disrupt OAG's operations.

150.    Accordingly, Mr. Amann's interest in communicating and commenting on these public matters outweigh OAG's interest in promoting the "efficiency" of the public services it provides.

151.    Further, the information OAG believed incorrectly that Mr. Amann provided to the Secret Service about Poulson's criminal history was a matter of public concern.

152.  Mr. Amann's protected speech, and/or Defendants' belief that he had engaged in protected speech, was a substantial or motivating factor in the Defendants' decision to terminate his employment and take other adverse actions against him.

153.  The individual Defendants, who were officials with final policy making authority, acted purposefully and intentionally to retaliate against Mr. Amann for exercising his First Amendment rights.

154.  OAG acted pursuant to a policy of retaliating against whistleblowers and ratified the actions of the individual Defendants by failing to take action to ensure that the retaliation did not occur.

155.  By terminating Mr. Amann and taking other adverse actions against him, including commissioning a criminal investigation of him, Defendants violated Mr. Amann's rights as protected under the First Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983.

156.  Defendants acted under the color of law.

157.  Defendants' conduct violated a clearly established constitutional right of free speech of which a reasonable person should have known.

158.  Mr. Amann has been injured by Defendants' conduct and has suffered and will continue to suffer losses. Pursuant to 42 U.S.C. § 1983, he is entitled to all available relief, including back pay, reinstatement and/or front pay, and actual and compensatory damages, as well as costs and attorney fees.

159.  The individual Defendants' conduct was willful and intentional, malicious, and exhibits reckless or callous indifference to Mr. Amann's constitutional rights, thereby entitling him to punitive damages.

## FOURTH CAUSE OF ACTION
### (Violation of Procedural and Substantive Due Process in Violation of 42 U.S.C. § 1983 against OAG and all individual Defendants in their official and individual capacities)

160.    Mr. Amann alleges and incorporates by reference all of the paragraphs and allegations set forth above.

161.    Mr. Amann had a property interest in his employment with OAG.

162.    Mr. Amann was entitled to only be discharged for cause, and to be given adequate notice of the charges against him, an explanation of the evidence against him, and a meaningful opportunity to present his side of the story to an impartial decision-maker.

163.    Mr. Amann was also entitled to be treated consistently with respect to his coworkers who were alleged to have engaged in conduct of similar severity.

164.     Mr. Amann was denied due process of law by Defendants in violation of his Fourteenth Amendment due process rights when Defendants moved him and decreased his pay without basis and without providing him means to object to the process; suspended him for months without a reason and without providing him with any means to appeal the suspension; targeted him for termination without cause; falsified reasons for his termination; refused to allow him access to his records to defend himself; provided him the opportunity to be "heard" by an agent of the person who had already decided to terminate him; withheld from him the claimed bases for his termination; and commissioned a criminal investigation against him.

165.     These actions by Defendants violated Mr. Amann's rights as protected under the Due Process Clause, pursuant to 42 U.S.C. § 1983.

166.     Defendants acted under the color of law.

167.     Defendants' conduct violated a clearly established constitutional right of due process, of which a reasonable person should have known.

168.     The individual Defendants, who were officials with final policy making authority, acted purposefully and intentionally to deprive Mr. Amann of his rights to due process.

169.     OAG ratified the actions of the individual Defendants by failing to take action to ensure that the retaliation did not occur.

170.     Mr. Amann has been injured by Defendants' conduct and has suffered and will continue to suffer losses. Pursuant to 42 U.S.C. § 1983, he is entitled to all available relief, including back pay, reinstatement and/or front pay, and actual and

compensatory damages, as well as costs and attorney fees.

171.    The individual Defendants' conduct was willful and intentional, malicious, and exhibits reckless or callous indifference to Mr. Amann's constitutional rights, thereby entitling him to punitive damages.

**FIFTH CAUSE OF ACTION**
**(Breach of Contract)**

172.    Mr. Amann alleges and incorporates by reference all of the paragraphs and allegations set forth above.

173.    OAG has enacted express and implied policies through which it makes certain promises to its employees.

174.    These policies include an agreement that employees will not be subject to retaliation for complaining about workplace harassment or support the claims of other employees who complain of harassment, and that their complaints will be adequately and fairly investigated.

175.    OAG also promises its employees that they will be treated consistently with respect to discipline.

176.    OAG violated these policies by failing to adequately investigate Mr. Amann's claims about the problems created for the department by the Barlow/Poulson affair, and Mr. Hanks' complaints of sexual harassment, and by retaliating against Mr. Amann for bringing and supporting these complaints.

177.    OAG also violated its policies by targeting Mr. Amann for termination and disciplining him more severely than coworkers who engaged in conduct that was

similar or worse in severity.

178.     Because of OAG's breaches of its written and/or implied promises, Mr.

Amann is entitled to all damages he has suffered due to OAG's breaches.

## REQUEST FOR JURY TRIAL

Mr. Amann requests that this matter be tried before a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Amann prays for the following relief:

1.     For injunctive relief;

2.     For reinstatement of Mr. Amann's OAG employment and/or front pay

in lieu of reinstatement;

3.     For the payment of lost wages, benefits, and seniority rights;

4.     For reimbursement due to negative tax consequences from lump

sum payments;

5.     For compensatory damages;

6.     For punitive damages as allowable;

7.     For costs and attorneys' fees as allowed by law;

8.     For pre- and post-judgment interest at the highest lawful rate;

9.     For other and further equitable relief as the Court deems just and

proper in this case to make Mr. Amann whole and achieve justice.

DATED this 4th day of January, 2021.

**HOLLINGSWORTH LAW OFFICE, LLC**

/s/ April L. Hollingsworth
April L. Hollingsworth
Attorneys for Plaintiff