FILED
2021 SEP 2 AM 11:37
CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

|  |  |
|---|---|
| PAUL G. AMANN,<br><br>     Plaintiff,<br><br>v.<br><br>OFFICE OF THE UTAH ATTORNEY GENERAL, SEAN REYES, BRIDGET ROMANO, CRAIG BARLOW, SPENCER AUSTIN, TYLER GREEN, and DANIEL WIDDISON, in their official and individual capacities,<br><br>     Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' PARTIAL MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Case No. 2:18-cv-00341-JNP-DAO<br><br>District Judge Jill N. Parrish |

Before the court is a Partial Motion to Dismiss Second Amended Complaint (the "Motion") filed by Defendants Office of the Utah Attorney General (the "OAG"), Attorney General Sean D. Reyes ("Reyes"), Bridget Romano ("Romano"), Craig Barlow ("Barlow"), Spencer Austin ("Austin"), Tyler Green ("Green"), and Daniel Widdison ("Widdison") (collectively, "Defendants"). ECF No. 98. The court entertained oral argument on the pending Motion on July 26, 2021. Having carefully reviewed the parties' memoranda[1] and the relevant law and considered

---

[1] In addition, the court considered Plaintiff Paul G. Amann's ("Mr. Amann") Charge of Discrimination filed with the United States Equal Employment Opportunity Commission (ECF No. 98-1), which Defendants attached to their Motion, for reasons set forth below. *See infra* Section II. The court also considered the Petition for Judicial Review of the State Records Committee Order (the "Petition") (ECF No. 98-2), which Defendants attached to their Motion. Although Mr. Amann did not expressly incorporate by reference or attach the Petition to his Complaint, the Petition is referenced in the Complaint and in Mr. Amann's response brief regarding his allegations against Widdison, is central to Mr. Amann's procedural due process claim against

the oral arguments raised, the court grants the Motion in part and denies the Motion in part as set forth below.

## BACKGROUND[2]

Hired as an attorney by the OAG in August of 1998, Plaintiff Paul G. Amann ("Mr. Amann") began working in the Child Protection Division and was later promoted to the Internet

---

Widdison, and its authenticity is not disputed. *See* ECF Nos. 90 ¶ 115, 111 at 18. Thus, it is proper for the court to consider the Petition in ruling on Defendants' Motion. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

The court also grants Defendants' Request for Judicial Notice (ECF No. 99) and considers (1) the Utah State Bar's notice to Widdison of receipt of an informal complaint filed by Mr. Amann, dated May 2, 2017, which includes a copy of Mr. Amann's complaint, and (2) the notice from the Utah State Bar Office of Professional Conduct, dated April 23, 2018, of the ruling on the appeal of the dismissal of Mr. Amann's bar complaint against Widdison. Both documents are designated as confidential under the Protective Order and filed under seal, and the court considers them not for the truth of the matters asserted therein but rather as evidence of their contents. Judicial notice of these documents is proper under Federal Rule of Evidence 201(b)(2). *See United States v. Walker*, 761 F. App'x 822, 833 (10th Cir. 2019) (unpublished) ("[M]atters in state bar disciplinary proceedings are subject to judicial notice."); *Rose v. Utah State Bar*, 471 F. App'x 818, 820 (10th Cir. 2012) (unpublished) (holding that a district court properly took judicial notice of "filings in the state-court disciplinary proceedings" on a Rule 12(b)(6) motion). The court also notes that Mr. Amann made neither a written nor an oral objection to Defendants' Request for Judicial Notice.

The court did not consider Defendants' Answers and Responses to Plaintiff's First Set of Interrogatories, Requests for Documents, and Requests for Admission (ECF No. 111-1), which Mr. Amann attached to his response brief. Mr. Amann did not incorporate by reference or attach this document to his Complaint, nor does his Complaint refer to this document. The discovery responses thus fall outside the pleadings and are not properly before the court in assessing a partial motion to dismiss. *See GFF Corp.*, 130 F.3d at 1384.

[2] On January 4, 2021, Mr. Amann filed a Second Amended Complaint. ECF No. 89. On January 14, 2021, an erratum to the Second Amended Complaint was filed. ECF No. 90. Absent any objection from Defendants regarding consideration of the erratum, the court treats the erratum as the operative Second Amended Complaint (the "Complaint"). The following facts are based on allegations contained in Mr. Amann's Complaint. ECF No. 90.

Crimes Against Children ("ICAC") Task Force. In September of 1999, Mr. Amann earned "career service status" at the OAG, becoming a merit employee who could only be terminated for cause. Mr. Amann was successful during his tenure as an OAG attorney, receiving many accolades and much praise. But the tide changed in April of 2013. That is when Mr. Amann began reporting, in good faith, OAG violations of state and federal law and misuse of government funds.

In April of 2013, Mr. Amann learned that his supervisors, Kris Knowlton and Barlow, planned to have a paralegal, Cindy Poulson ("Poulson"), work on state cases and perform the work of an attorney. Because Poulson's position was funded by ICAC, a federal grant program, this arrangement would violate federal grant restrictions. Mr. Amann reported his concerns about this misuse of federal funds to the OAG Civil Chief Kirk Torgensen. On April 25, 2013, Mr. Amann was moved from ICAC to the Securities Division. On June 5, 2013, Barlow told Mr. Amann that his pay would be decreased by five percent.

On December 23, 2013, Mr. Amann arrived at his office and found documents that had been slipped under his door. Among the documents were copies of sexually suggestive communications between Poulson and Barlow, indicating that they were having an affair. There was also a copy of Poulson's employment contract, which contained inaccurate statements about how long she had practiced law and her good standing with the Utah State Bar. Mr. Amann scanned these documents and sent them to a friend at the Federal Bureau of Investigation. The same day, Reyes was appointed to serve as the Utah Attorney General. On December 28, 2013, Mr. Amann gave Reyes's campaign communications director, Lee Rech, access to the OAG's Intranet site as she fielded calls and interviews regarding a high-profile case. Reyes never indicated that Mr. Amann's conduct in this instance was inappropriate, but this incident was later cited by Romano as an aggravating factor supporting Mr. Amann's termination.

In January of 2014, the sexually suggestive communications between Barlow and Poulson were reported in the press. A reporter, Lynn Packer ("Packer"), published a story about Barlow's support of Poulson's promotion to attorney. The OAG told Packer that it was investigating the "leaked emails and hiring standards." The OAG later began investigating "the break in of Poulson's office." This investigation was focused on Mr. Amann. The OAG copied his computer hard drive and searched his office.

In February of 2014, due to the OAG's unresponsiveness regarding his complaints about Barlow and Poulson, Mr. Amann reported his concerns to the Department of Human Resources Management ("DHRM"). DHRM interviewed another assistant attorney general, Jenette Turner ("Turner"), about Barlow and Poulson's affair.

In March of 2014, Mr. Amann interviewed for a Division Director position with Austin and Brian Tarbet ("Tarbet"). Although Mr. Amann provided a list of fifty-nine references, neither Austin nor Tarbet contacted any of them. Mr. Amann also met with DHRM investigators during this month, shared his concerns about corruption in the OAG—including the harassment of Turner, a whistleblower—and sent the investigators the paperwork that had been slipped under his door. Days later, Reyes and the OAG issued a "gag order" that prevented OAG employees from publicly reporting corruption and threatened "immediate disciplinary actions up to and including termination." Packer also reported this month that Poulson was having an affair with an attorney other than Barlow.

In May of 2014, Turner was placed on administrative leave. Turner's tablet, cell phone, and office computer were seized. She was later disciplined for speaking out about Poulson. Also in May, Reyes announced the new Commercial Enforcement and Criminal Justice Division Directors.

Mr. Amann was not chosen, even though his qualifications, experience, performance, and tenure substantially exceeded those of the appointed division directors.

In August of 2014, DHRM concluded its investigation of Barlow and Poulson's affair, finding that Barlow did not engage in sexual harassment. The investigation report did not mention the hostile work environment fostered by the affair. The report had also been edited to remove statements that Barlow had exposed the OAG to liability because of his relations with Poulson and recommendations that Barlow and Poulson be sanctioned for IT violations.

In September of 2014, Mr. Amann reported to his Commercial Enforcement Division supervisor that a Securities Division analyst, Skaggs,[3] was violating the Securities Act and contravening the recommendations of the 2008 Legislative Audit of the Utah Securities Division. Mr. Amann was subsequently scrutinized by the OAG through Securities Division Director Keith Woodwell ("Woodwell") and Commercial Enforcement Director Che Arguello ("Arguello"). On September 18, 2014, Austin emailed Reyes that he wanted to replace Mr. Amann. On September 25, 2014, Woodwell filed a DHRM complaint based on Skaggs's claim that Mr. Amann was "bullying" her. Austin then authorized a DHRM investigation into these allegations against Mr. Amann. The complaint was later dismissed as unsubstantiated.

In October of 2014, Austin informed Mr. Amann that he was being transferred to the Antitrust Division based on a September 25, 2014 co-worker complaint. Mr. Amann requested records regarding this complaint and related investigation. Woodwell stated he would comply with this request, but later refused to turn over the records. Mr. Amann filed a GRAMA request to the DHRM for the records, but to no avail. Mr. Amann appealed this denial to the DHRM director but

---

[3] Skaggs's full name is not provided in the Complaint.

was similarly unsuccessful. Mr. Amann then appealed to the State Records Committee ("SRC"). The OAG defended against Mr. Amann's GRAMA requests on behalf of DHRM. The SRC ruled in favor of Mr. Amann in January of 2015, and the OAG appealed this ruling to the Third District Court. In April of 2015, Assistant Attorney General Mark Burns had Mr. Amann served with the OAG's appeal by a constable in front of his colleagues.

In January of 2015, then-Solicitor General Romano and then-Civil Chief Deputy Tarbet told Mr. Amann that he could not recover the decrease in pay he suffered when he was transferred from ICAC, even though other managers had received such a recovery or had not had their pay decreased even upon losing their management positions.

In April of 2015, Mr. Amann met with the Director of Human Resources, Susan May ("May"), and a DHRM investigator in support of a complaint made by his colleague, Jason Hanks ("Hanks"), about sexual harassment that Hanks was experiencing in the office. May did not take action based on Hanks's complaint. Hanks appealed this decision to the Utah Labor Commission, and Mr. Amann provided testimony. Also in April, the OAG changed its policy manual to permit challenges to background checks by employees who failed background checks.

In June of 2015, Mr. Amann filed a GRAMA suit in the Third District Court. In July of 2015, Mr. Amann prevailed on summary judgment in state court and obtained the documents that he requested. In the documents he obtained through the GRAMA process, Mr. Amann discovered that Arguello had been seeking information about him as part of an investigation on September 8, 2014, which was before any complaint had been filed against Mr. Amann. Mr. Amann also met with legislative auditors in July of 2015. Mr. Amann and Turner were interviewed about OAG corruption and the absence of employee whistleblower protection. Mr. Amann later provided the auditors with documents regarding OAG corruption, Poulson, and the new policy regarding

background checks. Mr. Amann was also named as a corroborating witness in Hanks's lawsuit against the OAG during this month.

In August of 2015, Poulson sent a pardon application to the Utah Board of Pardons, falsely claiming she had no criminal history. At a prosecutor training later that month, Poulson was approached by the Deputy Director of the National Computer Forensic Institute of the Secret Service, Barry Page ("Page"), with documents regarding her criminal history that he had received in the mail. The OAG later terminated Mr. Amann based on an allegation that he had sent the documents to Page.

