IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| PAUL G. AMANN,<br><br>        Plaintiff,<br><br>v.<br><br>OFFICE OF THE UTAH ATTORNEY GENERAL, SEAN REYES, BRIDGET ROMANO, and TYLER GREEN, in their official and individual capacities,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT, AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:18-cv-00341-JNP-DAO<br><br>District Judge Jill N. Parrish |

Through this action, Plaintiff Paul G. Amann asserts a number of claims against the Office of the Utah Attorney General ("the AG's Office") and against Attorney General Sean Reyes ("AG Reyes"), Bridget Romano ("Romano"), and Tyler Green ("Green") in their individual and official capacities. Before the court are the parties' cross-motions for summary judgment. *See* ECF Nos. 329 ("Pl.'s Mot."), 330 ("Defs.' Mot."). For the reasons below, Plaintiff's motion is DENIED, and Defendants' motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

This lawsuit stems from the AG's Office's termination of Plaintiff in December 2016. Plaintiff argues that his termination violated state and federal antidiscrimination statutes, the Free Speech and Due Process Clauses of the U.S. Constitution, and a unilateral contract that he claims he formed with the AG's Office. The AG's Office, on the other hand, maintains that Plaintiff's

termination was legitimate, non-retaliatory, and the result of Plaintiff's alleged harassment of a coworker.

The AG's Office employed Plaintiff from August 1998 until his termination in December 2016. In September 1999, the AG's Office granted Plaintiff career-service status, meaning he could be terminated only for cause moving forward. During his tenure, Plaintiff moved between various divisions within the AG's Office. He began his government career as an attorney on the Internet Crimes Against Children Task Force ("Task Force"), eventually becoming section chief in 2008. A year later, he was removed from that position by Division Chief Craig Barlow for unsatisfactory management and interpersonal conflicts. In 2013, Plaintiff was transferred to the Securities Section of the Commercial Enforcement Division over concerns about a sexual relationship he had with a former superior. The next year, he was transferred out of the Securities Section to the Antitrust and Market Fraud Section of the Markets and Financial Fraud Division based on interpersonal conflicts with a coworker. During his time in the antitrust section, in July 2015, Plaintiff participated in a legislative audit by providing a 12-page memorandum with 70 pages of supporting documents detailing his concerns about office (mal)administration. To his knowledge, the auditors did not tell the AG's Office that he had participated in their audit.

In 2006, Cynthia Poulson was hired as an education specialist by the AG's Office and worked with Plaintiff on the Task Force, later becoming a paralegal. At the time she was hired, Poulson had several felony convictions; the AG's Office knew about these but hired her anyway. During her time at the AG's Office, she was able to get her convictions expunged by the Utah Bureau of Criminal Identification ("the Utah Bureau") with support from her supervisor at the AG's Office. After a local blogger posted several articles alleging sexual misconduct between Poulson and Barlow (the chief of her division), the Department of Human Resource Management

2

("Human Resources") at the AG's Office initiated an investigation into the matter. Plaintiff spoke

with Human Resources during the investigation and provided them with emails between Poulson

and Barlow. He also alleged that given Poulson's criminal background, the AG's Office improperly

hired her. Human Resources investigators concluded that although Barlow and Poulson engaged

in inappropriate use of the State's email system, the allegations about a sexual relationship between

them were unsubstantiated. The investigation also found that Poulson was hired and compensated

appropriately by the AG's Office and that Barlow did not show any favoritism toward her.

Toward the end of August 2015, Poulson was scheduled to attend a multiday conference in

Alabama sponsored by the National Computer Forensics Institute ("NCFI"). Before the conference

began, the director of NCFI received a packet sent anonymously in the mail regarding Poulson.

The packet contained disparaging information about Poulson, including a cover letter which read:

> Please be advised that Cynthia ("Cindy") Stonebraker Poulson is an ex-convict who
> has been sentenced to prison. She is scheduled to attend your Forensics in Court
> program beginning August 23rd. She was able to have her felony convictions
> expunged, but only because the Utah Bureau of Criminal Identification ("BCI")
> was not aware of her conviction for Assault on a Law Enforcement Officer using
> the AKA of Karen Openshaw. Since her convictions were expunged, she latently
> [sic] attempted, unsuccessfully, to have the Assault case expunged. BCI never
> should have granted any expungement based on her combination of offenses.
>
> She is not allowed to have access to any databases—BCI or NCIC ["National Crime
> Information Center"]. She should not have access to any databases while attending
> your program.
>
> Enclosed are relevant documents.

ECF 335-8 ("NCFI Packet"), at 3. The documents enclosed in the NCFI Packet included copies of

Poulson's criminal dockets. The director allowed Poulson to participate in the conference as

planned, notifying her about the packet only at the end of the conference.

A few days later, Poulson initiated a written complaint at the AG's Office about the packet, and the AG's Office proceeded to investigate. The documents in the packet indicated that they had been printed just after 7:30 P.M. on the evening of August 10. IT personnel determined that the print command had originated from Plaintiff's office by tracking the ethernet port linked to the IP address used to access the dockets at that time. The AG's Office also reviewed card key access logs showing that Plaintiff had entered the building shortly before the documents were printed and left shortly after.

