APRIL L. HOLLINGSWORTH (Bar No. 9391)
KATIE PANZER (Bar No. 16919)
WHITNEY NELSON (Bar No. 19031)
**HOLLINGSWORTH LAW OFFICE, LLC**
40 South 600 East
Salt Lake City, Utah 84102
Telephone: 801-415-9909
april@aprilhollingsworthlaw.com
katie@aprilhollingsworthlaw.com
whitney@aprilhollingsworthlaw.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **PAUL G. AMANN,**<br><br>Plaintiff,<br><br>vs.<br><br>**OFFICE OF THE UTAH ATTORNEY GENERAL,**<br><br>Defendant. | **PLAINTIFF'S RULE 59 MOTION FOR A NEW TRIAL**<br><br>Case No. 2:18-cv-00341-JNP-DAO<br><br>Judge Jill N. Parrish<br>Magistrate Judge Daphne A. Oberg |

Plaintiff Paul Amann, by and through his undersigned counsel, hereby submits the following Motion for a New Trial pursuant to Fed. R. Civ. P. 59(a). Mr. Amann asserts that he was prejudiced by improper evidence that Defendant presented, and comparator evidence that was excluded. The weight of the evidence was in his favor, and since the jury found against him, he maintains improper influences were at play. Further, he was prejudiced by his inability to present testimony directly from Reyes despite Reyes' clear involvement in his discipline and termination. As explained in detail herein, the court should GRANT Plaintiff's Motion and set this case for a new trial.

# TABLE OF CONTENTS

ARGUMENT ............................................................................................................4

I.     A NEW TRIAL IS WARRANTED BASED ON PREJUDICE CAUSED BY EVIDENCE IMPROPERLY INTRODUCED BY DEFENDANT AND/OR EXCLUDED BY THE COURT/....................................................................................................................5

    A.    The Court Erred in Excluding Plaintiff's Comparator Evidence. ..................................5

    B.    Defendant Prejudiced Mr. Amann by Referring to "Other Packets."............................8

    C.    The Court Erred in Allowing Testimony Regarding Plaintiff's GRAMA Requests. ....11

II.    THE JURY VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE..............13

    A.    Plaintiff Proved all Elements of his Breach of Contact Claim ......................................13

    B.    Plaintiff Proved all Elements of his Utah Whistleblower Act Claim. ...........................18

    C.    Defendant Elicited Testimony To Evoke Sympathy for Poulson ..................................26

III.   THE COURT ERRED IN QUASHING THE TRIAL SUBPOENA TO FORMER AG REYES ................................................................................................................28

    A.    Reyes's Testimony Was Essential to Plaintiff's Claims .................................................29

    B.    The Reyes Exhibits Were Not A Less Burdensome Means of Presenting Reyes' Testimony .........................................................................................................................29

    C.    Reyes' Absence Was Deeply Prejudicial – His Exclusion Affected the Outcome of the Trial....................................................................................................................................32

CONCLUSION ......................................................................................................33

## TABLE OF AUTHORITIES

**Cases**

*B.J. Barnes & Sons Trucking, Inc. v. Dairy Farmers of America, Inc.*, 2007 WL 315708
  (D. Utah 2007) …………………………………………………………………………13

*Holmes v. Wack*, 646 F.2d 86 (10th Cir. 1972) …………………………………………………13

*Off. of the Utah Att'y Gen.*, 56 F.4th 1254 (10th Cir. 2022) ……………………………………28

*McHargue v. Stokes Div. of Pennwalt Corp.*, 912 F.2d 394 (10th Cir. 1990) ……………...……..4

*Moody v. Ford Motor Co.,* 509 F.Supp.2d 823 (N.D. Okla. Mar. 20, 2007) ……………………28

*Procter & Gamble Co. v. Haugen*, 627 F.Supp.2d 1287 (D. Utah 2008) …………………..……5

*Scholz Homes Inc. v. Wallace*, 590 F.2d 860 (10th Cir. 1979)……………………………………4

*Seven Provinces Ins. Co. Ltd. v. Commerce Industry Ins. Co.*, 65 F.R.D. 674 (W.D.Mo. 1975)

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814 (9th Cir. 2001)……..…13

*Tidewater Oil Co. v. Waller*, 302 F.2d 638 (10th Cir. 1962) ……………………………………13

**Rules**

Fed. R. Civ. P. 59 ………………………………………………………………………………..4

**Statutes**

Utah Code Ann. § 67-21-4(3)(a) ……………………………………………………………..18

## ARGUMENT

Mr. Amann's claims against Defendant (or "the Office") for breach of contract and violations of the Whistleblower Act were tried to a jury in May 20125. As explained below, evidence came in that should not have, and evidence was excluded that should have come in. Ultimately, although the weight of the evidence was in Mr. Amann's favor, the jury found against him on both his claims.

Federal Rule of Civil Procedure 59(a) provides that after a jury trial, the court may, on motion, grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59(a)(1)(A). Additionally, the court may grant a new trial on a party's motion or "on its own . . . for any reason that would justify granting one on a party's motion," including, "after giving the parties notice and an opportunity to be heard, . . . for a reason not stated in [a party's] motion." Fed. R. Civ. P. 59(d).

"In ruling on a motion for a new trial, the trial judge has broad discretion." *McHargue v. Stokes Div. of Pennwalt Corp.*, 912 F.2d 394, 396 (10th Cir. 1990) (citing *Scholz Homes Inc. v. Wallace*, 590 F.2d 860, 864 (10th Cir. 1979)). The court "has the obligation or duty to ensure that justice is done, and, when justice so requires, [s]he has the authority to set aside the jury's verdict." *Id*. (citing *Seven Provinces Ins. Co. Ltd. v. Commerce Industry Ins. Co.*, 65 F.R.D. 674, 688 (W.D.Mo. 1975)). The court "may do so when [it] believes the verdict to be against the weight of the evidence or when prejudicial error has entered the record." *Id*. (citing *Holmes v. Wack,* 464 F.2d 86, 88 (10th Cir. 1972)).

Here, justice was not done. Mr. Amann proved his claims but was prejudiced by improper testimony, and the exclusion of important testimony that would have bolstered his claims, resulting in a verdict against him. For the following reasons, he should be granted a new trial.

## I.    A NEW TRIAL IS WARRANTED BASED ON PREJUDICE CAUSED BY EVIDENCE IMPROPERLY INTRODUCED BY DEFENDANT AND/OR EXCLUDED BY THE COURT

"A party moving for a new trial based upon an error of law must show not only that error occurred, but that the error affected the substantial rights of the parties." *Procter & Gamble Co. v. Haugen*, 627 F.Supp.2d 1287, 1302 (D. Utah 2008) (quoting *Smith v. Cochran*, 182 Fed. Appx. 854, 864 (10th Cir. 2006)). Mr. Amann contends that a new trial is warranted based on Defendant improperly introducing prejudicial evidence — some that the court had specifically excluded— and erroneous exclusions of evidence that substantially prejudiced him.