In September of 2015, Mr. Amann's office was searched, and his computer hard drive was mirror-imaged and forensically examined. Through this exam, the OAG discovered several files on Mr. Amann's computer in which he had been documenting OAG corruption. Access logs for the building also revealed that Mr. Amann had used his access card after hours, although these were his regular hours. Also during this month, the Antitrust section (including Mr. Amann) was moved from being under Austin's direction to Romano's direction. A week after the search of Mr. Amann's office and computer, Poulson filed an internal, written complaint alleging "workplace harassment" and stating that an anonymous tipster had sent documents regarding her criminal history to the organizer of a training she attended. The OAG initially only investigated Mr. Amann in connection with this complaint. Mr. Amann was unaware of this investigation and met with DHRM investigators to discuss corruption, sexual harassment, retaliation against whistleblowers in the OAG, and the OAG's failure to protect Hanks from sexual harassment.

In October of 2015, Mr. Amann represented himself at another SRC hearing and requested that the OAG provide him with evidence regarding an ongoing investigation of him. Mr. Amann later attended a National Association of Attorneys General Antitrust conference for the OAG.

While there, Mr. Amann received messages from Austin demanding that Mr. Amann call him. Mr. Amann attempted to reach Austin, but Austin did not answer Mr. Amann's calls.

On October 19, 2015, upon Mr. Amann's return to the office, Romano suspended Mr. Amann and placed him on administrative leave without explanation. Romano ordered Mr. Amann to have no contact with any other OAG employees and no access to any state databases. Mr. Amann was escorted out of the office by two OAG law enforcement officers. Romano's orders isolated Mr. Amann, who did not have access to his longtime friends and associates, or to his office, office email, client files, or state databases. Hanks was also placed on administrative leave months later. For the next eight months, the OAG did not investigate the alleged reasons for Mr. Amann's leave. During Mr. Amann and Hanks's suspensions, Poulson received a "full and unconditional pardon" at a Board of Pardons hearing. Hanks submitted a GRAMA request for records related to the Board of Pardons and Poulson, and Romano later stated that she prevented Hanks from obtaining these records.

In November of 2015, Mr. Amann submitted travel reimbursement forms, and it took the OAG nearly eight months to process the reimbursement.

In May of 2016, the OAG advertised Mr. Amann's position and filled it months before Mr. Amann was given a Notice of Intent to Terminate. On May 11, 2016, Romano notified Hanks that he had to appear for a "Garrity interview."[4] Mr. Amann received a subpoena duces tecum from

---

[4] The Complaint does not define "Garrity interview." In *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967), the Supreme Court held that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office," and the protection "extends to all, whether they are policemen or other members of our body politic." A *Garrity* warning is given to public employees before being questioned by their public employers as part of an internal investigation. The warning entails advising an employee of the following: "(1) he ha[s] the right

Hanks for documents related to Hanks's lawsuit against the OAG. Mr. Amann declined the OAG's help to respond to the subpoena, and the OAG's subsequent effort to quash the subpoena failed.

In June of 2016, the OAG ordered Mr. Amann to submit to a *Garrity* interview scheduled for the same day and time as the hearing on Hanks's subpoena of Mr. Amann, effectively preventing Mr. Amann from attending the hearing. At the interview, Mr. Amann again declined the OAG's assistance in responding to the subpoena and was questioned about Hanks's claims. When Mr. Amann responded to Hanks's subpoena in August of 2016, he stated that he could not provide responsive records without access to his office and computer.

In August of 2016, Assistant Attorney General Widdison reminded Hanks that he and Mr. Amann were not to have contact with one another. On August 17, 2016, Mr. Amann and his counsel met with Widdison and Romano. Romano indicated that she had drafted a Notice of Intent to Terminate that she would send to Reyes. Widdison and Romano refused to supply the documents that the OAG was relying upon to support the termination. Widdison said that the OAG would not provide such documents because they would be "used against" them.

On September 8, 2016, Mr. Amann filed an ethics complaint against Reyes with the Executive Branch Ethics Committee. On September 9, 2016, Romano mailed a Notice of Intent to Terminate to Mr. Amann, which included two fabricated claims about Mr. Amann to support his termination. Although Mr. Amann was apparently terminated because of Poulson's September 2015 complaint, the OAG did not provide Mr. Amann with a copy of the complaint in September

---

to remain silent if his answers would tend to incriminate him; (2) anything he sa[ys] or d[oes] may be used as evidence against him in a court of law; (3) he w[ill] not be disciplined solely for remaining silent; and (4) the interview [i]s strictly voluntary and he c[an] leave or stop answering questions at any time." *United States v. Lemon*, 714 F. App'x 851, 853 (10th Cir. 2017) (unpublished).

2016, during his termination process, or for several years thereafter. On September 16, 2016, Mr. Amann sent a letter to Reyes denying all of the allegations in the Notice of Intent to Terminate and requesting a meeting with Reyes. Reyes would not meet with Mr. Amann and assigned Solicitor General Green to meet with Mr. Amann instead.

In October of 2016, Mr. Amann submitted a GRAMA request for documents referenced in his Notice of Intent to Terminate. Widdison denied the GRAMA request, asserting that the documents were private and protected. Mr. Amann also sent, via USPS and email, a preservation/litigation hold letter to Reyes, copying the OAG's IT Department and Green. The OAG claims to have no record of this letter. On October 27, 2016, Mr. Amann's attorney canceled the meeting scheduled with Green to discuss Mr. Amann's termination because the OAG failed to provide the requested documents and refused to permit Mr. Amann to record the meeting.

In November of 2016, Mr. Amann appealed Widdison's denial of his GRAMA request to Reyes. Days later, Romano filed a declaration in state court claiming that Mr. Amann was permitted to contact other employees. But the administrative leave letter that she had provided to Mr. Amann expressly forbade such contact. At a hearing in Hanks's case, Mr. Amann appeared and stated that he needed access to his office and computer to provide Hanks with evidence requested in his subpoena. Although the judge ordered the OAG to grant Mr. Amann this access, the OAG has failed to do so.

On December 2, 2016, Green drafted Mr. Amann's termination letter, citing Mr. Amann's harassment of Poulson as the basis of the termination. The OAG sent a certified letter informing Mr. Amann of his termination on December 5, 2016, and Widdison and Green's secretaries simultaneously emailed Mr. Amann with the letter on December 7, 2016. The OAG would not

permit Mr. Amann to collect personal items and information from his office and still retains some of Mr. Amann's possessions.

In January of 2017, Mr. Amann sent a letter to Assistant Attorney General Joni Jones seeking access to his office, personal possessions, and records for Hanks's case. Mr. Amann sent a follow-up letter after not receiving a response for weeks. Romano responded to the letters in February of 2017 and directed Mr. Amann to communicate with Widdison instead. Mr. Amann has not been permitted to access his records.

In February of 2017, Widdison filed a brief with the SRC. In the brief, Widdison implied that Poulson's complaint from September of 2015 was written. Romano's Notice of Intent to Terminate had also claimed that the complaint was written. But Widdison later claimed that the complaint was verbal. On February 20, 2017, Austin commissioned a Unified Police Department ("UPD") investigation of Mr. Amann for "stalking" Poulson based on a false allegation that Mr. Amann sent packets of documents to others about her. Widdison had previously stated that, except for the packet sent to the Secret Service, the OAG "does not allege that [Mr. Amann] authored these packets, nor do they serve as part of the basis for the discipline imposed on him." SRC ordered the OAG to provide "the packet" sent to Page, but Widdison falsely stated that the cover letter sent to Page was in the "taint review" and filed a Petition for Judicial Review of the SRC Order on February 21, 2017. Widdison also contacted Poulson and told her about the order. Poulson then requested the court clerk to classify her case as private and obtained an order to that effect on March 23, 2017.

In anticipation of Mr. Amann filing a lawsuit against the OAG, Romano drafted legislation to change the undertaking requirement of Utah's Governmental Immunity Act to a mandatory

$300, unless otherwise ordered. The OAG was unsuccessful in having Mr. Amann's lawsuit dismissed under this requirement.

In April of 2017, UPD Detective Dan Child ("Detective Child") drafted a search warrant for Mr. Amann's office, and Romano provided Detective Child with a file on the internal employment investigation of Mr. Amann, which included a transcript of his *Garrity* interview. Detective Child served the warrant on Mr. Amann's office on April 6, 2017, seizing Mr. Amann's personal possessions. Although Mr. Amann emailed Reyes on May 8, 2017 to demand access to his office and office computer, Reyes did not respond to Mr. Amann's request.

On May 30, 2017, Mr. Amann filed his initial Complaint in this case and asserted a whistleblower claim. In June of 2017, Romano requested copies from "the August 2015 packet about Ms. Cindy Poulson that was anonymously sent to Barry Page" from Detective Child, as the OAG had given him the original packet and did not retain a copy. Upon discovery of Mr. Amann's *Garrity* interview transcript in the documents Detective Child had received from Romano, Detective Child returned the transcript to Romano.

In September of 2017, former Attorney General Mark Shurtleff provided Mr. Amann with an affidavit stating that he would not have hired Poulson had he known about her criminal history.

Based upon the foregoing, Mr. Amann asserts against the OAG a wrongful termination claim under the Utah Protection of Public Employees Act ("UPPEA" or "Whistleblower Act"), a retaliation claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and a breach of contract claim. Mr. Amann also asserts claims under 42 U.S.C. § 1983 against the OAG and all individual Defendants, in their individual and official capacities, for violation of his free speech and procedural and substantive due process rights. The operative

Complaint was filed on January 14, 2021. Defendants have moved for partial dismissal of Mr. Amann's Complaint under Federal Rule of Civil Procedure 12(b)(6).

## LEGAL STANDARD

Dismissal of a claim under Federal Rule of Civil Procedure 12(b)(6) is appropriate when the plaintiff fails to "state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citation omitted). "A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff has alleged facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## ANALYSIS

Defendants move for partial dismissal of Mr. Amann's Complaint with prejudice. Defendants seek dismissal of Mr. Amann's first cause of action against the OAG under the UPPEA for violation of the Whistleblower Act as it relates to any adverse action other than Mr. Amann's termination, arguing that his claims for all other alleged adverse actions are untimely. Defendants also contend that Mr. Amann's second cause of action against the OAG for unlawful retaliation under Title VII cannot be based on alleged retaliation that took place following Mr. Amann's

termination because Mr. Amann failed to exhaust his administrative remedies as it pertains to those post-termination allegations. Additionally, Defendants move for dismissal of Mr. Amann's third and fourth causes of action under § 1983 for violations of free speech and substantive and procedural due process for several reasons. First, Defendants assert that Mr. Amann has failed to meet the threshold requirements under § 1983 against the OAG and individual defendants in their official capacities because none of the Defendants have authority to remedy any alleged ongoing constitutional violation.[5] Second, Defendants argue that Mr. Amann has failed to plead an affirmative link or provide notice to each Defendant of their alleged specific constitutional violation. Defendants further argue that the individual defendants are entitled to qualified immunity and that Mr. Amann has not plausibly alleged violations of his free speech and procedural and substantive due process rights. Finally, Defendants argue that Mr. Amann's § 1983 claims against Widdison should also be dismissed because he is entitled to absolute or qualified immunity as well as the judicial proceedings privilege. The court considers each argument in turn.