Based on the information linking Plaintiff to the documents in the packet, Chief Civil Deputy Romano placed Plaintiff on administrative leave in October 2015. She instructed Plaintiff not to contact any other AG's Office employees or access any state databases while on leave. In June 2016, Romano conducted a *Garrity* interview with Plaintiff and his attorney to discuss the allegations against him. During this interview, Plaintiff complained about various aspects of Poulson's employment at the AG's Office, such as her inability to pass a background check.

A couple months later, in August, Romano met with Plaintiff and his counsel. Romano notified Plaintiff that she had prepared a Notice of Intent to Terminate Employment but offered Plaintiff an opportunity to resign and stay on paid leave for a definite period or until he found new employment. Plaintiff declined, so Romano issued the Notice on September 8.

According to the Notice, Romano based her decision on the information linking Plaintiff to the NCFI Packet and her view that this conduct constituted harassment. The Notice listed the evidence Romano had used to conclude that Plaintiff was involved in the NCFI Packet: card key access logs, the IT assessment linking the IP address that accessed the dockets to Plaintiff's office, and postage meters correlating the moment the NCFI Packet was placed in the mail with the card key access logs. The Notice also alleged additional evidence to support termination, including

4

Plaintiff's violations of several other internal policies. Finally, the Notice notified Plaintiff of his right to appeal the recommendation:

> You have the right to appeal this recommendation. . . . [Y]ou are notified that if you wish to do so, you have five (5) working days from your receipt of this letter to file a written reply and to request an opportunity to meet with Attorney General Reyes, or his designee, and to have your written reply considered by Attorney General Reyes or his designee. . . .
>
> If you elect not to appeal this notice, you will be deemed to have waived your right to reply and/or be heard . . . .

ECF No. 313-5 ("Notice of Intent to Terminate").

On September 16, Plaintiff sent a response to the Notice to AG Reyes. In the response, Plaintiff denied all claims in the Notice and requested a meeting with AG Reyes. He also suggested Solicitor General Green join the meeting. Green was relatively new to the AG's Office and had no prior relationship with Plaintiff. Subsequently, Green scheduled a meeting with Plaintiff on October 28 to give Plaintiff an opportunity to be heard. The evening prior, Plaintiff's attorney emailed Green to cancel the meeting. Green then reviewed Plaintiff's termination and supporting evidence. Based on this review, Green concluded that Plaintiff's conduct constituted harassment in violation of the AG's Office policy and that termination was thus warranted. On December 2, Green terminated Plaintiff's employment by letter. The letter indicated that Green's termination decision was based on Plaintiff's conduct violating the AG's Office policies, including the AG's Office's anti-harassment policy.

In May 2017, Plaintiff initiated this action in the Utah state courts. Defendants then removed the action to federal court. In his amended complaint, Plaintiff asserts five causes of action: (1) violation of the Utah Protection of Public Employees Act ("Whistleblower Act"), (2) unlawful retaliation in violation of Title VII of the Civil Rights Act, (3) violation of the Free Speech

5

Clause, (4) violation of the Due Process Clause, and (5) breach of contract. *See* ECF No. 89 ("Am. Compl."). He seeks damages from Defendants in their personal capacities for the purported federal constitutional violations under 42 U.S.C. § 1983.

Following extensive motion practice and discovery, the parties filed cross-motions for summary judgment. *See* ECF Nos. 329 ("Pl.'s Mot."), 330 ("Defs.' Mot."). Through his motion for partial summary judgment, Plaintiff argues that the AG's Office's termination of his employment violated the First Amendment and the Utah Whistleblower Act as a matter of law (claims 1 and 3). Through their respective motion, Defendants move for summary judgment on all of Plaintiff's claims.

## LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is material only if it might affect the outcome of the suit under the governing law. And a dispute over a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1186 (10th Cir. 2016).

Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When applying the summary-judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008). The court

must grant summary judgment on a claim if the party bearing the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322. When a court is presented with cross-motions for summary judgment, it must take each motion separately, viewing the facts in the light most favorable to one party and then viewing the facts in the light most favorable to the opposing party. *Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1211 (10th Cir. 2019).

## ANALYSIS

The court begins with Plaintiff's Whistleblower Act claim, on which both parties have moved for summary judgment.

## I.    WHISTLEBLOWER ACT CLAIM

The Whistleblower Act prohibits a government employer from taking "retaliatory action against an employee because the employee . . . communicates in good faith . . . a violation or suspected violation of a law, rule, or regulation adopted under the law[s] of this state . . . or . . . the United States; or [reports] gross mismanagement; abuse of authority; or unethical conduct." UTAH CODE ANN. § 67-21-3(1)(a). The Act also forbids an employer from taking "retaliatory action against an employee because an employee participates or gives information in an investigation, hearing, court proceeding, legislative or other inquiry, or other form of administrative review held by the public body." *Id.* § 67-21-3(2). Additionally,

> [a]n employer may not implement rules or policies that unreasonably restrict an employee's ability to document . . . the waste or misuse of public funds, property, or manpower; a violation or suspected violation of any law, rule, or regulation; or as it relates to a state government employer: gross mismanagement; abuse of authority; or unethical conduct.

*Id.* § 67-21-3(4).