### A.    The Court Erred in Excluding Plaintiff's Comparator Evidence.

Mr. Amann first contends that the court erred in not allowing him to present comparator evidence. At trial, Mr. Amann intended to introduce evidence that other employees of Defendant who engaged in serious misconduct were disciplined but not terminated, to show that Defendant's severe discipline of Mr. Amann (termination) was pretextual. In particular, Plaintiff identified several comparators: (1) Ed Lombard, a paralegal, disciplined in 2020 for sexual harassment; and (2) Steven Wuthrich, an Assistant AG, disciplined in 2021 for sending an inappropriate, office-demeaning email; (3) Kevin Pepper, an Assistant AG, disciplined in 2017 for improperly accessing information through UCJIS about a family member; and (4) Michael Dodge, an Assistant AG, disciplined in 2020 after being arrested for domestic violence. Almost none of this information was permitted at trial.

On the morning of March 16, 2025, before the jury was brought into the court room, Defense counsel raised an objection to two of Plaintiff's exhibits (the disciplinary records for

Lombard and Wuthrich). Ex. 3[1], 5:9-6:11. Defense counsel argued irrelevance and Rule 403. *Id*.

Plaintiff's counsel countered that both comparators were disciplined under the same ultimate

decision-maker—Attorney General Sean Reyes (or his deputies)—and thus the evidence was

probative of disparate treatment. *Id*. at 8:4-24. Counsel argued that Mr. Amann's misconduct was

treated much more harshly than comparable or more serious misconduct by others. *Id*. For

example, Ed Lombard's 2020 investigation found he had engaged in "sexual harassment", yet

"he wasn't terminated, he was given…80 hours of suspension. So that disparate treatment is very

relevant to establishing the defendant's motive in this case." *Id*. Likewise, Mr. Wuthrich's

conduct (sending an unprofessional, derogatory email to a public official that ended up being

reported in the news) "was embarrassing or should have been embarrassing to the office and yet

still they didn't do anything substantial to this employee." *Id*.  Both examples tended to show

that the Office *usually* imposed lesser discipline for misconduct, undermining Defendant's claim

that firing Mr. Amann was the only appropriate response. *Id*. Plaintiff's counsel also argued they

had "other examples…of attorneys engaging in misconduct and not being terminated" as well.

*Id*. at 8:22-24. The court ruled, on 403 grounds, that it would not allow admission of the

comparator evidence. *Id*. at 8:25-9:10. The court noted that if "the same decision-makers" had

been involved in those other incidents, "then I would have reached a different decision." *Id*.

Ultimately, based on Plaintiff's counsel's argument that all the decisions went through

HR and there were some examples of disparate treatment closer in time to Mr. Amann's

discipline, the court ruled, "if you want to question someone in HR about policies and practices,

---

[1] Mr. Amann attaches hereto as Exhibits 1-6 trial transcripts from 5/14/25 (Ex. 1), 5/15/25 (Ex. 2), 5/16/25 (Ex. 3), 5/19/25 (Ex. 4), the Rule 50 arguments on 5/20/25 (Ex. 5), and closing arguments on 5/21/25 (Ex. 6). Trial exhibits referred to herein are cited as Trial Ex. ____.

that's fine, but I don't think we need to get a bunch of documents with respect to what happened down the road. So that's where I'll draw the line." *Id.* at 10:3-7.

During Susan May's testimony, Plaintiff's counsel attempted to introduce evidence of treatment of comparators. Importantly, Ms. May testified the policies applied to disciplining all employees, no matter who was involved from HR or management, and that the policies stayed substantially the same from 2014 through at least 2020, such that all discipline or lack thereof during that time would be relevant to show whether Mr. Amann was treated differently than other employees who engaged in misconduct. Ex. 3, at 81:5-8, 88:10-17. Although the court permitted limited testimony about Mr. Pepper (the allegations against him and that he was not terminated), counsel was not permitted to introduce the disciplinary letter, which would have provided demonstrative evidence of the way Mr. Amann was treated versus another similarly-situated employee. Ex. 3, 84:23-87:13. Regarding Mr. Dodge, Ms. May testified he was "arrested for domestic violence," but the fact that he was not terminated for such conduct was not allowed in. *Id.,* at 89:10-18.

The court later appeared to acknowledge that evidence about what conduct rises to the level of a terminable offense was relevant. As the court stated in response to Defendant's Rule 50 motion, "I suppose there's some room for argument, and maybe a decent argument there, that they never would have terminated him for just sending the NCFI packet . . . ." Ex. 5, 1509:12-1510:10. But without being able to show what the Office did or did not consider terminable offenses regarding other employees, Mr. Amann was not able to support such an argument. The prejudice from excluding comparator evidence was apparent in closing arguments, when Defendant argued that Mr. Amann's firing was an appropriate and proportional response to his conduct. Ex. 6, 1644:8-10 ("the reason Mr. Amann was terminated was for the NCFI packet, not

for anything else"), 1648:13–1649:7. In the absence of any comparators, the jury heard only Defendant's side of the "severity" issue—i.e., that Mr. Amann's conduct was so egregious that termination was warranted. Jurors had no concrete example to consider whether AGO had treated other employees less harshly in similar or worse circumstances. The one-sided presentation of discipline evidence allowed Defendant to argue Mr. Amann's termination was the natural and only appropriate outcome, with no examples of disparate treatment to undermine that narrative. The record thus supports the fact that excluding the comparator evidence substantially adversely affected Mr. Amann's ability to prove pretext, warranting a new trial so the jury can hear all the relevant evidence of disparate treatment.

### B.   Defendant Prejudiced Mr. Amann by Referring to "Other Packets."

Next, Mr. Amann contends that Defendant's introduction of testimony about the "other packets" regarding Ms. Poulson was prejudicial, and to the extent it was allowed by the court, was an error. Prior to trial, Mr. Amann filed a motion in limine to exclude evidence of "other packets" that were sent to Ms. Poulson's husband, gym, and bishop. ECF 422. The court acknowledged, "Given Defendant's admission that it has no evidence linking Plaintiff to the packets and the fact that they were not a factor in Plaintiff's termination, those risks substantially outweigh any probative value of the packets." ECF 491, p. 4. It ordered that "Defendant may introduce evidence of the existence of the packets to the extent they are referenced in other evidence. But Defendant may not introduce each physical packet as the risk of wasting time and confusing the issues in doing so would substantially outweigh any probative value of the packets." *Id*. However, during trial, Defendant exceeded this scope.

Defendant apparently did not instruct its witnesses about this ruling. First, Ms. Romano inserted into her testimony unprompted (in response to a question about having talked to Ms.

Poulson a lot), that she had talked to her "on other occasions in early 2016, when additional packets had been sent anonymously to other individuals or entities that also appeared to be harassing to Ms. Poulson, and she was concerned about them." Ex. 1 at 133:18-134:6. When explaining why she highlighted certain entries in Mr. White's X-ways report such as "Packer to Records Committee 11 February 2014", Ms. Romano explained, because "it appeared more than coincidental that, previously, Ms. Poulson had complained about somebody harassing her and breaking into her office and taking contents of her office and providing them to Mr. Packer, and she felt like that was harassing in nature, and that the same type of information was on Mr. Amann's computer." Ex. 1 at 140:24-141:18. Ms. Romano stated "there were signs pointing to Mr. Amann having assembled and sent the packet about Ms. Poulson, which was harassing in nature, and that, previously, somebody had provided information to Mr. Packer about Ms. Poulson that was harassing in nature. It looked like a road I should go down." *Id.* at 141:24-142:7.