I.   **UPPEA Claim**

In his Complaint, Mr. Amann alleges six adverse actions that the OAG took against him in violation of the UPPEA: (1) "[e]ffectively demoting him from his positions with the ICAC and Securities Divisions, effectuating a 5% pay decrease;" (2) "[e]ffectively demoting him from the Securities Division to the Antitrust Division;" (3) "[u]nreasonably restricting Mr. Amann's access to documents and databases needed to defend himself against unsupported accusations and investigations;" (4) "[u]nreasonably restricting Mr. Amann's associations with his professional

---

[5] Defendants acknowledge that Reyes may have authority to remedy any alleged ongoing constitutional violations but argue that Mr. Amann has failed to allege a constitutional violation against Reyes.

colleagues; failing and refusing to promote him to positions for which he was best qualified;" (5) "[s]uspending him for 14 months and later terminating him and thereby restricting his ability to document and report OAG and employee violations;" and (6) "[t]erminating his employment." ECF No. 90 ¶ 136. Defendants contend that Mr. Amann's UPPEA claim must be limited solely to the termination of his employment, as it is the only adverse action alleged within the applicable limitations period. Citing a past ruling by this court in support of this contention, Defendants move for dismissal of Mr. Amann's UPPEA claim as it relates to any alleged adverse action other than his termination. In response, Mr. Amann "acknowledges his Whistleblower Claim reaches back in time only as far as his termination." ECF No. 111 at 6.[6]

Mr. Amann's allegations related to pre-termination adverse actions do not come within the UPPEA's statute of limitations. In *Zimmerman v. University of Utah*, 417 P.3d 78, 85 (Utah 2018), the Utah Supreme Court interpreted the UPPEA to permit a UPPEA claimant to recover only those damages that are causally connected to events that occurred within the 180-day limitations period. Mr. Amann filed suit exactly 180 days after his termination on December 2, 2016. Accordingly, as this court has previously noted (ECF No. 38 at 7 n.5), and as both parties have acknowledged, Mr.

---

[6] Mr. Amann also states in his response brief that he seeks to "make the Court aware" that "he alleges events that occurred after his termination for which he intends to seek recovery under the Whistleblower Act." ECF No. 111 at 6. Specifically, he alleges that Austin commissioned a criminal investigation against him on February 20, 2017 for "stalking" Poulson. *Id.*; ECF No. 90 ¶ 112. But this post-termination conduct is not pleaded in Mr. Amann's Complaint as a basis for relief under the Whistleblower Act. The adverse actions that Mr. Amann alleges support his requested relief under the Whistleblower Act include five pre-termination incidents and his termination; no mention is made of post-termination conduct under this cause of action. ECF No. 90 ¶ 136. A statement in Mr. Amann's response brief that he intends to seek recovery under the Whistleblower Act based on alleged post-termination conduct does not amend his Complaint to include this basis for relief. Thus, the issue of whether Mr. Amann may recover under the Whistleblower Act for alleged post-termination conduct is not before the court.

Amann's termination is the earliest adverse action for which he can recover under the UPPEA. Such pre-termination allegations fall outside of the UPPEA's statute of limitations and cannot be the basis of Mr. Amann's UPPEA claim.

In short, Mr. Amann's UPPEA claim is limited to his termination. The alleged pre-termination adverse actions are time-barred, and the alleged post-termination adverse actions are inadequately pleaded under his UPPEA cause of action.

## II.    Title VII Claim

Defendants also seek to limit Mr. Amann's Title VII claim to his termination. Defendants argue that Mr. Amann's allegations related to pre-termination retaliation are untimely, citing the court's decision on Defendants' partial motion to dismiss Mr. Amann's First Amended Complaint. Defendants also argue that Mr. Amann is not permitted to recover damages from alleged adverse actions that occurred after his termination, as Mr. Amann failed to file a charge with the United States Equal Employment Opportunity Commission ("EEOC charge") pertaining to these alleged post-termination acts. Mr. Amann responds that Title VII's charge-filing requirement is not jurisdictional but rather an affirmative defense. Mr. Amann explains that his EEOC charge did not include an allegation that Austin allegedly commissioned a criminal investigation against him after he was terminated because he was unaware of this information until he filed his lawsuit. Mr. Amann states that the court "should not exclude this allegation from [his] Title VII claim as a matter of law," and that he should have "an opportunity to explain at the appropriate time (such as summary judgment) why that allegation was not included in his EEOC charge." ECF No. 111 at 7. Defendants contend that the affirmative defense of failure to exhaust administrative remedies can be raised and decided at the motion to dismiss stage. Further, Defendants argue that several of the alleged post-termination retaliatory actions occurred before he filed his EEOC charge, and Mr.

Amann has failed to explain why such actions could not have been included in the initial EEOC charge or an amended charge, or why tolling or waiver should apply.

"A plaintiff normally may not bring a Title VII action based upon claims that were not part of a timely-filed EEOC charge for which the plaintiff has received a right-to-sue-letter." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1181 (10th Cir. 2018) (citation omitted). "[W]here discrete incidents of discrimination occur after an employee files an initial EEOC charge, the employee must file an additional or amended charge with the EEOC to satisfy the exhaustion requirement as to discrete incidents occurring after the initial charge." *Id.* (citing *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) (finding allegations as to September 2000 reprimand and April 2001 termination unexhausted where employee filed charge in July 1999 even though September 2000 and April 2001 incidents were part of a continuing pattern of alleged unlawful action)). "This regulatory exhaustion requirement is not a jurisdictional prerequisite for suit but is a claims-processing rule that the employer may raise as an affirmative defense." *Hickey v. Brennan*, 969 F.3d 1113, 1118 (10th Cir. 2020). Regulatory exhaustion is "accordingly subject to the same waiver and estoppel principles that govern other affirmative defenses." *Id.* "[T]he court must enforce this exhaustion requirement if the employer properly raises it." *Id.*

In an unpublished 2019 decision, the Tenth Circuit stated, "[a]lthough failure to exhaust is now an affirmative defense, it may be raised in a motion to dismiss when the grounds for the defense appear on the face of the complaint." *Cirocco v. McMahon*, 768 F. App'x 854, 858 (10th Cir. 2019) (unpublished) (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007)). A district court can dismiss "a claim on the pleadings based on an affirmative defense . . . only when the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements." *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018).

17

Here, Mr. Amann does not respond to Defendants' arguments regarding alleged pre-termination adverse actions. Pursuant to the court's prior order on Defendants' partial motion to dismiss Mr. Amann's First Amended Complaint, "Mr. Amann's termination is the earliest 'alleged unlawful employment practice' for which he may recover" under Title VII. ECF No. 38 at 17. Regarding Mr. Amann's allegations of post-termination adverse actions, Mr. Amann argues against dismissal only with respect to one such allegation—Austin's alleged commission of a criminal investigation against him in February of 2017. ECF No. 111 at 6–7. Thus, the court limits its analysis to that allegation.

Turning to Mr. Amann's Complaint, he alleges the following: (1) he "filed a timely Charge of Discrimination with the [EEOC] in March 2017, alleging retaliation under Title VII for protected activity concerning harassment" (ECF No. 90 ¶ 11); (2) "[o]n January 9, 2018, the United States Department of Justice issued Mr. Amann a Notice of Right to Sue" (*id.* ¶ 12); and (3) "[a]ll administrative prerequisites have been met" (*id.* ¶ 13). Mr. Amann does not attach his EEOC charge to his Complaint, but Defendants attached it to their Motion (ECF No. 98-1). Mr. Amann specifically references the EEOC charge in his Complaint (ECF No. 90 ¶¶ 11–13), the EEOC charge is central to his Title VII claim and the exhaustion of his administrative remedies, and neither party disputes the authenticity of the EEOC charge. Accordingly, the court may consider the EEOC charge without converting Defendants' partial motion to dismiss into a motion for summary judgment.[7] *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)

---

[7] The court notes that an unpublished Tenth Circuit opinion has stated the following:

> Although failure to exhaust is now an affirmative defense, it may be raised in a motion to dismiss when the grounds for the defense appear on the face of the complaint. *See Jones v. Bock*, 549 U.S. 199, 215, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007). But "when a

(holding that, in deciding a Rule 12(b)(6) motion, "the district court may consider documents

referred to in the complaint if the documents are central to the plaintiff's claim and the parties do

---

> defendant's motion to dismiss raises an affirmative defense that is
> not apparent on the face of the pleadings and outside matter is
> presented and accepted, federal courts will generally treat the
> motion as if it were one for summary judgment." *Weise v. Casper*,
> 507 F.3d 1260, 1267 (10th Cir. 2007). . . . [C]onversion to summary
> judgment would now be necessary given that exhaustion is no longer
> jurisdictional, *see, e.g.*, *Brooks v. Midwest Heart Grp.*, 655 F.3d 796,
> 798 (8th Cir. 2011).

*Cirocco*, 768 F. App'x at 858. In *Cirocco*, the Tenth Circuit held that the district court did not err under then-existing precedent when it "considered matters beyond [the] complaint in determining [the plaintiff] had not exhausted her administrative remedies" without converting a motion to dismiss into a motion for summary judgment. *Id.* But the Tenth Circuit stated that conversion to summary judgment would now be required under *Lincoln*, which held that a failure to exhaust administrative remedies is no longer a jurisdictional requirement but rather an affirmative defense. *Id.; see also Lincoln*, 900 F.3d at 1185. The district court in *Cirocco* considered not only the EEOC charge, but also "a letter from the SBA Office of Diversity, Inclusion and Civil Rights," "a copy of the EEO investigator's Memorandum to File regarding the EEO Complaint," "and an order of dismissal issued by the Administrative Law Judge ("ALJ") assigned to the matter." *Cirocco v. McMahon*, 294 F. Supp. 3d 1086, 1092 (D. Colo. 2018).

The circumstances were similar in the Eighth Circuit case to which the Tenth Circuit cites in *Cirocco*—*Brooks v. Midwest Heart Group*, 655 F.3d 796 (8th Cir. 2011). In *Brooks*, the Eighth Circuit observed that "the district court actively relied on various extra-pleading materials to arrive at its conclusions," and considered letters, correspondences, and an affidavit in ruling on a motion to dismiss. *Id.* at 800. The Eighth Circuit held that "[t]he district court erroneously assumed no conversion was necessary because it was 'only determining whether plaintiff has alleged sufficient facts to establish that she timely filed a charge with the EEOC; and not adjudicating the merits of the facts or resolving factual disputes.'" *Id.* (citation omitted). The Eighth Circuit noted that "[p]erhaps the court could avoid conversion if, in addition to pleadings, it considered only matters of public record, but the sources considered by the court here went far beyond the matters of public record." *Id.* (citation omitted).