7

To prevail in an action under the Act, the plaintiff "has the burden of proving by a preponderance of the evidence that the employee, in good faith, engaged in protected reporting and suffered a retaliatory action." UTAH CODE ANN. § 67-21-3(4)(3)(a). Plaintiff initially disputes that he sent the NCFI Packet at all, but if a jury finds that he did send it, he argues that sending the packet was protected by the Whistleblower Act. Defendants argue that because Plaintiff never admitted to sending the NCFI Packet, he cannot meet the burden of proving that he did so in good faith. *See* Defs.' Mot. at 36. But Defendants themselves point to evidence that Plaintiff did in fact send the NCFI Packet and that they based their termination decision on this action. Whether Plaintiff sent the NCFI Packet is a fact in dispute that is material to his Whistleblower Act claim.

Assuming that Plaintiff did send the NCFI Packet, the next issue is whether its contents were protected by the Whistleblower Act. The NCFI packet consisted of a letter and documents related to Poulson and her criminal history. The cover letter included an allegation that Poulson had her felony convictions expunged "only because [the Utah Bureau] was not aware of her conviction for Assault on a Law Enforcement Officer using the AKA of Karen Openshaw." ECF 335-8 ("NCFI Packet"), at 3. The letter further alleged that because the Utah Bureau should never have granted an expungement, she was "not allowed to have access to any databases—BCI or NCIC," including while attending the NCFI conference. *Id.*

Although the issue is close, the court concludes that the NCFI Packet was protected. The cover letter did not explicitly identify the particular law purportedly violated, but it nonetheless suggests violations of BCI or NCIC regulations on database access. Thus, the contents related to "a violation or suspected violation of a law, rule, or regulation adopted under the law of this state, a political subdivision of this state, or any recognized entity of the United States." UTAH CODE ANN. § 67-21-3(1)(a).

Even assuming that Plaintiff sent the NCFI Packet and that its contents were protected, a triable issue of fact remains about Plaintiff's motivation in sending the packet. To prevail on a Whistleblower Act claim, an employee must not only communicate protected information but also do so in good faith. "'Good faith' means that an employee acts with: (a) subjective good faith; and (b) the objective good faith of a reasonable employee." UTAH CODE ANN. § 67-21-2(6). Defendants argue that Plaintiff did not act in good faith given the context of his consistent complaints about Barlow and Poulson. *See* Defs.' Mot. at 41–42. Plaintiff counters that his complaints about Barlow and Poulson were sincere and that the NCFI Packet was thus not "of a purely personal nature." ECF No. 347 ("Pl. Opp.") at 53.

The issue of good faith is typically a fact question requiring resolution by a jury. *See Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982); *Crawford-El v. Britton*, 523 U.S. 574, 603 (1998). In that sense, this case is typical. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury may conclude that he sent the NCFI Packet in good faith and was terminated in violation of the Whistleblower Act. On June 28, 2016, Plaintiff expressed concerns to Romano in an interview about Poulson's employment at AGO, which he considered to be a "fraud on the state." ECF No. 349-13 ("Garrity Interview") at 31-41. A jury may conclude this fact demonstrates that Plaintiff had a legitimate concern about Poulson's employment. And viewing the evidence in the light most favorable to Defendants, a reasonable jury may also conclude Plaintiff sent the NCFI Packet in bad faith. Plaintiff continued to make reports about Poulson's employment even though the Human Resources Investigation concluded that Poulson was hired and compensated appropriately. *See* ECF No. 333-15 at 23. A jury may conclude Plaintiff's reports were motivated purely by personal vendetta rather than a good faith concern. Of course, a reasonable jury may also trust Plaintiff's testimony and conclude that he never sent the NCFI Packet.

9

Having determined that triable issues of fact exist under either view of the facts, the court denies both parties' motions for summary judgment on the Whistleblower Act claim.

## II.   TITLE VII CLAIM

Next, Plaintiff claims a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. However, in responding to Defendants' motion for summary judgment, Plaintiff "concedes [that] he cannot sustain a Title VII retaliation claim at this juncture and so does not oppose Defendants' [m]otion on that ground." Pl.'s Opp. at 1 n.1. Given Plaintiff's concession, the court grants Defendants' motion to enter summary judgment on Plaintiff's Title VII claim.

## III.   FREE SPEECH CLAUSE CLAIM

Plaintiff also claims that Defendants violated his First Amendment free-speech rights by terminating him for speaking out about corruption and mismanagement in the AG's Office. Specifically, Amann claims that the following speech acts were protected by the First Amendment: (1) a verbal complaint about the improper use of paralegals; (2) his report about improper preferential treatment of Poulson; (3) a request for documents related to a complaint against him; (4) his participation in the legislative audit; and (5) the NCFI Packet. He seeks monetary relief from Defendants in their individual capacities under 42 U.S.C. § 1983. To obtain monetary relief against Defendants in their individual capacities, Plaintiff would need to overcome their qualified immunity by demonstrating a constitutional violation of clearly established rights. *See Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020). The parties both move

for summary judgment on this claim.[1] The court grants Defendants' motion and denies Plaintiff's motion.

The First Amendment provides, "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. As incorporated against the States, the First Amendment prevents state and local governments from "condition[ing] public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983).