During its cross examination of Bridget Romano, when discussing the other packets, Defendant asked her, "what did you do, if anything to investigate this source of where those packets came from?" Ex. 2, p. 873:7-8. Mr. Romano testified that because of the similarity of the envelopes and the contents of the other packets she "determined that at least Mr. Amann or Jason Hanks, could potentially have been the individuals to put these packets together." *Id*. at 873:9-24. This line of testimony exceeded the court's order, because it went way beyond the "existence" of the packets and instead argued that Mr. Amann created and sent the packets (a fact Defendant has admitted there was no evidence of).

Later, when Ms. Poulson was testifying, Defendant asked her "things going missing from her office" (including a copy of her contract that Lynn Packer then reported on). Ex. 4, at 1300-01.

She was also asked whether "the August 2015 NCFI packet [was] the last one that [she] came to understand had been sent about [her], or were there others?" *Id.*, at 1315. The prior exhibit that Defendant had been questioning Ms. Poulson about did not reference any subsequent packets. *Id.* at 1308-1312 (see Trial Ex. 218). Thus, this line of questioning exceeded the court's prior ruling. Plaintiff objected to the relevance of this line of questioning. *Id.*, at 1315. The court overruled the objection and allowed Ms. Poulson to testify about several packets that were sent to her husband, her bishop, her kickboxing gym, and the board of pardons. *Id.* at 1315-1316. Defendant again brought up the other "anonymous packets" later in Ms. Poulson's testimony, and elicited testimony about Ms. Poulson reporting these packets to the Unified Police Department. *Id.* at 1326-1328.

After the extensive testimony regarding the other packets that was elicited throughout trial, Defendant also raised the issue in closing. Defendant argued that although Ms. Romano said "in the footnote of her notice of intent, that she was not able to tie Mr. Amann to those packets . . . she believed that he knew information about Ms. Poulson, including about her kickboxing gym, about the Board of Pardons' hearing, and about where she did choose to worship." Ex. 6, at 1618:13-18. Again, Defendant deliberately exceeded the court's order that allowed the "existence" of the packets to be discussed and instead insinuated that Mr. Amann had created and sent these packets.

The introduction this line of testimony throughout trial substantially prejudiced Mr. Amann's right to a fair trial. Defendant's theory of the case at trial was that Mr. Amann was justifiably terminated for harassing Ms. Poulson by sending the NCFI packet. The introduction of the "other" packets allowed Defendant to bolster this theory by insinuating that Mr. Amann sent these other packets to Ms. Poulson's husband, bishop, gym, and the board of pardons despite

there being absolutely no evidence linking him to those packets. This evidence is exactly the type of evidence that Rule 404(a) is designed to protect against. Fed. R. Evid. 404(a) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.") Defendant used subsequent acts (acts they cannot link to Mr. Amann) to ask the jury to find that Mr. Amann sent the NCFI packet and that he has a harassing character and therefore the Defendant was justified in terminating Mr. Amann. The introduction and testimony of the packets throughout trial was severely prejudicial—which the court had already determined it would be—and therefore warrants a new trial.

### C.  The Court Erred in Allowing Testimony Regarding Plaintiff's GRAMA Requests.

Mr. Amann also contends that testimony regarding Mr. Amann's GRAMA requests, in violation of the court's prior order, was clear error and prejudicial. Prior to trial, Mr. Amann filed a motion in limine requesting that the court exclude any evidence suggesting that Mr. Amann's post-termination GRAMA requests constituted harassment. ECF 427. The court ordered that the evidence was inadmissible character evidence, minimally probative, and that "any probative value they may have is substantially outweighed by the danger of unfair prejudice." ECF 491, pp. 8-9. During trial, however, Defendant proceeded to elicit this exact evidence. Ex. 4, pp. 1328-31.

In complete disregard of the court's order, Defendant asked Ms. Poulson, "So, Mr. Amann was terminated from the office at the end of 2016. At that point in time, did he leave you alone, did you have further contact with him, what happened next?" *Id*. at 1328. Ms. Poulson responded that she "became aware that the office was receiving GRAMA requests . . . ." *Id*. Plaintiff's counsel immediately objected, reminding the court that "this was the subject of a motion in

limine." *Id*. Defense counsel responded that the court "said we could provide testimony about it, we just couldn't introduce the actual exhibits." *Id*. This prompted the court to overrule Plaintiff's objection. *Id*. Defendant continued down this line of questioning, prompting Ms. Poulson to testify that Mr. Amann filed a bar complaint about her to begin describing an incident at her new job in 2024 (implying Mr. Amann had harassed her there as well). *Id*. at 1328-30. Plaintiff's counsel objected again. *Id*. at 1330. The court halted the testimony and excused the jury to address the issue. *Id*. Plaintiff pointed out that the court's order on motions in limine had held that any suggestion Mr. Amann used GRAMA requests "to harass Ms. Poulson is inadmissible character evidence" (and was subject to Rule 403). *Id*. at 1331. The court ultimately sustained the objection, stating that "we're getting pretty far afield."

Even though the court eventually shut down the line of questioning, the prejudice had already occurred. This was another successful attempt by the Defendant to argue to the jury that Mr. Amann was harassing Ms. Poulson and it was therefore justified in terminating him, by using acts after the fact to prove he had a harassing character. The prejudicial impact of this evidence was severe: it portrayed Mr. Amann as an obsessive *stalker* intent on destroying Ms. Poulson's life, likely inflaming the jury's emotions and biasing them against him. Defendant thus succeeded in getting the jury to hear exactly the sort of character-assassination evidence that the court had excluded under Rules 403 and 404(b). Admission of this testimony violated the letter and spirit of the court's prior order. It was error for the court to allow any testimony about the GRAMA requests after Mr. Amann was terminated, and it substantially prejudiced Mr. Amann's right to a fair trial. A new trial free of such improper evidence is therefore warranted.

## II.    THE JURY VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE

"A district court may grant a new trial where the verdict is against the clear weight of the evidence, or is based on false evidence, or to prevent a miscarriage of justice." *B.J. Barnes & Sons Trucking, Inc. v. Dairy Farmers of America, Inc.*, 2007 WL 315708, *1 (D. Utah 2007) (citing *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001)); *see also Holmes v. Wack*, 646 F.2d 86, 89 (10th Cir. 1972) ("where the trial court believes that the jury's verdict is against the weight of the evidence, a motion for new trial is proper."); *Tidewater Oil Co. v. Waller*, 302 F.2d 638, 643 (10th Cir. 1962). On both the Utah Whistleblower Act claim and the breach of contract claim, Mr. Amann presented strong, uncontroverted evidence supporting each element of his case, while Defendant offered no credible evidence to rebut it. No reasonable jury, faithfully applying the law to the trial record, could have found against Mr. Amann on these claims. Allowing the verdict to stand would result in a miscarriage of justice, so a new trial is required.

### A.    *Plaintiff Proved all Elements of his Breach of Contact Claim*

The jury's verdict on Mr. Amann's breach of contract claim is unsupported by the trial evidence. Utah law recognizes that employment policies and manuals can create an implied contract between an employee and employer. ECF 380, p. 22 (citing *Canfield v. Layton City*, 122 P.3d 622, 626 (Utah 2005)). For an implied-in-fact contract to arise, "there must be a manifestation of the employer's intent that is communicated to the employee and sufficiently definite to operate as a contract provision . . . the manifestation of the employer's intent must be of such a nature that the employee can reasonably believe that the employer is making an offer of employment other than employment at will." *Id*. at p. 23 (quoting *Snyder v. City of Moab*, 354 F.3d 1179, 1190 (10th Cir. 2003)).