Here, the court's consideration of the EEOC charge that Defendants have attached to their Motion does not require the court to convert the instant motion to dismiss into a motion for summary judgment. The EEOC charge is referenced in Mr. Amann's Complaint and central to his Title VII claim and the exhaustion of his administrative remedies, and its authenticity is not disputed by either party. Additionally, the court can take judicial notice of the EEOC charge as a matter of public record.

not dispute the documents' authenticity").[8] Additionally, the court can consider the EEOC charge

without converting Defendants' motion to a motion for summary judgment because the EEOC

charge is a matter of public record of which the court may take judicial notice under Federal Rule

of Evidence 201(b)(2). *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)

(holding that a district court may consider "matters of which a court may take judicial notice" in

ruling on a Rule 12(b)(6) motion to dismiss); *Van Woudenberg ex rel. Foor v. Gibson*, 211 F.3d

560, 568 (10th Cir. 2000) ("[T]he court is permitted to take judicial notice of . . . facts which are a

matter of public record."), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946, 955

(10th Cir. 2001).[9] As observed in *Vasser v. McDonald*, 228 F. Supp. 3d 1, 9–10 (D.D.C. 2016)

---

[8] Several courts have considered an EEOC charge without converting a motion to dismiss into a motion for summary judgment. *E.g.*, *Hudson v. Children's Nat'l Med. Ctr.*, 645 F. Supp. 2d 1, 5 n.5 (D.D.C. 2009) (considering EEOC charge without converting defendant's motion to dismiss based on failure to exhaust into a motion for summary judgment because the amended complaint made specific reference to the EEOC charge); *Marcelus v. Corr. Corp. of Am./Corr. Treatment Facility*, 540 F. Supp. 2d 231, 235 n.5 (D.D.C. 2008) (considering plaintiff's EEOC charge in deciding defendant's failure to exhaust argument under Rule 12(b)(6) without converting to a motion for summary judgment, even though plaintiff did not attach EEOC charge to his complaint, because he referenced the EEOC charge in his complaint); *Hyman v. N.M. State Univ.*, No. CIV 18-1103, 2020 WL 1514801, at *25 (D.N.M. Mar. 30, 2020) (unpublished) (considering plaintiff's EEOC charge in determining whether he failed to exhaust his administrative remedies on a motion to dismiss without conversion to a motion for summary judgment because the charge was referenced in the complaint and its authenticity was unchallenged); *Ayesh v. Butler Cnty. Sheriff's Off.*, No. 19-CV-1183, 2019 WL 6700337, at *2 n.8 (D. Kan. Dec. 9, 2019) (unpublished) (considering EEOC charge attached to defendant's motion to dismiss for failure to exhaust without converting to a motion for summary judgment because the EEOC charge was referred to in the complaint and central to plaintiff's claim, and the parties did not dispute its authenticity).

[9] Several courts have taken judicial notice of EEOC charging documents. *E.g.*, *Ingle v. Ieros, LLC*, No. 1:18-cv-02759, 2019 WL 2471152, at *4 (D. Colo. June 13, 2019) (unpublished) ("I take judicial notice of Plaintiff's EEOC Charge."); *Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 366 n.2 (D.D.C. 2018) ("In employment discrimination cases, courts often take judicial notice of EEOC charges and EEOC decisions."); *Romens v. City of Colorado Springs*, No. 13-cv-01441, 2015 WL 4607659, at *4 (D. Colo. Aug. 3, 2015) (unpublished) ("I have taken judicial notice of . . . the EEOC charge."); *Martinez v. City & County of Denver*, No. 08-cv-01503, 2010 WL 1380529, at *1 (D. Colo. Mar. 31, 2010) (unpublished) (noting that the EEOC proceedings were

(citations omitted), "[i]n the context of exhaustion, courts are willing to rely upon administrative orders and administrative complaints without converting the motion into one for summary judgment when the documents are 'referred to in the complaint, . . . are integral to [the plaintiff's] exhaustion of administrative remedies, and are public records subject to judicial notice,'" "courts have taken judicial notice of public administrative charges and parties' administrative complaints when no party disputes their authenticity," and "[i]f courts could not take judicial notice of such public documents, plaintiffs who obviously had not complied with the administrative-exhaustion process could survive motions to dismiss purely by failing to attach their administrative complaint."

Considering the Complaint, the EEOC charge, and Mr. Amann's concession in his response brief that the allegation of Austin commissioning a criminal investigation against him was not included in his EEOC charge, it is plain that Mr. Amann did not exhaust his administrative remedies with respect to allegations pertaining to post-termination adverse actions. But a failure to exhaust administrative remedies is subject to "the same waiver and estoppel principles that govern other affirmative defenses." *Hickey*, 969 F.3d at 1118. Mr. Amann states in his response brief that his EEOC charge did not include Austin's alleged commission of a criminal investigation against him because he was unaware of this information until he filed his lawsuit. That is sufficient at this stage to survive a motion to dismiss. If facts uncovered in discovery reveal that Mr. Amann's Title VII claim cannot survive with respect to his allegation that Austin commissioned a criminal investigation against him because of Mr. Amann's failure to exhaust, and that waiver and estoppel

---

referenced in the complaint and "critical" to the court's resolution of plaintiff's claims and stating the court may take judicial notice of EEOC charges).

do not apply, Defendants may raise this affirmative defense on a motion for summary judgment. But the court will not dismiss Mr. Amann's Title VII claim on this basis at this stage of the proceedings.

In short, Mr. Amann's Title VII claim is limited to his termination and Austin's alleged commission of a criminal investigation against him. Mr. Amann may not recover under Title VII for alleged pre-termination adverse actions, as such claims are time-barred.

### III.    Section 1983 Claims

Defendants argue for dismissal of Mr. Amann's § 1983 claims on three grounds: (1) under § 1983, Mr. Amann cannot sue the OAG and the individual defendants in their official capacities; (2) Mr. Amann has failed to plead his § 1983 claims against Defendants in their individual capacities with sufficient specificity to provide Defendants notice of the claims asserted against them; and (3) the individual Defendants are entitled to qualified immunity as to the § 1983 claims against them in their individual capacities. The court considers each argument in turn.

### A.    Claims Against the OAG and Individual Defendants in Their Official Capacities

Defendants argue that the OAG and the individual Defendants cannot be sued in their official capacities under § 1983. Defendants contend that the OAG is not a "person" within the meaning of § 1983, and the individual Defendants can only be sued in their official capacities based on ongoing constitutional violations and for prospective injunctive relief, neither of which are established or sought in the Complaint. Even if Mr. Amann has established an ongoing constitutional violation, Defendants argue that only Reyes has the authority to hire Mr. Amann, but Mr. Amann has failed to allege that Reyes committed any constitutional violation. Defendants maintain that Romano and Green are no longer employed by the OAG, Widdison is litigation counsel, and Barlow and Austin are identified as deputies in the Criminal division, which is not

22

the division in which Mr. Amann worked prior to his termination. Mr. Amann does not address whether the OAG can be sued under § 1983. But he does argue that Romano, Barlow, Austin, and Green all made decisions related to his employment and worked for Reyes, and his claims against them in their official capacities should not be dismissed "unless and until the undisputed facts show that they are either no longer employed with OAG or they do not have hiring authority." ECF No. 111 at 8. Mr. Amann concedes that Widdison would not be able to reinstate him.

       1)      The OAG

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citation omitted). The Tenth Circuit has held that "[n]either the state, nor a governmental entity that is an arm of the state for Eleventh Amendment purposes, nor a state official who acts in his or her official capacity, is a 'person' within the meaning of § 1983." *Harris v. Champion*, 51 F.3d 901, 905–06 (10th Cir. 1995) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989)), *superseded on other grounds by statute*, Fed. Courts Improvement Act of 1996, Pub. L. No. 104-317, 110 Stat. 3847 (1996)).

      The OAG is an arm of the state for Eleventh Amendment purposes and is therefore not a "person" within the meaning of § 1983. *See Meade v. Grubbs*, 841 F.2d 1512, 1525 (10th Cir. 1988) (holding that the Oklahoma Attorney General's office was an arm of the state for purposes

23

of Eleventh Amendment immunity), *abrogated in part on other grounds by Iqbal*, 556 U.S. at 676.

Thus, Mr. Amann's § 1983 claims against the OAG is dismissed with prejudice.

2) Individual Defendants in Their Official Capacities

"The Eleventh Amendment is a jurisdictional bar that precludes unconsented suits in federal court against a state and arms of the state." *Wagoner Cnty. Rural Water Dist. No. 2 v. Grand River Dam Auth.*, 577 F.3d 1255, 1258 (10th Cir. 2009). Unless Congress has abrogated states' Eleventh Amendment immunity, or a state has waived its immunity, a state or an arm of a state cannot be sued in federal court. *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002). A suit brought against a state official in his or her official capacity is "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (citation omitted). Thus, a suit brought against a state official in his or her official capacity is similarly barred by the Eleventh Amendment. But there is an exception: Unlike § 1983 claims for money damages, "official-capacity actions for prospective relief are not treated as actions against the State." *Id.* at 167 n.14. Known as the *Ex parte Young* exception, it permits a plaintiff to seek prospective injunctive relief for a violation of federal law in a suit against a state official in his or her official capacity. *Ex parte Young*, 209 U.S. 123, 156–60 (1908); *Klein v. Univ. of Kan. Med. Ctr.*, 975 F. Supp. 1408, 1417 (D. Kan. 1997).

Mr. Amann sues the individual Defendants in their official capacities seeking monetary damages and injunctive relief. ECF No. 90 ¶¶ 158, 170. The court considers whether he may recover such damages from Defendants in their official capacities under § 1983.

a) Monetary Damages

Mr. Amann seeks money damages for Defendants' conduct and the loss of his job. However, Congress has not abrogated Eleventh Amendment immunity from suits brought under

§ 1983. *See LaFavre v. Kansas ex rel. Stovall*, 6 F. App'x 799, 805 (10th Cir. 2001) (unpublished) ("It is well settled that neither 42 U.S.C. § 1981 nor § 1983 abrogate the Eleventh Amendment immunity of the states."). Nor has the state of Utah waived its immunity from § 1983 causes of action in federal court. *See Anderson v. Herbert*, 745 F. App'x 63, 69 (10th Cir. 2018) (unpublished) ("Utah has not waived its immunity against civil-rights suits."). Thus, Eleventh Amendment immunity applies to suits brought in federal court under § 1983 against the state of Utah and its officials acting in their official capacities. *See Will*, 491 U.S. at 70–71. And it is well-established that "claims for back pay, monetary damages, and retrospective declaratory relief are barred by the Eleventh Amendment." *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1232 (10th Cir. 2004). Mr. Amann's claims for money damages against the individual Defendants in their official capacities are thus barred by the Eleventh Amendment.

### b)  Prospective Injunctive Relief

Mr. Amann also seeks injunctive relief in the form of "reinstatement and/or front pay." ECF No. 90 ¶¶ 158, 170. To fall within the narrow *Ex parte Young* exception to Eleventh Amendment immunity, "there must be an 'ongoing violation of federal law,'" and the relief sought must be prospective in nature. *Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 495 (10th Cir. 1998) (citations omitted). The official sued in his or her official capacity must also have actual power to provide the requested relief. *Ex parte Young*, 209 U.S. at 157 ("[I]t is plain that such officer must have some connection with the enforcement of the act . . . ."); *see also Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (requiring that the defendant against whom suit was brought actually have a connection to the enforcement of the specific law challenged); *Klein*, 975 F. Supp. at 1417 ("[T]he state official must have the power to perform the act required in order to overcome the jurisdictional bar of the Eleventh Amendment." (citing *Ex parte Young*, 209 U.S. at 157)).

The court finds Mr. Amann has alleged an ongoing violation of federal law based on the continuing allegedly unconstitutional deprivation of his employment.[10] *See Buchwald*, 159 F.3d at 495–96 (finding an ongoing constitutional violation based on a plaintiff's continued unconstitutional exclusion from a school). Additionally, the Tenth Circuit has expressly held that "the Eleventh Amendment does not prohibit a suit in federal court to enjoin prospectively a state official from violating federal law," and "[r]einstatement of employment is a form of prospective equitable relief that is within the doctrine of *Ex parte Young*." *Meiners*, 359 F.3d at 1232–33; *see also Buchwald*, 159 F.3d at 495 n.5 ("[C]laims for reinstatement are treated as prospective relief when the plaintiff alleges that he or she was terminated for unconstitutional reasons . . . ."). Thus, Mr. Amann has alleged an ongoing violation of federal law, and the relief that Mr. Amann seeks is prospective in nature and therefore proper.