When a public employee claims that he suffered adverse employment action because of his speech, the court analyzes the claim using the following factors, which originate with the Supreme Court's decisions in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Garcetti v. Ceballos*, 547 U.S. 410 (2006): (1) whether the speech was made pursuant to an employee's official duties or whether it was made as a citizen; (2) whether the speech was on a matter of public concern; (3) whether the interests of the government as an employer in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free-speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have made the same employment decision even in the absence of the protected conduct. *Duda v. Elder*, 7 F.4th 899, 910 (10th Cir. 2021). The speech was protected if it was made by the employee as a citizen on a matter of public concern and if the employee's free-speech interests outweigh the government's efficiency interests (factors 1–3); whether the speech was protected is typically a question of law for the court to decide. *See id.* at 911. But just because the

---

[1] Plaintiff moves for summary judgment based only on the packet sent to the NCFI director. Defendants move for summary judgment based on all five speech acts.

speech was protected does not mean the employee can prevail on his First Amendment claim. To prevail, the employee must show that the speech was also a motivating factor in the adverse employment action and that the employer would not have made the same decision absent the protected speech (factors 4 and 5); these issues are typically questions of fact for a jury to decide. *Id.*

The court begins by analyzing whether any of the five speech acts listed in Plaintiff's complaint were protected as a matter of law. Defendants concede that all these speech acts were made in Plaintiff's capacity as a citizen, so the court will focus on whether the speech was on a matter of public concern and, if so, whether the Plaintiff's free speech interest outweighs the government's interest in the efficiency of the public service.

> 1)   Complaint about the use of paralegals

Plaintiff first points to a verbal complaint he made about what he thought was the improper use of paralegals. Only Defendants move for summary judgment for this speech act, so the court takes the facts in the light most favorable to Plaintiff. In his deposition, Plaintiff testified that in 2013, he had verbally raised concerns to two of his coworkers about the Task Force's so-called "best practices" that Barlow and another employee had come up with. In Plaintiff's view, these practices were "violati[ng] federal law" and "undermin[ing] the prosecution of a serious sex offender" by directing Poulson, a paralegal hired using federal Task Force grant money, to work on non-Task Force state cases for Barlow, with whom she was allegedly having an affair. *See* ECF No. 332-1 ("Amman Depo."), at 39:19–46:14. That is, Plaintiff was complaining about improper "mixing of . . . state and federal money" in connection with a purported romantic relationship between a paralegal and the division chief in her chain of command. *Id.* at 46:1–46:2.

To assess the public-concern factor, the court must examine the "content, form, and context" of the statement and determine whether it conveys "potential wrongdoing or breach of public trust" or whether it conveys simply "a single employee's [frustration] with the status quo." *Connick*, 461 U.S. at 147–48. Put differently, "[s]tatements revealing official impropriety usually involve maters of public concern" whereas "speech that simply airs grievances of a purely personal nature typically does not involve matters of public concern." *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1205 (10th Cir. 2007) (internal quotation marks omitted). The court may consider "the motive of the speaker" and "whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances." *Leverington v. City of Colorado Springs*, 643 F.3d 719, 727 (10th Cir. 2011).

Here, the content of Plaintiff's speech was squarely on a matter of public concern. Far from expressing a personal displeasure with the allocation of Poulson's time, Plaintiff was revealing potential division-level violations of federal grant requirements that commingled state and federal funds and potentially impeded the prosecution of a serious sex offender. Although Plaintiff may have had a vendetta against Poulson at the time of this speech, the content does not suggest that Plaintiff made the complaint primarily or significantly to harass Poulson. The speech largely concerned "government impropriety" and so "occupie[d] the highest rung of First Amendment protection." *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 991 (3d Cir. 2014) (internal quotation marks omitted).

To assess the balance of interests, the court must determine "whether the employer has an efficiency interest which would justify it in restricting the particular speech at issue." *Brammer-Hoelter*, 492 F.3d at 1207. Relevant to this determination are the "time, manner, and place of the employee's expression" and "the context in which the dispute arose." *Id.* (quoting *Rankin v.*

*McPherson*, 483 U.S. 378, 388 (1987)). The government has the burden of convincing the court that "[its] interest i[n] avoiding direct disruption, *by the speech itself*" outweighs "the employee's free[-]speech interest." *Duda*, 7 F.4th at 912.

Here, Defendants have not attempted to argue that Plaintiff's complaint about the improper use of Poulson's time caused any disruption in the workplace at all. So, the court concludes that Plaintiff's speech interest outweighed any efficiency interest the government may have had as an employer and that this speech was thus protected.

       2)     Report about the preferential treatment of Poulson

Plaintiff in his complaint next points to his 2014 reports about the preferential treatment Poulson allegedly received from Barlow due to their inappropriate relationship. The parties agree that Plaintiff complained to Human Resources investigators that Barlow favored Poulson by giving her higher bonuses, giving her a cell phone, and writing a letter on her behalf to the Board of Pardons.

Unlike Plaintiff's speech revealing mismanagement of federal funds, this speech "pertain[s] to internal personnel disputes" and so did not touch on matters of public concern. *Finn v. New Mexico*, 249 F.3d 1241, 1247 (10th Cir. 2001). Plaintiff in his response does not attempt to argue otherwise, and the court accordingly concludes that this speech was not protected.

       3)     Request for documents

Third, Plaintiff points to a Government Records Access and Management Act ("GRAMA") request he made in October 2014. GRAMA requests for Utah state agencies are analogous to federal Freedom of Information Act ("FOIA") requests for federal agencies, allowing the public to access government records and other documents. Plaintiff's GRAMA request sought documents related to a harassment complaint filed by a securities analyst during Plaintiff's tenure in the

Securities Section. The GRAMA request was of interest only to him and so did not touch on any matters of public concern. Plaintiff does not present any argument to the contrary in his response, and the court concludes that this speech was also not protected.