Pursuant to this authority, to prevail on his breach of contract claim, the jury was instructed that Mr. Amann had to prove:

> 1) There was a promise by the Office that was communicated to Mr. Amann;
>
> (2) The promise was sufficiently definite so that Mr. Amann could reasonably understand the nature of the Office's promise;
>
> (3) Mr. Amann accepted the Office's promise by continuing his employment;
>
> (4) The Office breached its promise to Mr. Amann by not performing its obligations; and
>
> (5) Mr. Amann was damaged because the Office breached its promise.

Final Instruction No. 35, ECF 518 at 56.

The evidence at trial indisputably established all the elements of Mr. Amann's breach of contract claim. First, Mr. Amann was granted career status and notified that "certain benefits and protections are accorded to you." Plaintiff's Trial Ex. 1. Among these protections were that as a career status employee, Mr. Amann could only be disciplined or discharge for cause. Ex. 1, 101:7-11.

Ms. Romano testified that all employees of the attorney general's office are bound by the Office's policy manual, and that the manual "adopts the Department of Human Resource Management rules under Title R477 [a section of the Utah Administrative Code], unless otherwise specifically amended by office policy, and provided herein." Trial Ex. 2, p. 1; Ex. 1, 96:24-98:5, 104:19-24. Mr. Amann accepted employment and relied on these promises by continuing his employment with the Office for 17 years. Both sets of policies included important commitments to employees. Trial Ex. 2; Trial Ex. 14. It is undisputed that Mr. Amann and the Office were bound by these policies. Thus, the first three elements of Mr. Amann's breach of contract claim were proven conclusively by these undisputed facts.

Mr. Amann also conclusively demonstrated that the Office breached its obligations under that employment contract, in many ways. For instance, the Office failed to follow its policies regarding investigating and disciplining employees in multiple ways that paved the way for Mr. Amann's ultimate termination.

First, the policies provide, "Investigations shall be conducted by qualified individuals." Ex. 3, at 70:4-6; Trial Ex. 2, p. 28. For instance, Ms. May explained that while she was qualified to conduct investigations because she "had been through investigation training," her predecessor in HR was not. Ex. 3, at 62:7-63:20. The investigation into Mr. Amann was started by Alan White, who had never done an internal investigation and whose experience was in investigating child sex abuse cases for the Internet Crimes Against Children division. Ex. 1, at 8:18-10:1. And it was completed by Ms. Romano, who had no training on conducting investigations. Ex. 2, at 700:14-701:4. Neither of these individuals was qualified to conduct the investigation into Mr. Amann, which undoubtedly affected the outcome of the investigation. (Notably, Alan Conner, who began the investigation with Mr. White, was a certified forensic examiner, but Mr. Conner quickly stated he had a conflict and ceased working on the investigation. Ex. 1, at 37:6-38:6.)

Ms. May testified that although management was "supposed to" work with her regarding discipline to make sure it was correct, she "was not involved" in Mr. Amann's termination. Ex. 3, at 60-62. The first she learned of Mr. Amann's discipline is when Ms. Romano gave her his badge and informed her "that they were placing him on administrative leave." *Id.*, at 80:1-20.

Additionally, both AGO and DHRM Policies provide that "paid administrative leave" is only to be used in specific circumstances: "If agency management determines that a career service employee endangers or threatens the peace and safety of other or poses a grave threat to the public service or is charged with aggravated or repeated misconduct, the agency may impose

the following actions . . . paid administrative leave." Plaintiff's Trial Ex. 14, p. 82; Plaintiff's Trial Ex. 2, pp. 37-38. Ms. Romano testified that at the time she placed Mr. Amann on administrative leave, she had not made the determination that he endangered or threatened the peace and safety of others, posed a great threat to the public service, or that he was charged with aggravated or repeated misconduct. Ex. 2, at 770:25-772:6. Ms. Romano clearly violated the policy regarding administrative leave.

She also violated the policies by disciplining Mr. Amann for reasons not set forth in the policy, and by means not provided for. The policies list 12 grounds for disciplining employees. Ex. 1, at 98:15-100:5; Trial Ex. 2, pp. 36-37. Mr. Amann's alleged conduct in sending the NCFI packet does not fall into any of these categories. (Importantly, "harassment" is not included in these categories, but furthermore, Ms. May testified that "harassment" as prohibited by its policies was based on the definition in Title VII. Ex. 3, at 65-67. Pursuant to that definition, Ms. May had investigated Mr. Hanks' complaint of sexual harassment related to a coworker who repeatedly washed his genitals in the sink in Mr. Hanks' presence, and found the complaint unsubstantiated because it was not a sexual overture towards Mr. Hanks. *Id.*, at 76:6-78:2.)

Further, the types of discipline available under the policies are: written reprimand, suspension without pay up to 30 days per incident, demotion, or dismissal. Ex. 1*,* at 100:16-21; Trial Ex. 2, pp. 36-37. As stated above, administrative leave for nearly a year is not an available form of discipline.

The policies also mandate, "Except in aggravated cases of misconduct an employee in career status may not be given a written reprimand, or suspended, demoted, or dismissed without . . . [being notified] in writing of the reasons for the written reprimand, suspension, demotion, or dismissal." Trial Ex. 2, p. 37. Ms. Romano testified she did not talk to Mr. Amann before placing

16

him on leave. Ex. 2, at 754:8-9. As of October 19, 2025 (the day he was placed on leave) she had never discussed with Mr. Amann what he was being investigated for. *Id*. at 764:24-765:1. Ms. Romano testified that she gave Mr. Amann an administrative leave letter, but nowhere in the letter did she tell Mr. Amann was the allegations were. Ex. 2, at 766:1-19; Plaintiff's Trial Ex. 20. Furthermore, Ms. Romano "didn't speak to him further about [her] investigation until . . . the summer of 2016." Ex. 2, at 780:1-4. Defendant has never claimed this was an "aggravated case of misconduct," nor would such a characterization be credible. Rather, the Office simply flouted its own rules in declining to inform Mr. Amann of the reasons for his discipline until after he had been on leave for over six months. Defendant's violations of these policies are uncontroverted and demonstrate conclusively that Mr. Amann proved his breach of contract claim.

Further, the DHRM rules prohibited any form of employer retaliation against an employee for engaging in protected activity, providing that "[n]o person may retaliate against any employee who … has filed a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing, or is otherwise engaged in protected activity." Plaintiff's Trial Ex. 14, p. 95; Ex. 2, at 702:15-23. Ultimately, the Office violated the promise of no retaliation by firing Mr. Amann for his whistleblowing activities, which will be discussed below. But one of the specific retaliatory acts that are prohibited is "exclusion or ostracism of the complainant." Plaintiff's Trial Ex. 2, p. 26. Ms. Romano put Mr. Amann on leave for almost a year and ordered him not to have any contact with the coworkers he had worked with for 17 years, which clearly amounts to "ostracism," in violation of policy.

The weight of the evidence shows that Mr. Amann, as a career service employee of the Office, was entitled to the protections found in its policy manual, and the DHRM policies incorporated therein. As stated above, Defendant breached the requirements of those policies in

17

many important and undisputed ways, in addition to retaliating against him for protected disclosures, as explained below. Therefore, the jury's decision finding no breach of contract was against the weight of the evidence.