Defendants contend that Mr. Amann has failed to establish that the officials he sues have the power to reinstate him. Defendants argue that Reyes is the only individual who would have authority to reinstate Mr. Amann, but Mr. Amann has not alleged that Reyes committed any constitutional violation. The court disagrees. Mr. Amann alleges that he reported to Romano, the Chief Civil Deputy Attorney General who wrote and mailed to Mr. Amann a Notice of Intent to Terminate. Mr. Amann alleges that he also reported to Barlow, the Division Chief of the Children's Justice Division who later became a Criminal Deputy; and Austin, the Chief Criminal Deputy.

---

[10] Mr. Amann has also alleged that Defendants have "provid[ed] false information about him to prospective employers to prevent him from obtaining employment" (ECF No. 90 ¶ 142), but only in the context of his Title VII cause of action. He does not provide any further detail as to when this conduct occurred, whether it is ongoing, or which Defendant engaged in this conduct. The court accordingly does not consider this allegation as it relates to Mr. Amann's § 1983 causes of action, as it has been inadequately briefed and argued.

Finally, Mr. Amann alleges that Green was the Solicitor General, drafted Mr. Amann's termination letter, and was scheduled to meet with Mr. Amann after Mr. Amann had received his Notice of Intent to Terminate. Mr. Amann argues that all of these individuals made decisions impacting his employment, and all of them worked for Reyes, the Attorney General who also participated in Mr. Amann's termination and took other retaliatory acts against him.[11] Mr. Amann concedes that Defendants who are no longer employed at the OAG would not have the authority to reinstate him but maintains that he does not know which Defendants no longer work for the OAG. Who is and is not still employed by the OAG is a fact dispute that the court will not take up at this juncture. Taking all facts pleaded in the Complaint as true and in the light most favorable to Mr. Amann, Mr. Amann alleges sufficient facts at this stage to support that Romano, Barlow, Austin, Green, and Reyes would have authority to reinstate him. The court considers whether Mr. Amann has sufficiently alleged a constitutional violation against these Defendants below.

In short, the court will dismiss Mr. Amann's § 1983 claims against the OAG and claims for monetary damages against Defendants in their official capacities. The court will not, however, dismiss Mr. Amann's § 1983 claims for prospective injunctive relief against Romano, Barlow, Green, and Reyes in their official capacities.[12] Based upon Mr. Amann's concession that Widdison

---

[11] Defendants do not argue, and the court therefore does not address, whether Mr. Amann's allegations of Reyes's conduct merely amounts to an assertion of *respondeat superior* liability, which cannot be the basis for § 1983 liability. *See Iqbal*, 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."); *Grimsley v. MacKay*, 93 F.3d 676, 679 (10th Cir. 1996) ("[A] supervisor is not liable under § 1983 for the actions of a subordinate unless an 'affirmative link' exists between the constitutional deprivation and either the supervisor's personal participation or his failure to supervise." (citation omitted)).

[12] Defendants also argue that Mr. Amann's § 1983 claims should be dismissed against Reyes as "redundant and unnecessary" since Mr. Amann's UPPEA and Title VII claims are against the OAG, and Mr. Amann seeks reinstatement under his UPPEA claims and his Title VII claims as well. ECF

would not have the authority to reinstate him, the court dismisses Mr. Amann's § 1983 claims against Widdison in his official capacity with prejudice. And, as detailed below, because the court finds that Mr. Amann has ultimately failed to allege that Austin has violated his constitutional rights, the court dismisses Mr. Amann's § 1983 claims against Austin in his official capacity without prejudice.

B.      Notice of Individual Capacity Claims

Defendants argue that Mr. Amann's § 1983 claims against the individual Defendants should be dismissed for failure to affirmatively link or provide notice to the individual Defendants of their specific constitutional violations. Defendants argue that although Mr. Amann makes many allegations regarding the individual Defendants' conduct in the "General Factual Allegations" portion of his Complaint, Mr. Amann fails to provide notice to each individual Defendant "of which constitutional right he or she is alleged to have deprived [Mr. Amann]," or "sufficiently plead any link between each Defendant's alleged action and any alleged constitutional violation." ECF No. 98 at 29. Rather, Mr. Amann's § 1983 causes of action only reference conduct of "the Defendants" and "the individual Defendants" generally, without alleging which Defendant violated Mr. Amann's constitutional rights and how. *See* ECF No. 90 ¶¶ 146–71.

Mr. Amann responds that his Complaint complies with Federal Rule of Civil Procedure 8(a)(2)'s pleading requirements and "sufficiently identifies each defendant's individual actions giving rise to his claims." ECF No. 111 at 10–11. Mr. Amann also argues that to the extent that the

---

No. 98 at 26. Defendants cite *Lewis v. Four B Corp.*, 211 F. App'x 663, 665 n.2 (10th Cir. 2005) (unpublished) in support of their position. But *Lewis* is not binding precedent. And, at this incipient stage of litigation, the court is not persuaded that the claims are, in fact, "redundant and unnecessary."

court determines that he "needs to provide additional specificity regarding the individual Defendants' roles in the retaliatory acts against him, he should be given the opportunity to amend after receiving the relevant documents Defendants have thus far withheld." *Id.* at 10.

Under Rule 8(a), a claim for relief must include "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). "'The *Twombly* standard may have greater bite' in the context of a § 1983 claim against individual government actors, because 'they typically include complex claims against multiple defendants.'" *Id.* (citation omitted). As this court acknowledged in its memorandum decision and order on Defendants' prior partial motion to dismiss (ECF No. 38), where multiple defendants are involved, "[i]t is particularly important . . . that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Kan. Penn*, 656 F.3d at 1215 (citation omitted).

Defendants cite *Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1157 (10th Cir. 2001) for the proposition that a plaintiff asserting a § 1983 cause of action must allege an "affirmative link between the defendant's conduct and any constitutional violation." Defendants argue that Mr. Amann has failed to assert such an affirmative link here. The court finds *Stidham* to be instructive. In *Stidham*, a plaintiff made allegations about "the 'Defendants'" in his complaint, and elsewhere in his complaint defined "Defendants" to include a particular named defendant. *Id.* The *Stidham* court ultimately held that the allegations pertaining to that particular named defendant were "sufficient[]": "While the link is rather loosely demonstrated, our system of liberal pleading

29

persuades us to accept Appellant's allegation without parsing responsibility to the various Defendants specifically." *Id.*

Here, although Mr. Amann's Complaint could more clearly state which individual defendant violated Mr. Amann's free speech and due process rights and how, his § 1983 causes of action incorporate by reference the preceding paragraphs in which Mr. Amann alleges specific conduct on the part of each individual Defendant. ECF No. 90 ¶¶ 146, 160. Additionally, although each cause of action refers to the Defendants collectively, Mr. Amann defines "Defendants" at the beginning of his Complaint to include the OAG, Reyes, Romano, Barlow, Green, and Widdison. Although Defendant Austin's name is excluded from this list, it is clear from the case caption and from Mr. Amann's subsequent identification of Austin and statement that "[h]e is sued in his individual and official capacities" that Austin is one of the "Defendants." *See* ECF No. 90 at 1, ¶ 6. Based upon the foregoing and the liberal pleading requirements of Rule 8(a), Mr. Amann's allegations sufficiently establish an "affirmative link" between the individual Defendant's actions and the constitutional violations asserted. Further, Mr. Amann's General Factual Allegations sufficiently put each individual Defendant on notice of "*who* . . . d[id] *what* to *whom*," such that each is provided "with fair notice as to the basis of the claims against him or her." *Kan. Penn*, 656 F.3d at 1215 (citation omitted).

The court limits its conclusion in the preceding paragraph in two ways. First, Mr. Amann represents in his response brief that he only seeks to pursue a § 1983 claim against Widdison for allegedly violating Mr. Amann's procedural due process rights. *See* ECF No. 111 at 17–18. But this limitation is not expressly stated in the Complaint. Thus, the court will dismiss without prejudice Mr. Amann's causes of action against Widdison as they pertain to alleged violations of Mr. Amann's free speech and substantive due process rights. Second, in his response brief, Mr.

Amann concedes that his "claims against Barlow are admittedly lean," couching the claims in terms of Barlow having "the most motive for targeting Mr. Amann of any of the officials named" and being in a position of authority. ECF No. 111 at 16. Mr. Amann states that Defendants have refused to provide him with information requested in discovery that would shed light on Barlow's involvement, and requests an opportunity to amend his allegations against Barlow after obtaining this discovery. Based on the insufficiency of Mr. Amann's allegations pertaining to Barlow, the court dismisses Mr. Amann's § 1983 claims against Barlow without prejudice. *See Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011) ("Personal liability 'under § 1983 must be based on personal involvement in the alleged constitutional violation.'" (citation omitted)).

In short, Mr. Amann's Complaint sufficiently asserts an affirmative link between the individual Defendants' alleged conduct and constitutional violations and provides adequate notice to the individual Defendants of the constitutional violations asserted against them. Mr. Amann's free speech and substantive due process § 1983 claims against Widdison are dismissed without prejudice. Only Mr. Amann's procedural due process § 1983 claim against Widdison may proceed.[13] Mr. Amann's § 1983 claims against Barlow are dismissed without prejudice for failure to state a claim.[14]

---

[13] The court will therefore limit its qualified immunity analysis to Mr. Amann's procedural due process § 1983 claim against Widdison.

[14] Because the court dismisses Mr. Amann's § 1983 claims against Barlow, it does not assess whether Barlow may avail himself of qualified immunity.

C.      Qualified Immunity

Defendants argue that, even if Mr. Amann has provided them with fair notice under Rule 8(a), the § 1983 claims against the individual Defendants in their individual capacities[15] should be dismissed based on qualified immunity.  "Qualified immunity protects officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). A right will be clearly established if there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains." *Brown*, 662 F.3d at 1164 (quoting *Stearns v. Clarkson*, 615 F.3d 1278, 1282 (10th Cir. 2010)).

"Although qualified immunity defenses are typically resolved at the summary judgment stage, district courts may grant motions to dismiss on the basis of qualified immunity." *Thomas*, 765 F.3d at 1194. When qualified immunity is asserted in a Rule 12(b)(6) motion, courts "evaluate 'the defendant's conduct *as alleged in the complaint*.'" *Sayed v. Virginia*, 744 F. App'x 542, 546 (10th Cir. 2018) (unpublished) (quoting *Thomas*, 765 F.3d at 1194). "To resolve qualified immunity claims at the motion to dismiss stage, a court must consider two elements: whether the

---

[15] "Qualified immunity applies to claims for monetary relief against officials in their individual capacities, but it is not a defense against claims for injunctive relief against officials in their official capacities." *Meiners*, 359 F.3d at 1233 n.3. Thus, the court considers Defendants' qualified immunity arguments only as they relate to Mr. Amann's claims against the individual Defendants in their individual capacities for monetary relief.

facts alleged establish a constitutional violation and whether the violation was 'clearly established' at the time of the alleged misconduct." *Hernandez v. Ridley*, 734 F.3d 1254, 1258 (10th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "A plaintiff 'must allege sufficient facts that show—when taken as true—the defendant plausibly violated his constitutional rights, which were clearly established at the time of violation.'" *Id.* (citation omitted).

    1)   First Amendment Free Speech Retaliation Standard

"When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). But "when government employees speak on matters of public concern, 'they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively.'" *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007) (quoting *Garcetti*, 547 U.S. at 419).