4)    Participation in the legislative audit

Plaintiff also points to a lengthy memorandum he sent to legislative auditors in July 2015. In it, he reported various concerns about workplace conditions and incidents of mismanagement and corruption. Once again, only Defendants move for summary judgment for this speech act.

The court agrees with Defendants that most of the material in the memorandum does not touch on matters of public concern. For example, Plaintiff reported that Barlow had an affair with Poulson and promoted her to a full-time felony prosecutor even though she lacked the experience or qualifications for it. ECF No. 335-9 ("Audit Memo") at 1. Plaintiff also reported that jobs were posted haphazardly and that bonuses were given arbitrarily. *Id.* at 4–5. One could argue that a couple paragraphs touch on matters of public concern. For example, Plaintiff suggests that AG Reyes may have used government money to fund his campaign and curry favor with reporters. *Id.* at 7. Proper use of taxpayer money by the top prosecutor in the state is certainly a matter of public concern. However, Plaintiff does not explicitly allege impropriety in those paragraphs; he merely speculates about it. And given that the memorandum was a 12-page litany of grievances followed by about 70 pages of documents, it "touched upon matters of public concern in a most limited sense" such that it "is most accurately characterized as an employee grievance concerning internal office policy." *Connick*, 461 U.S. at 154. Accordingly, the court concludes that this speech in context did not touch on matters of public concern and was therefore not protected.

5)    NCFI Packet

The heart of the parties' First Amendment dispute is the NCFI Packet. As noted before, Plaintiff denies sending this packet, but he argues that even if he did send it, it was protected under the First Amendment. In his view, the NCFI Packet informs the NCFI director that Poulson, a state prosecutor, is not supposed to access certain criminal databases because of her criminal history—a criminal history that was hidden, covered up, and improperly expunged by the illegal conduct of various government actors. In Defendants' view, this packet does not contribute to public debate about a government employee's qualifications; rather, they argue, the letter is best understood as private, personal attack on Poulson, particularly in the context of Plaintiff's repeated attacks on her qualifications and workplace relationships. Even taking this speech in the light most favorable to Plaintiff, the court concludes that it did not touch on a matter of public concern.[2]

First, the packet did not allege any wrongdoing by the Utah Bureau or any other government entities. *Cf. Eisenhour v. Weber County*, 744 F.3d 1220, 1228 (10th Cir. 2014) ("Speech involves a public concern when the speaker intends to bring to light actual or potential wrongdoing or breach of public trust by a public official or to disclose any evidence of corruption, impropriety, or other malfeasance within a governmental entity." (internal quotation marks and alterations omitted)). According to the cover letter, the reason the Utah Bureau improperly expunged Poulson's felony convictions was that the Utah Bureau was unaware of her assault conviction. Unawareness is not corruption, impropriety, or wrongdoing. Based on the cover letter,

---

[2] Unlike protected information under the Whistleblower Act, speech protected under the First Amendment must touch on a matter of public concern. The Whistleblower Act protects any communication concerning "a violation or suspected violation of a law, rule, or regulation," regardless of whether that violation touches on a matter of public concern. *See* UTAH CODE ANN. § 67-21-3(1)(a). Thus, although some speech may be protected under both the Whistleblower Act and the First Amendment, the protections provided by each law are different.

the only actor who may have engaged in wrongdoing was Poulson herself by using an alias to avoid full revelation of her criminal record. But it is not obvious from the letter that Poulson's use of the alias was malicious, and in any event, the letter did not identify her as a state employee. A letter that fails to reveal the governmental association of the alleged wrongdoer likely is not intended to uncover government wrongdoing. Even assuming that Poulson's governmental association was widely understood in Utah, it is unlikely that the NCFI director at a training in Alabama would have known about it. Further, in the context of Plaintiff's ongoing frictions with Poulson for the preceding five years, this speech most likely "dealt with a personal dispute or grievance with [Poulson] and was not calculated to disclose misconduct." *Leverington*, 643 F.3d at 727. Accordingly, the court concludes that this speech did not touch on a matter of public concern and therefore was not protected. Since the court reaches this conclusion considering the speech in the light most favorable to Plaintiff, the court need not separately consider the speech in the light most favorable to Defendants.

*     *     *

In sum, the court agrees with Plaintiff that his complaint about the use of paralegal time was a speech act protected by the First Amendment. As to the other four speech acts, the court agrees with Defendants that they did not touch on matters of public concern and so fall outside the scope of constitutional protection.

Defendants argue that even if the complaint about the use of paralegal time was a protected speech act, Plaintiff cannot point to any evidence in the record from which a reasonable jury could conclude that it was a motivating cause for his discharge (factor 4). The court agrees. Defendants' motion for summary judgment shows an "absence of evidence in the record" to support finding factor 4 in Plaintiff's favor. *Turner v. Westminster Coll. of Salt Lake City*, No. 91-C-0856, 1992

WL 336538, at *1 (D. Utah Sept. 11, 1992). The burden then shifts to Plaintiff to "designate specific facts showing that there is a genuine dispute for trial." *Id.* (internal quotation marks omitted). Plaintiff's response makes no effort to identify facts supporting a finding that his verbal complaints about the use of paralegal time were known to Romano, Green, or AG Reyes, or that those complaints otherwise influenced the termination decision. Plaintiff has thus failed to carry his burden to show that a genuine dispute of fact requiring trial exists, and the court concludes that Defendants did not terminate him for speech protected under the First Amendment. Since Plaintiff has not established a constitutional violation, the court need not consider the second prong of the qualified-immunity inquiry—whether the right violated was clearly established—and grants Defendants' motion for summary judgment on the First Amendment claim.