### B.  Plaintiff Proved all Elements of his Utah Whistleblower Act Claim.

The weight of the evidence also overwhelmingly showed that Mr. Amann was terminated in retaliation for protected whistleblower activity, in violation of the Utah Public Employees Protection Act. In order to prevail on his Whistleblower claim, Mr. Amann had "the burden of proving by a preponderance of the evidence that the employee, in good faith, engaged in protected reporting and suffered a retaliatory action." Utah Code Ann. § 67-21-4(3)(a).

The jury was instructed that Mr. Amann met his burden of proof on his Whistleblower Act claim if he proved he:

> 1. "made a communication in good faith;
> 2. The communication reported:
> i. waste or misuse of public funds, property, or manpower;
> ii. a violation or suspected violation of a law, rule, or regulation; or i
> ii. gross mismanagement, abuse of authority, or unethical conduct as it relates to a state government employer; and
> 3. The Attorney General's Office terminated Mr. Amann's employment because he made a protected, good faith communication.

Final Instruction No. 27, ECF 518, at 48.

Alternatively, he could prevail by proving he:

> 1. "participated or gave information in an investigation, hearing, court proceeding, legislative or other inquiry, or other form of administrative review held by the public body; and
> 2. The Attorney General's Office terminated Mr. Amann because he participated or gave information in an investigation, hearing, court proceeding, legislative or other inquiry, or other form of administrative review held by the public body."

Final Instruction No. 28, ECF 518, at 49.

At trial, Mr. Amann proved he engaged in many statutorily protected disclosures of government misconduct. It should have been clear to any reasonable juror paying attention that the fix was in to find a reason to discipline/terminate Mr. Amann from the start of the investigations into him in 2015, and that the reasons for the discipline had nothing to do with the purported NCFI packet and everything to do with his other acts of whistleblowing.

First, Mr. White testified he was asked by Greg Ferbrache to image Mr. Amann's computer in August/September 2015 "[b]ecause of past involvement." Ex. 1, at 15:7-23. (Mr. Amann's computer had been forensically examined in 2014 as part of an investigation into who leaked information to Lynn Packer that was printed in the Packer Chronicles. *Id.,* at 108:10-109:8.) Mr. Amann and Mr. Hanks were the subject of Mr. White's investigation from the beginning, but he claimed not to remember why. *Id.,* at 20:23-21:10.

Mr. White took photographs of the cover of the NCFI envelope, but did not log the contents of it, as any reasonable investigator would do when trying to research the origin of the documents in the packet or to provide proof of what document were in the packet. *Id.,* at 27:15-17. He imaged Mr. Amann's computer, but he only found one of the documents ostensibly in the packet on Mr. Amman's computer and was unable to tell when that document was downloaded. *Id.,* at 29:14-30:5. He found no evidence that Mr. Amann printed that document, or any of the documents in the NCFI packet. *Id.,* at 41:15-17, 90:3-6. Nor did he even investigate the printer, although that could have provided evidence that someone printed at document. *Id.,* at 41:18-42:8. And he acknowledged that the fact that a document was on Mr. Amann's computer did not indicate that he sent it to Barry Page. *Id.,* at 62:22-25.

Mr. White was ostensibly tasked with trying to find out who logged into the Xchange database (which houses court filings) on August 10, 2015. *Id.,* at 41:2-5. But as part of that

investigation, he created an X-Ways report (Plaintiff's Trial Ex. 18) based on the image of Mr.

Amann's hard drive, and "bookmarked several items of interest" in that report that were

unrelated to that determination. Ex. 1, at 45-46. He explained that these "items of interest" were

"policy violations," and he was looking for anything that might fit into one of these "policy

violations." *Id.,* at 46:12-48:12. These "items of interest" included several documents involving

Cindy Poulson, such as the Packer Chronicles from January 9, 2014 (which publicly revealed

Ms. Poulson's relationship with Mr. Barlow and her criminal history, see Plaintiff's Trial Ex. 6),

and Ms. Poulson's 2012 salary and bonuses. Ex. 1, at 47:4-48:21. Mr. White also flagged a

documented titled, "Notes for meeting with Auditors" from July 8, 2015 and a "Memorandum to

Auditors." *Id.,* at 50:12-51:2. And he bookmarked the document,

"Rambo_Reyes_Saves_Child_Sex_Slaves." *Id.,* at 52:3-8. Mr. White's report did not actually

include any documents that were in the packet, other than one that had not been accessed since

April 2015. *Id.,* at 57:7-61:9.

Enter Bridget Romano. Sean Reyes appointed Ms. Romano as chief civil deputy at the

end of August 2015. *Id.,* at 94:3-15. In her very first executive team meeting as chief civil

deputy, Ms. Romano was provided with information about Ms. Poulson's complaint, which

implicated Mr. Amann. *Id.,* at 112:22-114:2. Ms. Romano became aware at that time of the

Packer Chronicles from 2014. *Id.,* at 107:24-108:9. (She testified that she learned that Mr.

Amann complained to the Utah Department of Human Resource Management ("DHRM") in

2014 that Poulson's contract was essentially a "fraud on the state," and acknowledged that it

"could be whistleblowing." Ex. 2, at 796:10-797:5.)

Ms. Romano did not talk to Barry Page about the NCFI envelope; she simply trusted

what Ms. Poulson told her about the circumstances of the envelope. Ex. 1, at 119:15-120:21. This

is not a reasonable course of action for any legitimate investigator conducing a legitimate investigation.

Spence Austin provided Ms. Romano with a copy of Mr. White's report. *Id.,* at 114:10-12. Ms. Romano sat down at a computer with Mr. White and Spence Austin in early October 2015 to go over the items that Mr. White bookmarked from his review of Mr. Amann's hard drive. *Id.,* at 121:22-122:12.

Ms. Romano then created a large hard copy file of the investigation, that included Mr. White's X-ways report and documents from the report that she flagged. *Id.,* at 139:23-140:5. This file was introduced as Plaintiff's Trial Ex. 19I. She made handwritten exhibit numbers on the documents and highlighted certain entries on the report. Ex. 1*,* at 140:1-19. During her testimony, Ms. Romano acknowledged that only one document from this report actually appeared in the NCFI packet. Ex. 3, 149:17-22.

She highlighted many entries that had nothing to do with the NCFI packet, however, such as "Packer to Records Committee 11 February 2014", which she explained she highlighted because "it appeared more than coincidental that, previously, Ms. Poulson had complained about somebody harassing her and breaking into her office and taking contents of her office and providing them to Mr. Packer, and she felt like that was harassing in nature, and that the same type of information was on Mr. Amann's computer." Ex. 1*,* at 140:24-141:18. Ms. Romano stated "there were signs pointing to Mr. Amann having assembled and sent the packet about Ms. Poulson, which was harassing in nature[2], and that, previously, somebody had provided information to Mr. Packer about Ms. Poulson that was harassing in nature. It looked like a road I

---

[2] Ms. Romano apparently considers reporting information about government officials violating rules to be "harassing," but it is also, indisputably, protected whistleblowing.

should go down." *Id.,* at 141:24-142:7. She flagged other documents about "Cynthia Poulson," simply because they appeared to be documents about Ms. Poulson. *Id.,* at 143:1-5.

Similarly, Ms. Romano highlighted a document regarding "Poulson not prosecuting Spencer Glenn," which she explained was "because of . . . the concern raised by Ms. Poulson in making her complaint and having her conversations with me." Ex. 1, at 146:17-21. She was concerned about Mr. Amann documenting Ms. Poulson not doing her job when he no longer worked in her section. *Id.,* at 146:21-147:1.