When a government employer is alleged to have retaliated against an employee for engaging in a protected activity, courts apply the five-step inquiry known as the *Garcetti/Pickering* analysis. *See id.* Under *Garcetti/Pickering*, the court must consider

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 745 (10th Cir. 2010) (citation omitted).[16]

The first three steps are to be resolved by the court as a matter of law, "while the last two are

ordinarily for the trier of fact." *Brammer-Hoelter*, 492 F.3d at 1203. Finally, "[i]mplicit in the

*[Garcetti/]Pickering* test is a requirement that the public employer have taken some adverse

employment action against the employee." *Couch v. Bd. of Trs. of Mem'l Hosp. of Carbon Cnty.*,

587 F.3d 1223, 1235–36 (10th Cir. 2009) (citation omitted).

For purposes of this Motion, Defendants do not dispute that "[Mr. Amann's] speech was

protected or that [Mr. Amann] suffered an adverse action when he was terminated." ECF No. 98

at 35. Rather, Defendants argue that Mr. Amann has failed to allege facts sufficient to establish that

"his protected speech was a motivating factor in his termination or any other alleged adverse

action." *Id.*[17] Indeed, Defendants maintain that Mr. Amann failed to allege "that *any* of the

---

[16] Mr. Amann argues that Defendants have not provided support for the applicability of this five-factor test at the motion to dismiss stage. ECF No. 111 at 21. But the Tenth Circuit has applied this very test in assessing qualified immunity at the motion to dismiss stage. *Lincoln v. Maketa*, 880 F.3d 533, 535, 538 (10th Cir. 2018). The court therefore applies it here.

[17] Defendants do not argue that the Complaint fails to adequately allege the remaining *Garcetti/Pickering* steps. In both their Motion and reply brief, Defendants advance arguments relating only to whether Mr. Amann's protected speech was a motivating factor in his termination or other adverse actions. Defendants may subsequently reassert this qualified immunity defense with respect to the other elements of the *Garcetti/Pickering* test, many of which are ill-suited for resolution at this preliminary stage. For example, the first prong of that analysis—whether the employee's speech was made pursuant to his official duties—requires a fact-intensive review "of all the facts and circumstances surrounding the speech and the employment relationship." *Brammer-Hoelter*, 492 F.3d at 1204. This prong would require the court to consider the job description for each of the positions held by Mr. Amann during the relevant period alongside a fact-intensive examination of the setting and content of the speech—an analysis that requires materials that are not properly before the court on a motion to dismiss.

Additionally, although Mr. Amann mentions other adverse actions taken against him in addition to his termination in his Complaint and response brief, the only other adverse action that he specifically mentions in his Complaint in connection with his First Amendment claim is Austin's alleged commission of a criminal investigation against him, and the parties only meaningfully brief

individual Defendants were even aware of, let alone motivated by his protected speech." *Id.* at 35–36.

> a) Whether the Complaint Sufficiently Alleges Retaliation that Is
>
> Actionable Under the First Amendment

Taken as a whole and accepted as true, Mr. Amann's Complaint paints a picture of a state prosecutor with a blemish-free fifteen-year record, who, after engaging in allegedly protected speech activity, experienced retaliation including termination and other adverse actions. Defendants argue that Mr. Amann has failed to "connect" his termination to Reyes or Austin and that Mr. Amann failed to allege that Romano and Green knew about or were motivated by Mr. Amann's protected activity. ECF No. 98 at 36. The court considers these arguments in turn.

**Reyes.** Defendants' assertion that the Complaint "fail[s] to connect [Mr. Amann's] termination to Reyes" (*id.*) is incorrect. That each adverse action was not communicated to Mr. Amann directly by Reyes will not doom Mr. Amann's otherwise plausible account that it was undertaken at his direction. Without complete discovery, Mr. Amann has no way to ascertain the degree of Reyes's involvement. Nevertheless, the events described in the Complaint, construed in the light most favorable to Mr. Amann, plausibly allege that at least some of the adverse action was undertaken at Reyes's direction. Indeed, the Complaint alleges multiple interactions with Solicitors General and Chief Civil Deputies—among the most senior positions in the OAG. Some of those interactions occurred after the OAG learned that Mr. Amann had provided considerable

---

whether Mr. Amann has stated a First Amendment claim with respect to his termination. Accordingly, the court limits its First Amendment analysis to Mr. Amann's termination and Austin's alleged commission of a criminal investigation against Mr. Amann.

information to a legislative audit on the topic of corruption in the OAG. It is plausible that those individuals were acting at the behest of Reyes, who is the Attorney General. At minimum, the Complaint alleges, and the facts plausibly suggest, that Reyes ordered Mr. Amann's termination.[18]

**Romano.** Defendants' arguments that Mr. Amann failed to link Romano to his alleged free speech activities or allege that Romano "knew about or was motivated by any of his alleged protected free speech" (ECF No. 98 at 36) are also unavailing. As Defendants acknowledge, Romano wrote the Notice of Intent to Terminate that resulted in Mr. Amann's termination. Additionally, the Complaint alleges that Romano was the Chief Civil Deputy Attorney General and acted as Solicitor General while Mr. Amann worked at the OAG and that Mr. Amann worked under Romano's direction in the Antitrust section of the OAG. The Complaint further alleges that Romano placed Mr. Amann on administrative leave, ordered him not to have contact with other OAG employees or have access to any state databases, and had access to a file regarding the internal employment investigation of Mr. Amann. Based upon these allegations, it is plausible that Romano, given her position as Mr. Amann's superior, involvement in his termination, and access to information regarding Mr. Amann's activity at the OAG, was aware of and motivated by his alleged protected free speech.

**Green.** Defendants contend that Mr. Amann's allegation that Green wrote his termination letter is insufficient to link Green to Mr. Amann's alleged free speech activities and to establish that Green knew about and was motivated by such activities. Even though Mr. Amann's allegations

---

[18] The Complaint alleges that Romano met with Mr. Amann on August 17, 2016 and "indicated she had drafted a Notice of Intent to Terminate that she was sending to Reyes." ECF No. 90 ¶ 95. This allegation, construed in the light most favorable to Mr. Amann, and read in conjunction with Mr. Amann's allegations that Reyes is the Attorney General and that "Defendants" (which includes Reyes) terminated him, plausibly alleges that Reyes ordered Mr. Amann's termination.

pertaining to Green are not as substantial as his allegations pertaining to Romano, the court still finds them sufficient to survive a motion to dismiss. The Complaint alleges that Green acted as Solicitor General and drafted Mr. Amann's termination letter, which included reasons for Mr. Amann's termination and references to supporting documents. Mr. Amann was also terminated after the OAG learned that he had provided considerable information to a legislative auditor regarding OAG corruption. These allegations, construed in the light most favorable to Mr. Amann, plausibly establish that Green participated in Mr. Amann's termination and was aware of and motivated by Mr. Amann's free speech activities, which Mr. Amann asserts were the real basis of his termination.

**Austin.** Defendants argue that the Complaint fails to connect Austin to Mr. Amann's termination. The court agrees. The Complaint alleges that Austin was the Chief Criminal Deputy for the OAG, passed Mr. Amann over for a promotion for which Mr. Amann was qualified, contacted Reyes in September of 2014 about wanting to replace Mr. Amann, left messages on Mr. Amann's phone demanding he call back but then did not answer Mr. Amann's return calls, authorized a DHRM investigation against Mr. Amann based on a co-worker's complaint that Mr. Amann was bullying her, informed Mr. Amann that he was being transferred to the Antitrust Division, and allegedly commissioned a criminal investigation based on false allegations of Mr. Amann "stalking" Poulson. These allegations, even construed in the light most favorable to Mr. Amann, do not plausibly establish that Austin was connected to Mr. Amann's 2016 termination, much less that he was motivated by Mr. Amann's protected speech. Mr. Amann's Complaint alleges that his § 1983 claim for violation of his First Amendment rights is also based on "other adverse actions against him, including allegedly commissioning a criminal investigation of him." ECF No. 90 ¶ 155. However, as discussed in the following subsection, the law is not clearly

established that Austin's alleged retaliatory commission of a criminal investigation is actionable under the First Amendment. Accordingly, Austin is entitled to qualified immunity on Mr. Amann's § 1983 First Amendment free speech retaliation claim.

      b)  The Law is Clearly Established that Retaliatory Termination Is Actionable Under the First Amendment, But Not that Retaliatory Criminal Investigations Are Actionable Under the First Amendment

Termination was the sole adverse action experienced by the plaintiff in the Supreme Court's foundational First Amendment retaliation case. *See Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 574–75 (1968). As such, the law is clearly established that termination is an adverse action that would deter a reasonable person from exercising his or her First Amendment rights.

The same cannot be said of commissioning a criminal investigation. "The fourth element of the *Garcetti/Pickering* test requires that 'the protected speech [be] a motivating factor in the adverse employment action.'" *Lincoln v. Maketa*, 880 F.3d 533, 539 (10th Cir. 2018) (citation omitted). But "the law does not clearly support" characterizing criminal investigations as adverse employment actions. *Id.* at 540. As the Tenth Circuit in *Lincoln* observed:

> The Supreme Court has declined to consider whether a retaliatory criminal investigation entails a constitutional violation. *Hartman v. Moore*, 547 U.S. 250, 262 n.9, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006). Other circuits disagree with one another on the issue. *Compare Rehberg v. Paulk*, 611 F.3d 828, 850–51 & n.24 (11th Cir. 2010) (declining to treat a retaliatory criminal investigation as a First Amendment violation), *with Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003) (noting that a criminal investigation could violate the First Amendment). Our court has not settled the question.

880 F.3d at 540. Although the Tenth Circuit held in *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996), that filing criminal charges at the behest of an employer constituted an adverse employment action, the Tenth Circuit held in *Lincoln* that "an investigation is a far cry from formally filing charges and bringing someone to trial," and "that the investigation had a 'criminal' aspect does not necessarily create an adverse employment action," *Lincoln*, 880 F.3d at 540 (citation omitted). The *Lincoln* court ultimately held that qualified immunity applied because the plaintiff failed to demonstrate that a criminal investigation would "obviously" constitute an adverse employment action. *Id.* at 541 (citation omitted). Here, Mr. Amann has failed to direct the court to any on-point case from the Tenth Circuit, the Supreme Court, or other courts that commissioning a criminal investigation would constitute an adverse employment action. Thus, Austin is entitled to qualified immunity.

In sum, the allegations in the Complaint, taken as true and construed in the light most favorable to Mr. Amann, have plausibly alleged that Reyes, Romano, and Green—in violation of clearly established law—terminated Mr. Amann in retaliation for having engaged in a protected activity. They are accordingly not entitled to qualified immunity on Mr. Amann's § 1983 First Amendment free speech retaliation claim. The Complaint does not, however, plausibly allege that Austin terminated Mr. Amann in retaliation for having engaged in a protected activity. And Mr. Amann has failed to provide authority that Austin's alleged retaliatory commissioning of a criminal investigation against him is actionable under the First Amendment. Accordingly, Austin is entitled to qualified immunity on Mr. Amann's § 1983 First Amendment free speech retaliation claim.

Defendants Reyes, Romano, and Green may reassert and avail themselves of qualified immunity if, at summary judgment, they each establish that they played no role in the adverse

39

action taken against Mr. Amann. They may also be entitled to qualified immunity if they retaliated against Mr. Amann for speech that is not protected by the First Amendment—for example, if the speech that motivated Mr. Amann's termination was made pursuant to his official duties. Finally, Defendants Reyes, Romano, and Green may be entitled to qualified immunity if the specific factual circumstance in which the constitutional violation occurred is sufficiently distinguishable from precedent such that reasonable officials in their positions would not know that their conduct violates the law. But at this stage of the proceedings, where the Complaint governs, Mr. Amann has alleged that Defendants Reyes, Romano, and Green terminated him based on his constitutionally protected speech activity. Thus, Defendants' motion to dismiss is denied as to Defendants Reyes, Romano, and Green.