## IV.  DUE PROCESS CLAUSE CLAIM

Plaintiff next claims a violation of his procedural and substantive due-process rights. Here, too, he seeks monetary relief from Defendants in their individual capacities under 42 U.S.C. § 1983, meaning he must show both a constitutional violation and that the rights violated were clearly established to prevail. *See Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020). Defendants move for summary judgment on this claim under both procedural and substantive due-process theories. Under either theory, Plaintiff would need to show a constitutionally protected property interest in his employment at the AG's Office. *See Merrifield v. Bd. of Cnty. Comm'rs*, 654 F.3d 1073, 1078 (10th Cir. 2011). Defendants concede that Plaintiff had such a protected property interest. *See* Defs.' Mot. at 68.

### A.  Procedural Due Process

Procedural due process imposes restraints "on governmental decisions [that] deprive individuals of liberty or property interests within the meaning of the Due Process Clause of

18

the . . . Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) (internal quotations omitted). In the employment context, due process demands a hearing prior to the termination of an employee who has "a constitutionally protected property interest in his employment." *Merrifield*, 654 F.3d at 1078 (internal quotations omitted). An adequate pretermination hearing requires "(1) oral or written notice to the employee of the charges against him; (2) an explanation of the employer's evidence; and (3) an opportunity for the employee to present his side of the story." *Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009).

Since Defendants concede that Plaintiff had a constitutionally protected property interest in his employment at the AG's Office, the only issue remaining on Plaintiff's procedural due-process claim is whether Plaintiff was given an impartial pretermination process. Plaintiff does not dispute that he was provided with written notice of the charges against him, an explanation of the AG's Office's evidence, and an opportunity to present his side of the story. Rather, he argues that his procedural due-process rights were violated when Defendants failed to provide him with an impartial pretermination hearing. Defendants counter that Plaintiff never attended the pre-termination hearing with Green (he canceled it the evening before) and so waived his due-process rights.

"A plaintiff may waive his right 'to challenge [his due-process rights] in federal court' by a knowing failure to take advantage of the available procedures." *Roberts v. Winder*, 16 F.4th 1367, 1374 (10th Cir. 2021) (quoting *Pitts v. Bd. of Educ.*, 869 F.2d 555, 557 (10th Cir. 1989)). "Waiver depends upon the facts of a particular case, and is good only if it is done in an informed manner." *Pitts*, 869 F.2d at 557 (internal quotations omitted). Here, Plaintiff argues that he was not required to attend a pretermination hearing because the AG's Office failed to provide him with "the documents used to decide his termination prior to his meeting with Green." Pl.'s Opp. at 66.

But to "take advantage of available procedures" and avoid waiver, Plaintiff should have attended the meeting with Green and made a demand for the documents. *Roberts*, 16 F.4th at 1374. After all, the meeting with Green was an opportunity for him "to present his side of the story." *Riggins*, 572 F.3d at 1108. Furthermore, Plaintiff never attempted to reschedule the meeting prior to his termination in December. Even when viewing the facts in the light most favorable to Plaintiff, his argument that the pretermination hearing would have been biased falls short because the evidence suggests the opposite. For example, Plaintiff himself requested Green's presence (a request that was granted) since he believed that Green would be impartial: Plaintiff did not know Green prior to his termination proceedings, and Green was relatively new to the office. Thus, Plaintiff has waived his procedural due process claim.

### B. Substantive Due Process

"A public employee with a property interest in continued employment has a substantive-due-process right not to be terminated for arbitrary or capricious reasons." *Darr v. Town of Telluride*, 495 F.3d 1243, 1257 (10th Cir. 2007). In deciding a substantive due-process claim, a court must consider "whether the challenged government action would shock the conscience of federal judges." *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 528 (10th Cir. 1998) (internal quotations omitted).

> To satisfy this standard, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power. Instead, a plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.

*Id.* (internal quotation marks omitted). "Substantive due process prohibits only the most egregious conduct." *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 750 (10th Cir. 2013).

Plaintiff here argues that he was fired for pretextual reasons and that his termination violated the law. The facts of this case are thus similar to those in *Koessel*, where the plaintiff claimed he was terminated in violation of the law and never notified of "the real reason for his termination." *Id.* The *Koessel* plaintiff argued that his termination violated his substantive due-process rights, but the Tenth Circuit disagreed: even assuming that all of plaintiff's allegations were true, losing employment "was not so egregious an injury as to shock the judicial conscience." *Id.* So it is here—Plaintiff's termination, though doubtlessly a stressful and disheartening development for him, does not shock the conscience. Furthermore, even if Defendants' reliance on the NCFI Packet was pretextual, the reliance provided Defendants with rational reasons for termination. *See id.* (holding that even if employer's reliance on a report was pretextual, "its reliance [nevertheless] provided the department with rational reasons for its decision").