Ms. Romano also flagged a document called "Problems with Knowlton and Barlow" because these concerns had been sent to Mr. Packer. *Id.,* at 1443:6-13. She also thought she should look at Mr. Amann's folder labeled "SCAM." *Id.,* at 144:6-16.

Another document that Ms. Romano incorporated into her investigation file was "Mr. Amann's notes from meeting with auditors in July 2015." Ex. 2, at 753:20-754:3. In those notes, Mr. Amann talked about "misappropriation of funds," which Ms. Romano acknowledged could fit within the "quintessential definition of whistleblowing." *Id*. at 754:14-755:23.

She claimed not to remember why she put a star next to "Notes for meeting with Auditors," "Memorandum to Auditors," and "Notes regarding Audit." Ex. 1*,* at 144:25-146:3. But she was aware that the substance of all these documents represented whistleblowing. She testified that she understood Mr. Amann expressed to the auditors that "he, Jason Hanks, and Jeanette Turner, had all been victims of retaliation for bringing problems to the attentions of supervisors. Ex. 2, at 743:2-7. She testified that Mr. Amann's letter contained a section on "Lack of Transparency" that "explains Mr. Amann's view of the proceedings before the State Records Committee regarding a GRAMA request he had made." *Id*. at 743:12-17. She testified that Mr. Amann's letter also talks about "priorities which violate the law . . . office mismanagement . . .

and employment and hiring issues." *Id*. at 743:18-24. She acknowledged that Mr. Amann's letter "raised monetary issues, including bonuses given for sexual favors," "hiring irregularities," "sexual improprieties," and included a section about the relationship between Reyes and OUR (Operation Underground Railroad). *Id*. at 744:20-745:5. Ms. Romano stated that she reviewed the letter to the auditors during her investigation and later returned to it during her Garrity interview with Mr. Amann in August of 2016. *Id*. at 747:17-21.

Ms. Romano acknowledged that she discussed with Mr. Amann his whistleblowing conduct during the Garrity interview. Ex. 2, at 882:11-883:2. She stated that during the interview, Mr. Amann "indicated that he had been providing information to other entities, DHRM, to members of the A.G.'s administration, and to the auditors" and that Mr. Amann "described himself as a whistleblower." *Id*. at 882:15-19.

Based on this testimony, Mr. Amann proved a causal connection between his whistleblowing and his termination. Ms. Romano testified that she finalized the draft of the notice of intent to terminate on September 8, 2016. Ex. 2, at 812:19-813:2. This was shortly after her interview with Mr. Amann (after almost a year in a holding pattern), in which he had indicated he had engaged in whistleblowing efforts. The timeline of events reinforces the inference of retaliation.

But Ms. Romano was not only was aware of Mr. Amann's protected disclosures, she also reacted with hostility toward them. She explained that Mr. Amann was open about his whistleblowing: "when Mr. Amann engaged in whistleblowing conduct, conduct that he consciously undertook and believed was protected in the statute, he did it in a very obvious manner. He either spoke with people personally, or he provided information which clearly identified him by name and by position and that clearly laid out his view." *Id*., at 882:21-883:2.

(Her purported issue with the NCFI packet was that Mr. Amann did it anonymously and did not

"accept responsibility" for it. *Id.,* at 883:3-16.)

Her hostility towards Mr. Amann's whistleblowing was also evident when she spoke with

Detective Childs regarding an investigation into the packets after Mr. Amann's termination.

During that conversation, Ms. Romano told the Detective that Mr. Amann "was also alleging that

Cindy had been illegally hired and the mere fact that she was retained as an attorney was fraud,

waste, abuse and misuse of public funds." *Id*. at 835:20-836:3. When asked about this statement,

Ms. Romano admitted that she was aware of these allegations prior to recommending Mr.

Amann's termination. *Id*. She also told the Detective that Mr. Hanks and Mr. Amann were

"taking down the AG's office because they're convinced we're just a hot bed of corruption,

here." *Id.,* at 920:1-7. This statement, made to a Detective she was trying to convince to

criminally prosecute Mr. Amann ostensibly for sending packets about Ms. Poulson, provides

strong evidence of Ms. Romano's motive for all her actions against Mr. Amann. In sum, Ms.

Romano's animus towards Mr. Amann based on his whistleblowing was clear and unrefuted at

trial, and provides strong evidence of her retaliatory motive.

Ms. Romano also testified that she was aware that Mr. Amann was pursuing GRAMA

requests related to a complaint against him by Ann Skaggs. *Id*. at 821:17-822:2. And the

evidence was clear that she held Mr. Amann's GRAMA activities against him as well. She

inquired with HR (Susan May) as to whether Mr. Amann had appropriately taken leave on days

he appeared in courts in his GRAMA case. Ex. 1, at 126:5-23. Ms. Romano considered Mr.

Amann's pursuit of his GRAMA requests to be "in his capacity as a private citizen, as an

individual," regardless of whether he was seeking information having to do with his

employment. *Id.,* at 126:24-127:10. This evidence goes to the second way Mr. Amann could

24

prove his Whistleblower claim: by showing he participated in "participated or gave information in an investigation, hearing, court proceeding, legislative or other inquiry, or other form of administrative review held by the public body," and that he was terminated for such participation.

Reyes then appointed Tyler Green to address Mr. Amann's request for a hearing on his proposed termination. Ex. 3, at 18:9-11. Mr. Green served as a rubber stamp for the recommendation Ms. Romano made. Ms. Romano gave Mr. Green her "big file that she had put together that had all the documents, the underlying materials that she had referenced in her notice of intent to Mr. Amann." *Id.,* at 19:21-20:18. Mr. Green looked at all 900 pages of the file. *Id.* But he refused to provide Mr. Amann with the evidence that supported his termination. *Id.,* at 34:10-15. Ultimately, Mr. Green upheld Mr. Amann's termination, citing policy violations including the conflicts of interest policy, although he could not explain why he included that policy. *Id.* at 30:13-31:17*;* Plaintiff's Trial Ex. 28. The only basis anywhere in the record for Mr. Green to have determined Mr. Amann violated the conflicts of interest policy is his whistleblowing about the corruption of his leadership.

In sum, the jury's verdict on both counts was unsupported and unjust. Mr. Amann met his burden of proof on the Whistleblower Act and contract claims with compelling, largely uncontroverted evidence. Defendant, for its part, failed to substantiate a rationale for the firing unrelated to whistleblowing, or to refute the existence and breach of its contractual obligations. Where, as here, the jury's verdict flies in the face of the clear weight of the evidence, the court not only may but should set aside that verdict to prevent a miscarriage of justice. A new trial is therefore warranted under Rule 59. The verdict on each claim was against the great weight of the evidence and cannot be allowed to stand.