2)   Fourteenth Amendment Procedural Due Process Standard

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment." *Mathews v. Eldridge,* 424 U.S. 319, 332 (1976). "Due process is flexible and calls for such procedural protections as the particular situation demands." *Id.* at 334 (brackets and citation omitted). To determine whether an individual was denied procedural due process, the court engages in a two-part inquiry: "(1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process." *Merrifield v. Bd. of Cnty. Comm'rs,* 654 F.3d 1073, 1078 (10th Cir. 2011) (citation omitted).

Mr. Amann alleges that Defendants deprived him of his Fourteenth Amendment due process rights in the following ways: (1) he was transferred with a decrease in pay without notice or an opportunity to object; (2) he was suspended for months and was not provided reason or an

opportunity to object; (3) he was terminated without cause based on falsified reasons, not given access to records he could use to defend himself, only provided an opportunity to be heard by a biased agent, and not given the claimed bases for his termination; and (4) a criminal investigation was commissioned against him. ECF No. 90 ¶ 164. Defendants argue that Mr. Amann cannot assert a procedural due process claim based on his transfer and decrease in pay because the transfer occurred outside of Utah's four-year statute of limitations, *Mismash v. Murray City*, 730 F.2d 1366, 1367 (10th Cir. 1984), and Mr. Amann has not established that he had a property interest in the five percent of his salary that he lost. Mr. Amann has responded to neither argument. The court agrees with Defendants and thus dismisses with prejudice Mr. Amann's due process cause of action as it pertains to the transfer and pay decrease.[19] The court also notes that Mr. Amann has failed to advance any arguments or provide any authority to establish a protected interest in relation to the commissioning of a criminal investigation against him. The court accordingly dismisses without prejudice Mr. Amann's due process cause of action as it pertains to this criminal investigation. All that remains for the court to consider is Mr. Amann's suspension and termination.

**Suspension.** With respect to Mr. Amann's suspension, the court must first determine whether Mr. Amann has a protected property interest to which due process principles apply. The Tenth Circuit has affirmed a district court's holding that "suspension with pay did not invade any recognized property interest," *Pitts v. Bd. of Educ. of U.S.D. 305, Salina, Kan.*, 869 F.2d 555, 556

---

[19] The Tenth Circuit has also observed that "the overwhelming weight of authority holds that no protected property interest is implicated when an employer reassigns or transfers an employee absent a specific statutory provision or contract term to the contrary." *Anglemyer v. Hamilton Cnty. Hosp.*, 58 F.3d 533, 539 (10th Cir. 1995). Mr. Amann has failed to point to a statutory provision or contract term supporting a property interest in his ICAC position. This provides further support for dismissing Mr. Amann's procedural due process claim based on his transfer.

(10th Cir. 1989), and has subsequently observed that "[s]uspension with pay does not raise due process concerns," *Hicks v. City of Watonga, Okla.*, 942 F.2d 737, 746 n.4 (10th Cir. 1991) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 544–45 (1985)). Other circuits have also held that being placed on paid administrative leave does not implicate any property interest for purposes of procedural due process, *see, e.g.*, *Piscottano v. Murphy,* 511 F.3d 247, 288 (2d Cir. 2007) (holding that being placed on fully-paid administrative leave pending a *Loudermill* hearing does not give rise to a cognizable procedural due process claim); *Davis v. Dallas Indep. Sch. Dist.,* 448 F. App'x 485, 495 (5th Cir. 2011) (unpublished) ("Placement on paid administrative leave does not constitute deprivation of a property interest."), as have other district courts, *see, e.g.*, *Shively v. Utah Valley Univ.*, No. 2:20-cv-119, 2020 WL 4192290, at *2, *5 (D. Utah July 21, 2020) (unpublished) (holding that an employee failed to overcome a qualified immunity defense when his complaint did not establish his suspension with pay as a "clearly established," protectible property interest); *Ishoo v. Bd. of Regents, Univ. of N.M.*, No. CIV-06-0747, 2007 WL 9729216, at *14 (D.N.M. Sept. 29, 2007) (unpublished) ("Both the Supreme Court and the Tenth Circuit have held that suspension with pay does not implicate due process."); *Pierce v. Engle*, 726 F. Supp. 1231, 1237 (D. Kan. 1989) (holding that an employee had no § 1983 claim for being placed on leave without a hearing and for being prevented from formally returning to work until a certain date when he "continued to be paid throughout his leave of absence period").

Here, Mr. Amann makes no argument in his response brief pertaining to the plausibility of his procedural due process claim as it relates to his suspension. Mr. Amann does not expressly state in his Complaint whether his suspension was paid, but he also does not contest Defendants' contention that his suspension was paid. Accordingly, based upon the foregoing case law and in

the absence of any argument to the contrary from Mr. Amann, there is no property interest involved in Mr. Amann's suspension.

**Termination.** Mr. Amann's termination requires more extensive analysis. For purposes of this Motion, Defendants do not dispute that Mr. Amann had a protected property interest in his position at the OAG. At issue then is whether Mr. Amann was afforded the appropriate process in light of his termination. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews,* 424 U.S. at 333 (citation omitted). The Supreme Court has described "'the root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" *Loudermill*, 470 U.S. at 542 (citation omitted). "This principle requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Id.* (citations omitted). This pre-termination hearing "need not be elaborate." *Id.* at 545. "The key requirement is that the employee is entitled to a pre-termination opportunity to respond; more specifically, 'to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.'" *Benavidez v. City of Albuquerque,* 101 F.3d 620, 627 (10th Cir. 1996) (citation omitted). Generally, a post-termination hearing is also required. *Loudermill*, 470 U.S. at 546–47.

Here, Mr. Amann alleges that he was notified on August 17, 2016 at a meeting with his attorney, Widdison, and Romano that Romano had drafted a Notice of Intent to Terminate that she would send to Reyes. Mr. Amann alleges that Widdison and Romano refused to supply documents supporting the termination at the meeting. Mr. Amann alleges that Romano mailed the Notice of Intent to Terminate, which included two fabricated claims to support Mr. Amann's termination, to him on September 9, 2016. Mr. Amann further alleges that he sent a letter to Reyes on September

16, 2016 denying all of the allegations in the Notice of Intent to Terminate and requesting a meeting with Reyes. Reyes referred Mr. Amann to Solicitor General Green for the meeting, but Mr. Amann's attorney ultimately cancelled the meeting with Green on October 27, 2016. Mr. Amann alleges that the meeting was cancelled because the OAG did not provide the documents that Mr. Amann had requested supporting the allegations made against him in the Notice of Intent to Terminate and would not permit Mr. Amann to record the meeting. Mr. Amann was subsequently terminated on December 2, 2016.

Defendants argue that Mr. Amann was afforded the requisite process. Defendants contend that before his termination, Mr. Amann was given notice of the OAG's intention to terminate him, which included the bases for his termination; an opportunity to be heard, both in writing and in a meeting with Green (although Mr. Amann's counsel cancelled the meeting); and a "detailed decision outlining the final termination decision." ECF No. 98 at 39. And after Mr. Amann's termination, Defendants note that he had the ability to challenge his termination before the Career Service Review Office ("CSRO") under Utah law, UTAH CODE § 67-19a-101 *et seq.*, but did not do so. Without citation to any authority, Mr. Amann points to[20] his allegations that Defendants relied upon falsified claims to justify his termination and refused to provide him information

---

[20] Mr. Amann further states that Defendants' arguments regarding his opportunities to be heard before and after his termination were not included in his Complaint and thus are "not an appropriate basis for a motion to dismiss." ECF No. 111 at 23. In support, Mr. Amann cites *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013), but the citation plainly does not stand for such a sweeping proposition, as it discusses the more limited subject of a district court's ability to consider documents outside of the pleadings on a motion to dismiss. A failure to include allegations establishing the elements of proof required to state a procedural due process claim in a complaint does not bar the court from considering these deficiencies on a motion to dismiss.

regarding those claims, and argues that they "support a claim for procedural due process." ECF No. 111 at 23.[21]

In considering the adequacy of Mr. Amann's pre-termination opportunity to respond, it is important to note that "[a] full evidentiary hearing is not required prior to an adverse employment action. The individual entitled to due process protection needs only to be given notice and an opportunity to respond." *West v. Grand County*, 967 F.2d 362, 367 (10th Cir. 1992) (citing *Loudermill*, 470 U.S. at 545–46). The Tenth Circuit has held that "pretermination warnings and an opportunity for a face-to-face meeting with supervisors, and a conversation between an employee and his supervisor immediately prior to the employee's termination" are sufficient to satisfy this requirement. *Id.* Here, Mr. Amann was given notice, at a meeting with his counsel, Romano, and Widdison, that Romano had drafted a Notice of Intent to Terminate that she would send to Reyes. And Mr. Amann sent a letter to Reyes on September 16, 2016 denying all of the allegations in the Notice of Intent to Terminate and requesting a meeting with Reyes. He was given the opportunity to meet with Solicitor General Green to discuss his objections, but Mr. Amann's attorney cancelled the meeting because the OAG did not provide the documents that Mr. Amann had requested and would not permit Mr. Amann to record the meeting. Mr. Amann was then terminated on December 2, 2016. Mr. Amann thus had the opportunity to be heard and tell his side of the story orally, in face-to-face meetings with superiors, and in writing on three occasions before his termination.

---

[21] It is possible that Mr. Amann intends to state a claim for violation of his due process rights based on a deprivation of a liberty interest, which requires, in part, a plausible allegation that a false statement was made. *McDonald v. Wise*, 769 F.3d 1202, 1212 (10th Cir. 2014). But it is not apparent from the face of Mr. Amann's Complaint or from his response brief that he intends to assert such a claim. Indeed, Mr. Amann's due process cause of action in his Complaint is rather ill-defined, failing to separate his allegations for procedural due process from his allegations of substantive due process. *See* ECF No. 90 at 30–32.

Although he forewent the third occasion, he still had a meeting with Romano and sent his written objections to Reyes before he was terminated. This was sufficient pre-termination due process.

That Mr. Amann did not receive the documents he requested does not establish a procedural due process violation. Under *Loudermill*, he was entitled to "an explanation of the employer's evidence," 470 U.S. at 546, which he received and had the opportunity to challenge in person and in writing before his termination. Mr. Amann alleges that Defendants "withheld from him the claimed bases for his termination" (ECF No. 90 ¶ 164), but he evidently had notice of these bases, as he alleges that the bases were fabricated and that he stated his objections to them in a letter sent to Reyes. Mr. Amann had notice and multiple opportunities to respond and give his side of the story, and that is sufficient process. *See Riggins v. Goodman*, 572 F.3d 1101, 1109 (10th Cir. 2009) (holding that the process given to an employee "more than adequately satisfied due process requirements" when the employee "was given written notice of the charges against him, an explanation of the evidence, and several opportunities to present his side of the story"). It is the post-termination hearing "where the definitive fact-finding occurs." *West*, 967 F.2d at 368 (citation omitted). But Mr. Amann makes neither an allegation nor an argument in his Complaint or response brief that his post-termination process was inadequate. Mr. Amann does not appear to have availed himself of a post-termination hearing through the CSRO. *Tansy v. Mondragon*, 52 F.3d 338, at *4 (10th Cir. 1995) (unpublished table decision) ("Although [the employee] declined to take advantage of [the] opportunity [for a full evidentiary hearing post-termination,] the availability of the post-termination proceeding is an important factor in our decision that he has not shown the pretermination hearing to be constitutionally inadequate." (citing *Loudermill*, 470 U.S. at 546–48)). Mr. Amann argues that Utah law permits a public employee to "go through CSRO or file a lawsuit" (ECF No. 111 at 23); *see also* UTAH CODE § 67-21-4(c), but does not argue that his post-

termination process was inadequate. Accordingly, the adequacy of Mr. Amann's post-termination process is not before the court.