Thus, under either theory of due process, Plaintiff's due-process claim fails as a matter of law even when making all reasonable inferences in his favor. Since Plaintiff has not established a constitutional violation, the court need not consider the second prong of the qualified-immunity inquiry—whether the right violated was clearly established—and grants Defendants' motion for summary judgment on the Due Process claim.

## V.   BREACH OF CONTRACT CLAIM

Defendants also move for summary judgement on Plaintiff's breach-of-contract claim. Plaintiff claims that Defendants breached "written and/or implied promises" by retaliating against him for bringing and supporting workplace complaints. Defendants argue that Plaintiff's contract claim is preempted by Title VII or the Utah Anti-Discrimination Act, that the AG's Office's Policy Manual does not establish an enforceable contract, and that even if there were an enforceable contract, Defendants have not breached it.

### A.  Preemption

Whether a statutory scheme preempts other legal claims, such as breach of contract, is a matter of legislative intent. *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 281 (1987). Preemption may be express or implied. *See id.* Preemption is implied where the statutory scheme is "sufficiently comprehensive to make reasonable inference" that the legislature intended to "occupy the field." *Cal. Fed. Sav. & Loan Ass'n*, 479 U.S. at 280–81. As for Title VII, "Congress has explicitly disclaimed any intent categorically to pre-empt state law or to 'occupy the field' of employment discrimination law." *Id.* at 280.

Likewise, the Utah Supreme Court has held that the Utah Antidiscrimination Act does not preempt breach-of-contract causes of action. *See Retherford v. AT&T Commc'ns*, 844 P.2d 949, 966 (Utah 1992). In *Retherford*, the plaintiff filed a breach-of-contract action, alleging she was terminated for reporting sexual harassment. Similarly here, Plaintiff's complaints "arise out of [D]efendant's retaliatory conduct." 844 P.2d at 967. But "preemption depends on the nature of the injury, not the nature of the conduct allegedly responsible for that harm." *Id*. Here, as in *Retherford*, Plaintiff alleges "broken [contractual] promises," which "are distinct from the injury of retaliation." *Id.* Thus, Plaintiff's breach-of-contract claim is not preempted by either Title VII or the Utah Antidiscrimination Act.

### B.        Existence of an Implied Contract

A contract, express or implied, forms "when there is a manifestation of mutual assent, by words or actions or both, which reasonably are interpretable as indicating an intention to make a bargain with certain terms or terms which reasonably may be made certain." *Brian High Dev., LC v. Brian Head Town*, 348 P.3d 1209, 1212 (internal quotation marks omitted). "An implied contract may arise from a variety of sources including . . . personnel policies" or provisions of an

employment manual. *Canfield v. Layton City*, 122 P.3d 622, 626 (Utah 2005). "Employee manuals may create contractual obligations not subject to the governmental immunity notice requirements because employees may reasonably rely on the document's provisions and may expect the employer to conform to the procedures it outlines." *Id.*

> For an implied-in-fact contract term to exist [under Utah law], it must meet the requirements for an offer of a unilateral contract. There must be a manifestation of the employer's intent that is communicated to the employee and sufficiently definite to operate as a contract provision. Furthermore, the manifestation of the employer's intent must be of such a nature that the employee can reasonably believe that the employer is making an offer of employment other than employment at will.

*Snyder v. City of Moab*, 354 F.3d 1179, 1190 (10th Cir. 2003) (quoting *Johnson v. Morton Thiokol*, 818 P.3d 997, 1001–02 (Utah 1991)).

While statutory law rather than contract law generally governs the employment of public employees, Utah "has recognized that circumstances may exist where the government voluntarily undertakes an additional duty beyond its normal obligation to the employee, in which case an implied contract arises." *Canfield*, 122 P.3d at 626 (internal quotations omitted). However, a "clear and conspicuous disclaimer, as a matter of law, prevents employee manuals or other like material from being considered as implied-in-fact contract terms." *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1003 (Utah 1991).

Plaintiff argues that by voluntarily adopting the Department of Human Resource Management ("DHRM") Rules under Title R477, the AG's Office manifested an intent to comply with rules in addition to its own policies. *See* Pl.'s Opp. At 75. The AG's Office is not bound by Title R477 of the Utah Administrative Code ("DHRM Rules"). *See* UTAH ADMIN. CODE R477-2-1(5). Nonetheless, the AG's Office's Administrative Policy Manual "adopts" the rules voluntarily.

*See* ECF No. 333-3 ("AG's Office Policy Manual"), at 1. Furthermore, DHRM Rules state that "[m]anagement shall comply with [DHRM Rules]." UTAH ADMIN. CODE R477-2-2. In voluntarily adopting DHRM Rules, the AG's Office undertook additional duties beyond its normal obligations. *See Canfield*, 122 P.3d at 626. Still, Defendants argue that the AG's Office's adoption of the DHRM Rules do not alter the AG's Office's statutory obligations. *See* Defs.' Rep. at 41. But in agreeing to be bound by a statutory scheme that explicitly does not apply to them otherwise, Defendants demonstrated an intent to contract.

Moreover, the AG's Office Policy Manual lacks a sufficiently clear disclaimer of contractual liability. The AG's Office Policy Manual states that "[o]ffice personnel are required to be familiar with the Office's policies and procedures. This Policy Manual is for Office employees' convenience and general guidance . . . The policies outlined in [the] manual are subject to review and change by the Office or the State." AG's Office Policy Manual at 1. However, Utah precedent reveals that disclaimer language must be clearer and more conspicuous than the language in the Policy Manual to disclaim contractual liability. For example, a policy manual that explicitly states that it is not intended to create a contractual relationship can disclaim contractual liability. *See Morton Thiokol*, 818 P.2d at 1003 ("The policies and procedures expressed in this book, as well as those in any other personnel materials which may be issued from time to time, do not create a binding contract or any other obligation or liability on the company."). Such express language is not uncommon in Utah.[3] But the AG's Office's Policy Manual is silent on the question of whether

---

[3] *See, e.g.*, *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 401 (Utah 1998) ("This handbook is not intended to create a contract of employment . . . ." (quoting the policy)); *Bahnmaier v. N. Utah Healthcare Corp.*, 402 P.3d 796 (Utah Ct. App. 2017) ("I understand and agree that any employee handbook which I may receive will not constitute an employment contract, but will be merely a gratuitous statement of facility policies. (emphasis removed) (quoting the employment

a contract is created. The "disclaimer" statement that Defendants point to does not rise to the level

of specificity and express articulation of intent required to establish a "clear and conspicuous

disclaimer." *Morton Thiokol*, 818 P.2d at 1003. Therefore, the court concludes that the AG's Office

formed an implied contract by adopting the DHRM Rules without disclaiming contractual liability.

Still, factual issues remain as to whether Defendants breached that contract. Plaintiff claims

that Defendants breached the implied contract when terminating him for reporting protected

information. As discussed under Plaintiff's Whistleblower Act claim, factual issues remain as to

whether Plaintiff was fired for communicating protected information. So, the court denies

Defendants' motion for summary judgment on Plaintiff's breach-of-contract claim.

\*       \*       \*

In sum, the court denies Defendants' motion for summary judgment on Plaintiff's state-

law claims for breach of contract and violations of the Utah Whistleblower Act. The court grants

Defendants' motion for summary judgment on Plaintiff's federal-law claims under Title VII, the

First Amendment, and the Fourteenth Amendment. Thus, only the state-law claims remain.

The court would ordinarily remand a case to state court where only state law claims remain.

*See Bd. of Cnty. Comm'rs v. Geringer*, 297 F.3d 1108, 1115 n.6 (10th Cir. 2002) ("[D]istrict courts

---

application)); *Kirberg v. W. One Bank*, 872 P.2d 39, 40 (Utah Ct. App. 1994) ("I also understand
that if I accept employment, there is no express or implied employment contract between me and
the company." (quoting the application form)); *Trembly v. Mrs. Fields Cookies*, 884 P.2d 1306,
1309 (Utah Ct. App. 1994) ("This handbook is provided as a guide which you may use to
familiarize yourself with [Mrs. Fields]. It is provided and is intended only as a helpful guide. It
does not constitute, nor should it be construed to constitute an agreement or contract of
employment, express or implied, or as a promise of treatment in any particular manner in any given
situation." (alteration in original) (quoting the handbook)); *Weese v. Davis Cnty. Comm'n*, 834 P.2d
1, 2 (Utah 1992) ("No contract exists between Davis County and its employees with respect to
salary ranges, movement within salary ranges, or employee benefits or any other aspects of
employment." (quoting the policies and procedures manual)).

should dismiss state claims without prejudice after all federal claims have been dismissed, particularly when the federal claims are dismissed before trial . . . ."). However, the court's decision to exercise supplemental jurisdiction over the remaining state-law claims is discretionary. *See* 28 U.S.C. § 1367 ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction. . . ."); *see also Yanez v. Davis County*, No. 1:12-CV-200, 2014 WL 4954622, at *2 (D. Utah 2014) (explaining that a court has discretion to exercise supplemental jurisdiction over the state claims after it has granted summary judgment for the defendant on the federal claims). "In deciding whether to exercise jurisdiction, the district court is to consider 'judicial economy, convenience, fairness, and comity.'" *Nielander v. Bd. of County Comm'rs*, 582 F.3d 1155, 1172 (10th Cir. 2009) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

The litigation before the court has a lengthy, five-year history filled with extensive motion practice and discovery. Given the court's investment in the case and familiarity with the issues, judicial economy does not support remand to state court. Furthermore, the case is now ready for trial, which the court can schedule in short order. In the interest of judicial economy, convenience, fairness, and comity, the court retains supplemental jurisdiction over this case and declines to remand the case to state court on the remaining state law claims.

## CONCLUSION AND ORDER

For the foregoing reasons, Plaintiff's motion for partial summary judgment is **DENIED**, and Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**:

(1) Triable issues of fact exist as to whether Plaintiff was terminated in violation of the Utah Whistleblower Act for his suspected role in sending the NCFI packet. As a result, neither party is entitled to summary judgment on Plaintiff's first claim;

(2) Plaintiff concedes that he cannot sustain a Title VII claim. Defendants are thus entitled to summary judgment on Plaintiff's second claim;

(3) As a matter of law, Plaintiff's third and fourth claims, pleaded under 42 U.S.C. § 1983, fail, and Defendants are entitled to summary judgment on both claims; and

(4) Triable issues of fact exist as to whether Defendants have breached the unilateral contract in the AG's Office Policy Manual. As a result, Defendants are not entitled to summary judgment on Plaintiff's fifth claim.

DATED September 30, 2024.

BY THE COURT

Jill N. Parrish

United States District Court Judge