### C.  Defendant Elicited Testimony To Evoke Sympathy for Poulson

Mr. Amann has satisfied his burden of demonstrating why he should be granted a new trial by showing the jury's verdict was against the weight of the evidence. He is not required to demonstrate *why* the jury reached a decision that was contrary to the evidence. That said, it bears mentioning that the jury was exposed to highly emotional information that had little relevance to the core issues, and that likely clouded their ability to decide the case impartially. In particular, Defendant presented testimony about Ms. Poulson's personal life history – testimony clearly calculated to engender sympathy for her and, by extension, antipathy toward Mr. Amann, who Defendant repeatedly suggested was harassing her. During Ms. Poulson's direct examination, the jury heard a detailed narrative of her struggles: she testified about her teenage alcoholism, her DUI and other criminal troubles in the 1990s, the collapse of her first marriage, and her journey to sobriety. Ex. 4, at 1280-82. She recounted how she overcame childhood sexual abuse, depression, and the death of her child's father, eventually achieving 21 years of sobriety by 2025. *Id.,* at 1282-83. She even described her ongoing volunteer work helping incarcerated women turn their lives around. *Id.,* at 1283. In short, the jury was led through a moving life story of redemption – none of which had any direct bearing on whether Mr. Amann was fired for whistleblowing or whether the AG's Office breached an employment contract.

The only purpose of this line of testimony was to make the jury feel that Ms. Poulson was a sympathetic, deserving individual who had reformed her life, and thus to cast Mr. Amann as a villain for allegedly sending an anonymous letter that dredged up her painful past. This emotional appeal was powerful – but it was also improper. The court expressly instructed the jurors that they "must not be influenced by any personal likes or dislikes, opinions, or sympathy" and that they "must decide the case solely on the evidence" and the law. The introduction of Ms.

26

Poulson's personal travails invited the jury to do the opposite: to base its verdict on sympathy for Ms. Poulson and hostility toward Mr. Amann, rather than on an unbiased evaluation of the evidence. There is a strong likelihood that the jury succumbed to this invitation.

Indeed, Defendant doubled down on this emotional theme during Mr. Green's testimony. Mr. Green effectively argued to the jury (under the guise of testimony) that the anonymous packet was a cruel act that threatened to undo Ms. Poulson's rehabilitation. He described how, in his view, the packet showed that "somebody out there" would never let Ms. Poulson escape her criminal past – that "despite all [her] efforts to correct" her life, "we're not going to let you forget it." Ex. 3, at 49:2-15. He emphasized that Ms. Poulson had "paid her debt to society" and obtained expungements as a neutral third party found appropriate, only to have Mr. Amann (supposedly) "out of the blue" hit her with this anonymous condemnation. *Id.,* at 48:16-49:15. This testimony blatantly appealed to the jurors' sense of outrage on Ms. Poulson's behalf. It painted Mr. Amann as vindictive and mean-spirited – effectively asking the jury to punish him for that perceived character flaw.

The result appears to be that the jury's passions were inflamed far beyond the objective merits of the legal claims. Once emotionally aligned with Defendant's narrative, the jury was far less likely to fairly weigh evidence favorable to Mr. Amann. In short, the verdict was likely prejudiced by a pattern of inflammatory and sympathy-inducing evidence that should have had no role in the jury's deliberations.

To be clear, Mr. Amann does not suggest that this testimony was allowed in as part of an incorrect evidentiary ruling. He did not object to the testimony (elicited by defense counsel), as his counsel was caught off guard by Ms. Poulson's narrative (and would have filed a motion in limine if they had known it was coming). Furthermore, by making an objection to this type of

testimony, counsel would have risked seeming insensitive to Ms. Poulson's history, playing into Defendant's narrative. But the only evident purpose to such testimony was to influence the jury by appealing to "passion or prejudice," which is improper and a basis for a new trial in this case, just as it would be if "passion or prejudice" had influenced the jury to award excessive damages to Mr. Amann. See *Moody v. Ford Motor Co.,* 509 F.Supp.2d 823, 847 (N.D. Okla. Mar. 20, 2007) ("Tenth Circuit precedent is clear that when a jury's verdict was the result of passion, prejudice or bias, the proper remedy is to order a new trial"), citing *Mason v. Texaco, Inc.* 948 F.2d 1546 (10th Cir. 1991).

## III.    THE COURT ERRED IN QUASHING THE TRIAL SUBPOENA TO FORMER AG REYES

Prior to trial, the court granted Defendant's Motion to Quash Mr. Amann's Trial Subpoena to Former AG Reyes on the basis that admitting certain exhibits authored by Reyes ("the Reyes exhibits") was a less burdensome means of presenting the evidence. ECF 491, at 21-23. While the admission of the Reyes exhibits was a less burdensome means of presenting *some* of the evidence, it was not an adequate replacement for *all* of Reyes' testimony.

In order to call a high-ranking official to testify, a plaintiff must meet the extraordinary circumstances test by showing: "(1) the official has first-hand knowledge related to the claim being litigated; (2) the testimony will likely lead to the discovery of admissible evidence; (3) the [testimony] is essential to the party's case; and (4) the information cannot be obtained from an alternative source or via less burdensome means." *In re Off. of the Utah Att'y Gen*., 56 F.4th 1254, 1260 (10th Cir. 2022) (cleaned up), quoting *White v. City & Cnty. of Denver,* No. 13-cv-01761-CMA-MJW, 2014 WL 3373368, at *2 (D. Colo. July 10, 2014). The Tenth Circuit held that Mr. Amann satisfied the first two elements. *Id.,* at 1264. This Court quashed the subpoena

on the basis of the fourth element: the information could be presented from an alternative source or via less burdensome means. ECF 491, at 23.

### A. Reyes' Testimony Was Essential to Plaintiff's Claims

Former Utah Attorney General Sean Reyes was a key figure throughout the events at issue, with personal involvement in the retaliation against Mr. Amann. Even Defendant acknowledged Reyes' importance by listing him at the very top of their initial disclosures as an individual "likely to have discoverable information." Reyes had direct knowledge of the key events in Mr. Amann's case—from the initial whistleblowing reports in 2013, through policy changes and investigations in 2014-2015, to the events culminating in Mr. Amann's 2016 termination.

Reyes' testimony would have been uniquely probative of retaliatory motive and pretext, far beyond what any other witness or exhibit standing alone could offer. Evidence of retaliatory motive and pretext is essential in a whistleblower case. Defendant has attempted to distance Reyes from the decision to terminate Mr. Amann but the Reyes exhibits paint a different picture. See, Plaintiff's Opposition to Defendant's Motion in Limine to Quash Trial Subpoena to Former AG Sean Reyes, at 3-8 (ECF 461). Although the court recognized these exhibits as essential evidence to Mr. Amann's case, Reyes' testimony about the exhibits was essential as well.

### B. The Reyes Exhibits Were Not A Less Burdensome Means of Presenting Reyes' Testimony

As the court recognized, the Reyes exhibits were essential to Mr. Amann's case. ECF 491, at 22. As explained in the Opposition to the Motion to Quash, Reyes' testimony about these documents was essential as well. ECF 461, at 3-8. Allowing the admission of the Reyes exhibits without the traditional requirement of calling a witness to lay the foundation and authentic the

documents was a less burdensome means of presenting the information contained within the exhibits. It was not, however, a substitute for information that only Reyes' testimony could provide.

Mr. Amann laid out numerous examples of why Reyes' testimony was essential and irreplaceable at trial in his Opposition to the Motion to Quash. ECF 461, at 3-8. Without reiterating all of those examples, a few are particularly illustrative of why the admission of the Reyes' exhibits was not a less burdensome means of presenting the information. While many of the exhibits were able to tell the "what," only Reyes' testimony could tell the "why." And in retaliation and whistleblower cases, the "why" is usually the most crucial fact.

In July 2015, Reyes put Mr. Amann on his "to do list" twice. Plaintiff's Trial Exs. 15 & 17. Admitting these exhibits was a less burdensome means of presenting the fact that Reyes put Mr. Amann on his to do list. It did not, however, present any facts about *why* Reyes put Mr. Amann on his to do list. There is no other evidence or means to present such information—only Reyes could have testified to why he did that. Reyes' reasoning behind putting Mr. Amann on his to do list—four days after Mr. Amann sent him a letter containing allegations of misconduct in the Office (Plaintiff's Trial Ex. 13)—is crucial to the question of retaliatory motive. The exhibits alone do not answer that question and are thus not an adequate substitute for Reyes' testimony.

Another example of how the Reyes exhibits are an adequate substitute for the "what" but not the "why" is the September 7, 2016 text message Reyes sent to Alan Crooks stating "Amann reneged on our deal so he wants to 'burn us to the ground.'" Plaintiff's Trial Ex. 23. Obviously, the admission of the exhibit established the fact Reyes sent the text message but provides no insight as to why he sent or what he was talking about. There is no other evidence in the record

of what "deal" Reyes was referring to, nor is there alternative evidence explaining what Reyes meant or why he said Mr. Amann "wants to 'burn us to the ground.'" Nor is there evidence to explain why Reyes was even talking to Alan Crooks about Mr. Amann, particularly when Reyes has disclaimed any involvement in the decision to terminate Mr. Amann. Only Reyes' testimony could provide these facts—facts that are crucial to Defendant's retaliatory motive especially considering the fact the text message was sent either the day before or the day of the Notice of Intent[3].

Additionally, there were facts for which there simply was not alternative evidence and thus, those facts did not come into evidence. For example, there were no documents that could have been admitted showing whether Reyes was aware of the EBEC complaint prior to the Notice of Intent. Only Reyes could testify to that knowledge. Defendant has tried to distance Reyes from any involvement in the decision to terminate Mr. Amann while the Reyes exhibits tell a different story. Only Reyes could testify about his actual involvement.

Admitting the Reyes exhibits was not an adequate substitution for his testimony and did not present a less burdensome means of presenting the evidence at trial. Mr. Amann can satisfy the extraordinary circumstances test and Reyes should have been compelled to testify at trial. It was error to quash the subpoena to Reyes and attempt to replace his testimony by admitting exhibits that fail to tell the full story. The court can and should remedy this error by granting a new trial and compelling Reyes to testify.

---

[3] There is a discrepancy on the date of the document. At the top, it suggests the text was sent on September 8, 2016, but elsewhere, suggests it was sent the day before, September 7, 2016. Quashing the subpoena also deprived Mr. Amann of the chance to establish when the text was actually sent, which was important given that Mr. Amann submitted his complaint about Reyes to the EBEC on September 8, 2016.

### C.  Reyes' Absence Was Deeply Prejudicial – His Exclusion Affected the Outcome of the Trial.

In addition to depriving Mr. Amann of evidence for which there is no substitute, the decision to admit the Reyes exhibits in lieu of Reyes' actual testimony forced Mr. Amann to present evidence in a manner that did not make sense. Because Reyes was not testifying, Mr. Amann either had to bring in the exhibits through other witnesses (many of whom had no first-hand knowledge of the documents or events) or wait until closing argument to present the evidence to the jury. This significantly prejudiced Mr. Amann's ability to present his case. By keeping him off the stand, the jury was deprived of the most direct evidence of Reyes' motive.

Key communications involving Reyes were admitted into evidence, but without him on the stand, their full significance could not be presented to the jury. In some instances, the jury was shown critical documents with zero explanatory testimony, leaving the jurors to interpret. Amann introduced a September 7, 2016 text message from Reyes to his Chief of Staff, Alan Crooks (Plaintiff's Trial Ex. 23), in which Reyes wrote "Amann reneged on our deal and he wants to 'burn us to the ground.'" This explosive statement—coming the day before the Office issued Plaintiff's intent-to-terminate letter—suggests a retaliatory animus or personal vendetta. Yet because Reyes did not testify, the jury never heard any explanation of what "deal" Mr. Amann supposedly reneged on, or why Reyes believed Mr. Amann wanted to "burn [them] to the ground."

Mr. Amann's counsel attempted to fill the gap in closing argument by piecing together context, but that could not substitute for Reyes' sworn testimony. In fact, counsel had to explicitly remind the jury that they "did not see this [text] during trial" in any witness' testimony "because Reyes is not here to testify.". This underscores how hamstrung Plaintiff's presentation was: a juror listening to attorney argument about what Reyes might have meant is not the same

as hearing from Reyes directly under oath. The absence of Reyes' testimony left the jury to speculate rather than draw inferences from the evidence.

In another example, text messages between Reyes and Parker Douglas (Plaintiff's Trial Ex. 29), were introduced through Susan May, the Human Resource Manager at the AOffice during the events at issue. Ex. 3, at 89:19-91:15. On December 7, 2016, Reyes told Douglas he was "causing [him] more stress than Paul A and Jason Hanks." Plaintiff's Trial Ex. 29, at 2. Ms. May testified she was not aware of any situations concerning Mr. Amann or Mr. Hanks that would have explained why they were causing Reyes stress. Ms. May had no first-hand knowledge of this exhibit but as the HR Manager, she was the witness most likely know what Reyes was talking about. Even so, introducing this exhibit through her did not make sense. Only Reyes could have explained why Mr. Amann was causing him so much stress—especially considering he disclaimed any involvement in Mr. Amann's termination. Being forced to shoehorn the Reyes exhibits in through other witnesses hindered Mr. Amann's ability to present his case in a logical manner.

Reyes' testimony was critical not only to Mr. Amann's ability to fully present his case to the jury but also deprived him of the ability to introduce evidence of Defendant's retaliatory motive and pretext. As explained above, the admission of the Reyes exhibits was not an adequate substitution for his testimony and quashing the subpoena was in error. The deprivation of such crucial evidence undoubtably effected the jury's decision. The Court, however, can remedy the error by granting Mr. Amann a new trial in which Reyes is compelled to testify.

## CONCLUSION

Defendant was able to introduce evidence that painted Mr. Amann as a harasser, some of which had been specifically excluded. To the contrary, Mr. Amann was prevented from

presenting evidence that, for instance, another Assistant AG who had been arrested for domestic violence was not terminated, which would have bolstered his case. Mr. Amann was also forced to put on evidence of Mr. Reyes' involvement without Mr. Reyes' testimony. Ultimately, the weight of the evidence was in Mr. Amann's favor and yet the jury found against him. The circumstances, viewed together or separately, require a new trial to ensure that justice is served.

DATED this 25th day of July, 2025.

**HOLLINGSWORTH LAW OFFICE, LLC**

/s/April L. Hollingsworth
April L. Hollingsworth
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of July, 2025, a copy of **PLAINTIFF'S**

**RULE 59 MOTION FOR A NEW TRIAL** was served, via the court's electronic filing system,

on the following:

Liesel B. Stevens
Beth J. Ranschau
Aaron C. Hinton
RAY QUINNEY & NEBEKER, P.C.
36 South State St., #1400
Salt Lake City, Utah 84111
lstevens@rqn.com
branschau@rqn.com
ahinton@rqn.com

Daniel R. Widdison
Bradley Blackham
Assistant Utah Attorneys General
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114
dwiddison@agutah.gov
bblackham@agutah.gov

/s/April L. Hollingsworth
April L. Hollingsworth