Mr. Amann also alleges that his procedural due process rights were violated when he was given "the opportunity to be 'heard' by an agent of the person who had already decided to terminate him." ECF No. 90 ¶ 164. "A fundamental principle of procedural due process is a hearing before an impartial tribunal." *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 518 (10th Cir. 1998) (citing *Withrow v. Larkin*, 421 U.S. 35, 46–47 (1975)). "A tribunal is not impartial if it is biased with respect to the factual issues to be decided at the hearing." *Patrick v. Miller,* 953 F.2d 1240, 1245 (10th Cir. 1992) (citation omitted). "[A] substantial showing of personal bias is required to disqualify a hearing officer or tribunal in order to obtain a ruling that a hearing is unfair." *Tonkovich*, 159 F.3d at 518 (citation omitted). "[B]ecause honesty and integrity are presumed on the part of a tribunal, there must be some substantial countervailing reason to conclude that a decisionmaker is actually biased with respect to factual issues being adjudicated." *Id.* (citation omitted). Although Mr. Amann had a face-to-face meeting with Romano, wrote a letter detailing his side of the story and objections to Reyes, and had an opportunity to meet with Green, Mr. Amann has alleged sufficient facts to demonstrate that these individuals were not impartial. Indeed, Mr. Amann has alleged that he was terminated for falsified reasons and in retaliation for speaking out about OAG corruption. In construing Mr. Amann's Complaint in the light most favorable to him, the court finds that Mr. Amann was not afforded the impartial pre-termination process to which he was entitled. *See Cypert v. Indep. Sch. Dist. No. I-050 of Osage Cnty.*, 661 F.3d 477, 480–81 (10th Cir. 2011) (applying the principle that "[i]mpartiality of the tribunal is an essential element of due process" to a pre-non-renewal hearing); *Bjorklund v. Miller*, 467 F. App'x 758, 765 (10th Cir. 2012) (unpublished) (collecting cases and noting the existence of "over thirty years of

Tenth Circuit precedent holding that employees with a property interest *do* have a right to an unbiased pre-termination decision-maker").

In sum, because there is no property interest at issue in Mr. Amann's suspension, his suspension does not support a procedural due process violation. In contrast, Mr. Amann had a property interest in his position at the OAG, and he has plausibly alleged that he was not awarded impartial pre-termination process. Mr. Amann has not otherwise plausibly alleged a procedural due process violation. Defendants do not argue that the law at issue was not clearly established with respect to Mr. Amann's procedural due process claim.[22] Accordingly, Defendants Reyes, Romano, and Green are not entitled to qualified immunity with respect to Mr. Amann's procedural due process claim as it pertains to the bias of his pre-termination process. Because Mr. Amann has not alleged bias in his pre-termination process as it pertains to Widdison or Austin and has not otherwise plausibly alleged that Widdison or Austin violated his procedural due process rights, the court grants Widdison and Austin qualified immunity on Mr. Amann's procedural due process claim.[23]

Defendants Reyes, Romano, and Green may reassert and avail themselves of qualified immunity if, at summary judgment, the specific factual circumstance in which the constitutional

---

[22] The court notes, however, that it is clearly established that sufficient process requires "a hearing before an impartial tribunal." *Tonkovich,* 159 F.3d at 518 (citing *Withrow,* 421 U.S. at 46–47); *see also Cypert,* 661 F.3d at 481 ("Impartiality of the tribunal is an essential element of due process." (citation omitted)); *Miller v. City of Mission, Kansas,* 705 F.2d 368, 372 (10th Cir. 1983) ("An impartial tribunal is an essential element of a due process hearing.").

[23] Because the court finds that Widdison is entitled to qualified immunity with respect to Mr. Amann's § 1983 procedural due process claim against him, the court does not address the additional bases for dismissal of the claim against Widdison that Defendants raised in their Motion—*i.e.*, judicial proceedings privilege and absolute immunity.

violation occurred is sufficiently distinguishable from precedent such that reasonable officials in their positions would not know that their conduct violates the law. But at this stage of the proceedings, where the Complaint governs, Mr. Amann has alleged that he was not afforded impartial pre-termination process. Thus, Defendants' Motion is denied as to Defendants Reyes, Romano, and Green as it pertains to the bias of Mr. Amann's pre-termination process.

3) Fourteenth Amendment Substantive Due Process Standard

In his Complaint, Mr. Amann combines his substantive due process claim and allegations with his procedural due process claim and allegations. ECF No. 90 at 30–32. "In order to present a claim of denial of 'substantive' due process by a discharge for arbitrary or capricious reasons, a liberty or property interest must be present to which the protection of due process can attach." *Brenna v. S. Colo. State Coll.*, 589 F.2d 475, 476 (10th Cir. 1978). Defendants do not argue that Mr. Amann has failed to establish a property interest for purposes of his substantive due process claim,[24] nor do they argue that Mr. Amann's substantive due process claim fails under the clearly established law prong of a qualified immunity analysis. ECF No. 98 at 40–42.

Substantive due process under the Fourteenth Amendment bars "certain government actions regardless of the fairness of the procedures used to implement them." *County of Sacramento v. Lewis,* 523 U.S. 833, 840 (1998) (citation omitted). "The ultimate standard for determining whether there has been a substantive due process violation is whether the challenged

---

[24] Defendants mention in their reply brief that "Plaintiff ignores the cases cited in Defendants' motion that a government employee has no protectable interest attached to suspension with pay." ECF No. 118 at 13. The court hereby incorporates by reference its analysis of Mr. Amann's protected property interests under his procedural due process cause of action here. *See supra* Section III(C)(2).

government action shocks the conscience of federal judges." *Hernandez v. Ridley*, 734 F.3d 1254, 1261 (10th Cir. 2013) (citation omitted). The Tenth Circuit has explained this standard as follows:

> "Conduct that shocks the judicial conscience . . . is deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir.2008) (quotations omitted). To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or "employ[ed] it as an instrument of oppression." *Williams v. Berney*, 519 F.3d 1216, 1220 (10th Cir.2008). The behavior complained of must be egregious and outrageous. *Id.* (substantive due process prohibits "only the most egregious official conduct") (quotations omitted); *see also Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir.1995) ("[T]he plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.").

*Id.*

Here, Mr. Amann alleges that, despite years of being a high-performing and high-achieving attorney at the OAG, he was terminated[25] for falsified reasons in retaliation for exercising his First Amendment right to speak out and raise concerns about OAG corruption. Taking these allegations to be true, and construing them in the light most favorable to Mr. Amann, they allege arbitrary and capricious conduct that is shocking to the conscience. Mr. Amann has alleged that the reasons proffered in support of his termination were pretextual and fabricated and that he was deprived of his livelihood for exercising his constitutional right. Although Defendants argue that Mr. Amann has failed to provide evidence supporting his claim that the bases upon which he was terminated were fabricated, Mr. Amann has alleged that the OAG has prevented him from obtaining such

---

[25] Although Mr. Amann mentions other actions taken against him in addition to his termination in his Complaint and response brief, the parties only meaningfully brief whether Mr. Amann has stated a substantive due process claim with respect to his termination. Accordingly, the court limits its substantive due process analysis to Mr. Amann's termination.

evidence. The court declines to dismiss Mr. Amann's substantive due process claim against Defendants Reyes, Romano, and Green for lack of supporting evidence at this early stage of litigation. But, because the court has found that Mr. Amann has failed to connect Austin to Mr. Amann's termination and a related constitutional violation, the court grants Austin qualified immunity from Mr. Amann's substantive due process claim.

Defendants Reyes, Romano, and Green may reassert and avail themselves of qualified immunity if, at summary judgment, it is shown that they did not arbitrarily abuse their authority or employ it as an instrument of oppression. They may also be entitled to qualified immunity if the specific factual circumstance in which the constitutional violation occurred is sufficiently distinguishable from precedent such that reasonable officials in their positions would not know that their conduct violates the law. But at this stage of the proceedings, where the Complaint governs, Mr. Amann has alleged that Defendants Reyes, Romano, and Green terminated him for pretextual and fabricated reasons and for engaging in constitutionally protected speech activity. Thus, Defendants' Motion on this basis is denied.

## CONCLUSION AND ORDER

Based upon the foregoing, the court GRANTS IN PART and DENIES IN PART Defendants' Partial Motion to Dismiss Second Amended Complaint (ECF No. 98) as follows:

1) To the extent that Mr. Amann's First Cause of Action seeks to recover for adverse actions other than Mr. Amann's termination, it is DISMISSED. The alleged pre-termination adverse actions fall outside of the UPPEA statute of limitations and are dismissed with prejudice. The alleged post-termination adverse actions are not properly before the court.

2) To the extent that Mr. Amann's Second Cause of Action seeks to recover for adverse actions other than Mr. Amann's termination and Defendant Austin's alleged commission of a

criminal investigation against Mr. Amann, it is DISMISSED. The alleged pre-termination adverse actions are time-barred and dismissed with prejudice.

3) Mr. Amann's Third and Fourth Causes of Action against the OAG are DISMISSED with prejudice.

4) Mr. Amann's claims for monetary damages under his Third and Fourth Causes of Action against the individual Defendants in their official capacities are DISMISSED with prejudice.

5) Defendants' motion to dismiss Mr. Amann's claims for prospective injunctive relief under his Third and Fourth Causes of Action against Defendants Romano, Green, and Reyes in their official capacities is DENIED. Mr. Amann's claim for prospective injunctive relief against Defendant Widdison in his official capacity is DISMISSED with prejudice. Mr. Amann's claim for prospective injunctive relief against Defendant Austin in his official capacity is DISMISSED without prejudice.

6) Mr. Amann's Third and Fourth Causes of Action against Defendant Barlow are DISMISSED without prejudice.

7) Defendants' motion to dismiss Mr. Amann's Third Cause of Action against the individual Defendants in their individual capacities based on qualified immunity is DENIED as to Defendants Reyes, Romano, and Green. The motion is GRANTED as to Defendant Austin. Mr. Amann's Third Cause of Action against Defendant Widdison is DISMISSED without prejudice.

8) Defendants' motion to dismiss Mr. Amann's Fourth Cause of Action against the individual Defendants in their individual capacities for violation of his procedural due process rights based on qualified immunity is GRANTED as to Defendants Reyes, Romano, Green,

Austin, and Widdison. The motion is DENIED as to Defendants Reyes, Romano, and Green as it pertains to the bias of Mr. Amann's pre-termination process.

9) Defendants' motion to dismiss Mr. Amann's Fourth Cause of Action against the individual Defendants in their individual capacities for violation of his substantive due process rights based on qualified immunity is GRANTED as to Defendant Austin. The motion is DENIED as to Defendants Reyes, Romano, and Green. Mr. Amann's Fourth Cause of Action for violation of his substantive due process rights against Defendant Widdison is DISMISSED without prejudice.

DATED September 2, 2021.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge