IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| PAUL G. AMANN,<br><br>    Plaintiff,<br><br>v.<br><br>OFFICE OF THE UTAH ATTORNEY GENERAL,<br><br>    Defendant. | MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR A NEW TRIAL UNDER RULE 59<br><br>Case No. 2:18-cv-00341-JNP<br><br>Chief District Judge Jill N. Parrish |

At trial, a jury found in favor of Defendant the Office of the Utah Attorney General (the "AG's Office" or "Office") on Plaintiff Paul Amann's ("Amann") claims for breach of contract and violation of the Utah Whistleblower Act ("Whistleblower Act"), Utah Code Ann. §§ 67-21-1 to -10. ECF No. 520 ("Jury Verdict"). Now, Amann brings a motion for a new trial under Federal Rule of Civil Procedure 59 on a variety of alternative grounds.[1] ECF No. 541 ("Pl.'s Mot."). For the reasons below, the court DENIES Amann's motion.

**BACKGROUND**

This case arises from an employment dispute. Amann alleged that he was illegally terminated by the AG's Office after making reports of misconduct. ECF No. 89 ("Second Am. Compl."). The AG's Office, however, maintained that it lawfully terminated Amann for his own

---

[1] Since filing the present motion, Amann has subsequently filed a motion under Federal Rule of Civil Procedure 60 to vacate the judgment and either grant default judgment or, in the alternative, a new trial. ECF No. 567 ("Pl.'s Rule 60 Mot."). The court is still considering this subsequent motion, which has yet to be fully briefed, and nothing in this order should be construed as ruling thereon.

misconduct, mainly in connection to another employee Cynthia Poulson ("Poulson"). ECF No. 213 ("Am. Answer to Second Am. Compl.").

Amann was employed as an attorney with the AG's Office beginning in 1998. ECF No. 523 ("Trial Tr. Vol. 1") at 140–41. Meanwhile, Poulson was hired by the AG's Office as an education specialist in 2006 and then paralegal, working with Amann on the Internet Crimes Against Children Task Force. *Id.* at 178–81. She had several felony convictions, which the AG's Office was aware of, that were later expunged. ECF No. 528 ("Trial Tr. Vol. 6") at 1281, 1285, 1297–99. After a local blogger published an article alleging that Poulson and another employee Craig Barlow ("Barlow") had engaged in misconduct, the AG's Office initiated a formal investigation. ECF No. 524 ("Trial Tr. Vol. 2") at 196, 207–08. Amann assisted the investigation, providing information and raising concerns about Poulson. *Id.* at 208–09. The investigation ultimately found that, besides some inappropriate emailing, neither Poulson nor Barlow had engaged in misconduct. Trial Tr. Vol. 6 at 1303–04.

In connection with her duties as an employee of the Office, Poulson attended a National Computer Forensics Institute ("NCFI") conference in Alabama. *Id.* at 1304–06. The conference director received an anonymously sent package containing disparaging information about Poulson. *Id.* at 1306–07. It included information regarding Poulson's felony convictions and alleged that they had been improperly expunged. *Id. See* Pl.'s Trial Ex. 19D.[2] Poulson was informed of the packet by the conference director, causing her extreme emotional distress. Trial Tr. Vol. 6 at 1306–07. She thereafter submitted complaints to the AG's Office. *Id.* at 1307–11.

---

[2] The trial exhibits have been filed non-electronically and are currently retained by the clerk's office. *See* ECF No. 534 ("Notice of Non-Electronic Filing of Trial Exs.").

The Office then commenced an investigation to determine the source of the packet. The investigation uncovered evidence linking Amann to the packet—including card key access logs and internet activity from Amann's office computer—and, shortly thereafter, Amann was placed on administrative leave by Chief Civil Deputy Bridget Romano ("Romano"). ECF No. 525 ("Trial Tr. Vol. 3") at 631–32, 635, 639; ECF No. 526 ("Trial Tr. Vol. 4") at 867–70; Pl.'s Tr. Ex. 19G. Romano eventually issued a notice of intent to terminate Amann's employment, citing evidence that Amann had sent the NCFI packet and her conclusion that such conduct constituted harassment of a fellow employee, in addition to other policy violations. Trial Tr. Vol. 4 at 874–79. Solicitor General Tyler Green ("Green") reviewed the relevant evidence and officially terminated Amann for violating the Office's policies, including its anti-harassment policy. ECF No. 527 ("Trial Tr. Vol. 5") at 942–43, 945–47, 960, 969–71.

Amann denied that he had sent the packet and alleged that his termination was unlawful. ECF No. 2-1 ("First Am. Compl."). He asserted claims against Utah Attorney General Sean Reyes ("Reyes"), the AG's Office, and many other Office employees allegedly involved in his termination. *Id.*; ECF No. 89 ("Second Am. Compl."). After cross motions for summary judgment, the case was limited to two claims against the AG's Office for breach of contract and violation of the Whistleblower Act. ECF No. 380 ("Summ. J. Order") at 27. These claims proceeded to trial, where both Amann and the AG's Office offered extensive live testimony and documentary evidence. ECF No. 519 ("Ex. and Witness List"). Following an eight-day jury trial, the jury returned a verdict for the AG's Office on both claims. Jury Verdict.

Amann now moves for a new trial pursuant to Federal Rule of Civil Procedure 59 on the following grounds: (1) evidence was erroneously excluded and improperly introduced; (2) the verdict was against the weight of the evidence; and (3) the court improperly quashed the trial

subpoena issued to Reyes. Pl.'s Mot. The AG's Office fully opposes the motion. ECF No. 555 ("Def.'s Opp'n"). In his reply memorandum, Amann raises additional arguments based on a document contained in a file labeled "Children's Justice Division Internal Review," which was not disclosed by the AG's Office until after Amann filed his Rule 59 motion. ECF No. 563 ("Pl.'s Reply") at 4–9; ECF No. 555-10 ("New Evidence"); Def.'s Opp'n at 33 n.20. The relevant section of the document consists of an undated note that Amann contends was written by Reyes and identifies Amann as the source of the article that first raised allegations regarding Barlow and Poulson's alleged misconduct. Pl.'s Reply at 4.

## LEGAL STANDARD

Federal Rule of Civil Procedure 59(a) provides that a court may "grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). The standard for "the granting of a new trial involves an element of discretion . . . [that] embraces all the reasons which inhere in the integrity of the jury system itself." *Tidewater Oil Co. v. Waller*, 302 F.2d 638, 643 (10th Cir. 1962). Thus, it may be appropriate to grant a Rule 59(a) motion under a broad range of circumstances, including when "the jury verdict is against the weight of the evidence, the damages are excessive, a party was prejudiced by erroneous evidentiary rulings, or the trial was not fair to the moving party." *Megadyne Med. Prods., Inc. v. Aspen Lab'ys, Inc.*, 864 F. Supp. 1099, 1102 (D. Utah 1994), *aff'd,* 52 F.3d 344 (Fed. Cir. 1995). However, such motions are "generally not regarded with favor[] and [are] granted only with great caution" in light of "[t]he work, effort, and expense involved in trial" and the public's "strong interest in protecting the finality of judgments." *United States v. Perea*, 458 F.2d 535, 536 (10th Cir. 1972); *Braun v. Medtronic Sofamor Danek, Inc.*, 141 F. Supp. 3d 1177, 1192 (D. Utah 2015), *aff'd,* 719 F. App'x 782 (10th Cir. 2017); *Nelson*

*v. City of Albuquerque*, 921 F.3d 925, 929 (10th Cir. 2019). *See also Kanatser v. Chrysler Corp.*, 199 F.2d 610, 615 (10th Cir. 1952) ("There is good reason . . . for . . . confining the trial court within the narrow limits of its discretionary powers, for it is important in the administration of justice that there shall be an end to litigation, and that issues tried and decided by a jury shall not be lightly set aside.")

Consequently, "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial," and "the court must disregard all errors and defects that do not affect any party's substantial rights." FED. R. CIV. P. 61. The court should not grant a new trial "unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Nosewicz v. Janosko*, 857 Fed. App'x 465, 468 (10th Cir. 2021) (quoting 11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2803 (3d ed. Apr. 2021 update)) "If 'a new trial motion asserts that the jury verdict is not supported by the evidence, the verdict must stand unless it is clearly, decidedly, or overwhelmingly against the weight of the evidence.'" *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 762 (10th Cir. 2009) (quoting *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1284 (10th Cir. 1999)); *Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013). When a party moves for "a new trial . . . on grounds not called to the court's attention during the trial," the request will be denied "unless the error was so fundamental that gross injustice would result" absent a new trial. *Cyprus Fed. Credit Union v. CUMIS Ins. Soc'y, Inc.*, 638 F. App'x 751, 754 n.1 (10th Cir. 2016) (quoting *United States v. Walton,* 909 F.2d 915, 924 (6th Cir.1990)).

## ANALYSIS

Amann raises three categories of arguments in support of his motion for a new trial. The court considers these arguments in turn and, when relevant, discusses the additional arguments in his reply memorandum based on the newly discovered evidence. Ultimately, the court concludes that these arguments, whether considered individually or collectively, fall well short of justifying a new trial and, accordingly, denies the motion.

## I. Evidentiary Issues

### A. Exclusion of Amann's Comparator Evidence

Amann first seeks a new trial based on the court's "erroneous exclusion . . . [of] comparator evidence" regarding other employees investigated and disciplined by the AG's Office. Pl.'s Mot. at 5–8. Specifically, Amann argues that the court erred by excluding evidence of the disciplinary records of Ed Lombard and Steven Wuthrich and limiting his ability to introduce evidence concerning Kevin Pepper and Michael Dodge. *Id.* Amann contends that this comparator evidence showed that the Office's explanation for its termination decision was pretextual because the Office did not terminate these other employees who engaged in similar, if not more serious, misconduct. *Id.* However, Amann has failed to demonstrate that these rulings were erroneous or prejudicial.

When Amann sought to introduce Lombard's and Wuthrich's disciplinary records, the AG's Office objected under Federal Rule of Evidence 403. Trial Tr. Vol. 5 at 928–29. The court sustained the objection, ruling that the dangers of unfair prejudice, misleading the jury, and wasting time substantially outweighed the probative value of the evidence, especially because these comparators were disciplined years after Amann and by different initial decision-makers. *Id.* at 931–32. Amann's initial memorandum in support of his motion for a new trial raised no arguments as to why this ruling was incorrect. In Amann's reply memorandum, he suggests that the court

improperly discounted the probative value of the comparators because "the same rules applied to all employees during the time frames at issue" and the disciplinary process was subject to "the same ultimate supervisor." Pl.'s Reply at 11. But it is well-established that "comparator evidence involving temporally remote events has diminished probative value because employers' disciplinary practices necessarily change over time," notwithstanding consistent rules. *Donez v. Leprino Foods, Inc.*, No. 21-1212, 2022 WL 500549, at *8 (10th Cir. Feb. 18, 2022) (citation modified). It is similarly well accepted that comparators are less probative of pretext when they were disciplined by different supervisors. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) ("Similarly situated employees are [limited to] those who deal with the same supervisor.") (quoting *Wilson v. Utica Park Clinic, Inc.*, No. 95–5060, 1996 WL 50462, at *1 (10th Cir. Feb.7, 1996)). And even if these alleged comparators involved the same official atop the organizational chart—Attorney General Reyes—they involved different supervisors driving the disciplinary process, which clearly diminishes their probative value. Consequently, Amann has failed to persuade the court that it should have ruled otherwise with respect to Lombard and Wuthrich.

While questioning the Office's human resources employee Susan May, Amann's counsel also attempted to solicit testimony that another AG's Office employee, Michael Dodge, had not been terminated after being arrested for domestic violence. Trial Tr. Vol. 5 at 1010–12. The court sustained the Office's Rule 403 objection. *Id.* Again, Amann does not explain in his initial memorandum why this specific ruling was erroneous but argues in his reply memorandum that the same official policies that were in place when Dodge was investigated were in place when Amann was terminated. Pl.'s Reply at 11. Yet continuity in policy alone does not negate the fact that over three years passed between Amann's termination and the investigation into Dodge, which

7

undermines the probative value of Dodge's discipline. *See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330–31 (10th Cir. 1999) (holding that comparator evidence that occurred in 1991 was "not sufficiently connected to the employment action in [1994] to demonstrate pretext"); *Webb v. Level 3 Commc'ns, LLC*, 167 F. App'x 725, 731 (10th Cir. 2006) ("Discriminatory incidents which allegedly occurred either several years before the contested action or anytime after are not sufficiently connected to the employment action in question to demonstrate pretext.") (citation modified). Therefore, the court's ruling is justified because the incident involving Dodge occurred well after Amann was terminated and thus was of minimal probative value.[3] In any event, Amann fails to show that the court incorrectly exercised its "considerable discretion in performing the Rule 403 balancing test" with respect to Dodge. *United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001).

The court did allow Amann to solicit testimony from May regarding Pepper's misconduct and the fact that he was not terminated but instructed Amann's counsel to "move on" when she began questioning May about the specifics of Pepper's disciplinary letter. Trial Tr. Vol. 5 at 1007–10. Amann suggests that this was in error because it prevented Amann from "introduc[ing] the disciplinary letter, which would have provided demonstrative evidence of the way . . . Amann was treated versus another similarly-situated employee." Pl.'s Mot. at 7. But Federal Rule of Evidence 611(a) instructs the court to "exercise reasonable control over the mode . . . of examining witnesses and presenting evidence," including to "avoid wasting time." FED. R. EVID. 611(a); 28 FED. PRAC.

---

[3] Additionally, the allegations against Dodge were insufficiently analogous to the allegations against Amann to outweigh the risk of undue prejudice. Specifically, the allegations against Dodge, while incredibly serious, were personal; they did not involve any misconduct directed at a co-worker, unlike the allegations against Amann. Thus, the court had an independent basis to exclude the evidence regarding Dodge under Rule 403, which Amann does not address.

& PROC. EVID. § 6164 (2d ed.). *See also MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1171 (7th Cir. 1983) ("Litigants are not entitled to burden the court with an unending stream of cumulative evidence."). By directing counsel away from questions regarding Pepper's disciplinary letter, the court was simply acting pursuant to its obligations under Rule 611(a), ensuring that scare trial time would not be wasted on a mini-trial regarding the details of Pepper's misconduct and discipline. And even now, Amann fails to explain how the disciplinary letter could have altered the jury verdict. *See* Pl.'s Mot. at 7; Pl.'s Reply at 10–12.

In addition, Amann has not shown that these supposed errors were prejudicial or implicate his substantive rights. He was permitted to introduce comparator evidence regarding Pepper, and it is unclear how probative the additional comparator evidence was given its temporal remoteness and the involvement of different supervisors. Amann similarly fails to grapple with the substantial evidence and arguments—on which the jury could have relied in rejecting his claims without even needing to consider pretext—that, for example, the Office's employment policies were too vague to constitute a contract and that Amann did not act with the good faith needed to invoke the protection of the Whistleblower Act. *See* ECF No. 518 ("Jury Instructions") at 48–49, 56 (outlining the elements Amann was required to prove to prevail on his claims); Def.'s Opp'n at 17–24 (raising plausible arguments that the required elements were not proved, irrespective of whether Amann proved pretext).

In summary, the court's rulings regarding comparator evidence were well within its properly exercised discretion and any possible error was harmless.

### B. Reference to Other Packets

Next, Amann argues that the court committed prejudicial error by permitting testimony about other packets similar in substance to the NCFI packet that were anonymously sent to

9

Poulson's husband, her bishop, her gym, and the board of pardons. Pl.'s Mot. at 8–11. After the AG's Office included some of these packets on its exhibit list, Amann moved in limine to exclude them under Federal Rules of Evidence 402 and 403. ECF No. 422 ("Pl.'s First Mot. in Limine"); ECF No. 491 ("Order on Mots. in Limine") at 3–4. The court partially granted Amann's motion and excluded the exhibits under Rule 403, reasoning that the probative value of these exhibits was low because the packets were not a factor in the decision of the AG's Office to terminate Amman and there was, in fact, no direct evidence linking Amann to the other packets. Order on Mots. in Limine at 3–4. However, because the packets were part of the factual fabric of the case and mentioned in other exhibits, the court ruled that "[t]o the extent the packets are merely referenced in other exhibits or testimony, there is no danger in letting the jury know of their existence." *Id.* at 4. Amann claims that the AG's Office violated this order by soliciting testimony about these other packets and that the court committed error by permitting such testimony. Pl.'s Mot. at 8–11.

Amann faces a particularly heavy burden in advancing this argument because he failed to bring this issue to the court's attention at trial. *See* Def.'s Opp'n at 9–10; Pl.'s Reply at 13. Indeed, Amann permitted defense counsel to question Romano regarding the other packets without raising any objections. Trial Tr. Vol. 3 at 643–44; Trial Tr. Vol. 4 at 872–74. While Amann's counsel objected to defense counsel's questioning of Poulson about the other packets under Rule 402, she neither cited Rule 403 nor the court's prior order in limine and was properly overruled.[4] Trial Tr.

---

[4] The testimony concerning the other packets easily cleared the low bar for relevance under Rule 402 for a variety of reasons. For example, the existence of the other packets explained the timing of the investigation into Amann, thereby rebutting Amann's argument that it was suspicious. *See, e.g.*, Trial Tr. Vol. 4 at 872. *See also* Def.'s Opp'n at 8–9 (outlining additional reasons why the testimony was relevant). This non-propensity use of the evidence also undermines Amann's assertion that the testimony was improperly introduced as character evidence in violation of Federal Rule of Evidence 404(a). *See* Pl.'s Mot. at 11.

Vol. 6 at 1315. Other than that misplaced relevance objection, Amann's counsel failed to object at trial to questions and testimony regarding the other packets. *Id.* at 1326–27. Thus, Amann must contend with the principle "that a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result" unless a new trial is granted. *Cyprus Fed. Credit Union*, 638 F. App'x at 754 n.1 (quoting *Walton,* 909 F.2d at 924).

Amann cannot meet this burden because he cannot establish that the questioning regarding the packets violated the court's prior in limine order. Besides a single clause buried in the body of the motion, Amann's motion in limine focused entirely on the admissibility of the packets themselves and did not seek to exclude other testimony concerning them.[5] Pl.'s First Mot. in Limine. Similarly, the court's order partially granting Amann's motion in limine focused on the documentary exhibits themselves. Order on Mots. in Limine at 3–4. Indeed, the order simply emphasized that "there is no danger in letting the jury know of [the other packets]" and permitted the AG's Office to "introduce evidence of the existence of the packets to the extent that they are referenced in other evidence." *Id.* at 4. Because the order can fairly be read as only excluding the packets themselves and not placing any constraints on testimony describing them, the questions propounded by defense counsel were not improper. *See* Def.'s Opp'n at 8 (adopting this

---

[5] In her memorandum arguing that the packets sent to Poulson's husband should be excluded in limine, Amann's counsel included a single sentence indicating that the "testimony about [these packets] should be excluded under Rule 402." Pl.'s First Mot. in Limine at 3. But other than this single comment, in the middle of the memorandum, there is no suggestion that testimony was within the scope of the motion in limine. The memorandum's introduction, conclusion, headers, and the accompanying proposed order all suggest that the motion in limine was focused exclusively on the documentary exhibits themselves. *See id.*; ECF No. 422-8 ("Pl.'s Proposed Order Granting Pl.'s First Mot. in Limine").

interpretation). This, especially when combined with the failure of Amann's counsel to raise any pertinent objections at trial, does not evince error justifying a new trial.[6]

Moreover, Amann has not met his burden of demonstrating that any alleged error was harmless in light of the ample evidence supporting the verdict. In fact, because Romano testified that she was unable "to connect . . . Amann to [these other] packets," the testimony regarding the other packets may have even supported Amann's trial testimony that he did not send the NCIF packet. Trial Tr. Vol. 3 at 644; Trial Tr. Vol. 2 at 344.

C.      Testimony Regarding Amann's GRAMA Requests

Amann's final evidentiary argument is that the court erred by allowing the AG's Office to introduce testimony regarding his requests for documents about Poulson made under Utah's Government Records Access and Management Act ("GRAMA"), Utah Code Ann. §§ 63G-2-101 to -901. Pl.'s Mot. at 11–12. According to Amann, the court entered an order before trial excluding any evidence concerning these GRAMA requests because the danger that such evidence would be used for an inadmissible character inference outweighed its minimal probative value. *Id.* at 11; Order on Mots. in Limine at 8–9. Amann argues defense counsel "complete[ly] disregard[ed]" this order by soliciting testimony from Poulson that, after Amann's termination, she became aware that he had been submitting GRAMA requests. Pl.'s Mot. at 11; Trial Tr. Vol. 6 at 1328.

---

[6] Amann also takes issue with defense counsel's references to the other packets in her closing argument. Pl.'s Mot. at 10 (citing ECF No. 530 ("Trial Tr. Vol. 8") at 1618). But, for the reasons discussed above, there is no reason to conclude that this comment was based on improperly introduced testimony. Nor is there any reason to believe that defense counsel was making the comment for improper reasons because it occurred in the context of responding to Amann's arguments about the length and timing of the investigation into Amann. Trial Tr. Vol. 8 at 1596, 1618. These comments, to which Amann's counsel did not object, certainly do not constitute an egregious error that warrants a new trial.

After defense counsel began asking Poulson about these GRAMA requests, Amann's counsel objected; her objection was initially overruled; and Amann's counsel solicited three lines of testimony indicating that Amann had requested government records about Poulson. Trial Tr. Vol. 6 at 1328–29. Following a break in the trial, while the jury was excluded, the court then reversed its earlier ruling and sustained Amann's counsel's objection, stating that defense counsel was "getting pretty far afield" and "what may have been motivating someone prior to the termination is completely different from what may have motivated someone after the termination." *Id.* at 1331. The following exchange then ensured:

> [Defense Counsel]: Your Honor, we would like a curative instruction—
>
> The Court: Propose one and I will include it in the jury instructions. If you have one now, I'm happy to consider it.
>
> [Defense Counsel]: Not off the top of my head.
>
> The Court: Okay. Well, I'm in the same boat. So if you want me to give one, you need to propose one.
>
> [Defense Counsel]: Okay.

*Id.* at 1332. But at no point thereafter did counsel follow through and provide a curative instruction. The Office's counsel did not resume this line of questioning, and there is no suggestion that they made any further references to these GRAMA requests during trial. Amann now argues that undue "prejudice had already occurred" and was "severe," by "portray[ing] Amann as an obsessive *stalker* intent on destroying . . . Poulson's life." Pl.'s Mot. at 12 (emphasis in original); Trial Tr. Vol. 6 at 1330–31.

But the court is not persuaded that its initial ruling overruling Amann's objection was in error. When Poulson first testified about the GRAMA requests, Amann's counsel objected on the basis that "this was the subject of a motion in limine." Trial Tr. Vol. 6 at 1328. However, the

13

relevant motion only asked the court to exclude documentary exhibits containing the GRAMA requests and to "preclude the AG's Office from offering evidence or argument that Amann's GRAMA requests were 'harassment' for purposes of trying to prove he acted in accordance with such character." ECF No. 425 ("Pl.'s Fourth Mot. in Limine") at 2. In line with this request, the court's order granting the motion excluded only the exhibits themselves and the argument that "[Amann] used [the GRAMA] requests to harass Poulson." Order on Mots. in Limine at 8–9. It did not extend to any testimony regarding the mere existence of these requests. *Id.* Thus, Poulson's testimony about the GRAMA requests fell outside the scope of this pre-trial order. And it was properly offered as impeachment evidence after Amann had opened the door by volunteering testimony that he did not "track[]" or "keep[] tabs on" Poulson after they were no longer working in the same section. Trial Tr. Vol. 1 at 129; Trial Tr. Vol. 3 at 413–14. In short, Amann has failed to identify error on the part of the court or defense counsel, even if the court later changed course and decided to exclude testimony regarding the GRAMA requests.

In any event, any alleged error was harmless. The court ultimately sustained Amann's objection regarding the post-termination GRAMA requests. And there is no indication that defense counsel made any impermissible character arguments based on the post-termination GRAMA requests. In an eight-day trial, the transcript of which spans over sixteen-hundred pages, it is unfathomable that three lines of testimony about GRAMA requests had any lasting impact on the jury, let alone influenced its verdict. Indeed, the failure of Amann's counsel to propose any curative instructions after receiving an invitation to do so from the court further suggests that any error was harmless, if not invited. Trial Tr. Vol. 6 at 1332; ECF No. 529 ("Trial Tr. Vol. 7") 1370–1405. Because Amann deliberately eschewed available remedial measures that had been offered by the trial court, he faces a particularly heavy burden in explaining why justice now requires the drastic

14

measure of a new trial. In his attempt to meet this burden, Amann provides nothing but "speculation [that clearly] cannot support the award of a new trial." *Acree v. Minolta Corp.*, 748 F.2d 1382, 1386 (10th Cir. 1984). *See* Pl.'s Mot. at 11–12; Pl.'s Reply at 17–20.

## II. Weight of the Evidence

### A. Contract Claim

Amann requests a new trial on his breach of contract claim, arguing that the jury verdict was "unsupported by the trial evidence." Pl.'s Mot. at 13–18. As reflected in the jury instructions, which Amann is not challenging, this claim required Amann to prove (1) "[t]here was a promise by the Office that was communicated to . . . Amann"; (2) "[t]he promise was sufficiently definite so that . . . Amann could reasonably understand the nature of the Office's promise"; (3) "Amann accepted the Office's promise by continuing his employment"; (4) "the Office breached its promise to . . . Amann by not performing its obligations"; and (5) "Amann was damaged because the Office breached its promise." Jury Instructions at 56. Amann argues that "[t]he evidence at trial indisputably established all the[se] elements" with respect to promises contained in the employment policies adopted by the Office. Pl.'s Mot. at 14. But Amann has not met his burden in demonstrating that the evidence "clearly, decidedly, or overwhelmingly" showed that the AG's Office breached its promises.[7] *M.D. Mark*, 565 F.3d at 762 (quoting *Anaeme*, 164 F.3d at 1284).

---

[7] Additionally, Amann has not met his burden of establishing that the Office's promises were sufficiently definite to create a contract. *See* Def.'s Opp'n at 16–20. This especially applies to Amann's cursory argument that the Office's human resources department was inadequately involved with the disciplining of Amann. Pl.'s Mot. at 15. The only evidence that Amann cites is testimony that "management was 'supposed to' work with [human resources] regarding discipline." *Id.* (quoting Trial Tr. Vol. 5 at 984). A reasonable jury could easily find that this policy was too vague to constitute a contract. And, in any event, there is evidence that the Office did involve human resources in the investigation regarding Amann. Trial Tr. Vol. 3 at 628.

15

First, Amann cites the Office's policy that any employee misconduct would be investigated by "qualified individuals." Pl.'s Mot. at 15. While Amann raises concerns regarding the investigators' qualifications, the trial evidence does not clearly establish that they were unqualified—especially because there is no suggestion that the policy included any definition regarding the necessary qualifications. *See* Pl.'s Mot. at 15 (failing to offer any concrete definition); Pl.'s Reply at 21 (same). And, in any event, trial evidence established that the investigators did, in fact, have relevant experience. Trial Tr. Vol. 3 at 514–15, 519 (evidence regarding Alan White's qualifications); Trial Tr. Vol. 4 at 700–02 (evidence regarding Romano's qualifications).

Second, Amann argues that the AG's Office violated its policy providing that paid administrative leave could only be instituted upon specific findings. Pl.'s Mot. at 15–16. However, the Office raises a colorable argument, supported by Romano's testimony, that it did not place Amann on administrative leave as a form of discipline and, therefore, the requirement cited by Amann is inapplicable. Def.'s Opp'n at 18–19; Trial Tr. Vol. 4 at 768–71, 861–63. Amann challenges the Office's alternative interpretation of the policy based mainly on structural and functional considerations, but these arguments fail to demonstrate that the Office's interpretation is incorrect. Pl.'s Reply at 21–22. Moreover, Amann's argument that paid administrative leave was not explicitly authorized by the Office's policies falls short of demonstrating that it was affirmatively prohibited, rather than simply unaddressed. Pl.'s Mot. at 15–16; Pl.'s Reply at 21–22.

Third, Amann argues that the AG's Office violated its policies by disciplining Amann for reasons not stated in its policies. Pl.'s Mot. at 16. But Amann is unable to definitively establish that the Office's policies prohibited it from engaging in discipline for reasons not explicitly stated.

16

*Id.*; Pl.'s Reply at 22–23. Indeed, the AG's Office cites policy language suggesting that the enumerated reasons were merely discretionary factors to be considered when imposing discipline. Def.'s Opp'n at 19. Additionally, the AG's Office argues persuasively that it did discipline Amann for an enumerated reason. *Id.* at 19–20. Amann's reply to this argument turns on questions about the scope and application of the Office's harassment policies, on which a reasonable jury likely could disagree. Pl.'s Reply at 23.

Fourth, Amann suggests that the AG's Office engaged in an unauthorized form of discipline by placing Amann on administrative leave for a lengthy period and without an explanation of the allegations against him. Pl.'s Mot. at 16–17. This argument is predicated on the assumption that the paid administrative leave was a form of discipline. But, as discussed above, there is evidence challenging this characterization. Trial Tr. Vol. 4 at 769–71, 863. Additionally, this argument assumes that this case did not involve an "aggravated case[] of misconduct." Pl.'s Mot. at 16. But it appears that the Office policies did not define aggravated misconduct, and no party suggests otherwise. Amann, therefore, cannot rule out the conclusion that the jury found his misconduct to be aggravated.

Fifth, Amann argues that the AG's Office breached its policies against retaliation. But this argument assumes that the AG's Office "fir[ed] Amann for his whistleblowing activities." Pl.'s Mot. at 17. As discussed below, there is ample evidence challenging Amann's theory of why he was terminated. Amann also argues that the AG's Office engaged in impermissible retaliation through "ostracism." Pl.'s Mot. at 17. But there is evidence that Amann's paid administrative leave and restrictions on communications were enacted for the non-retaliatory purpose of more effectively conducting the investigation into Amann's conduct. Trial Tr. Vol. 4 at 770, 863. And given the ambiguity of the term and evidence suggesting that Amann was still able to contact his

17

colleagues during his administrative leave, a reasonable jury could conclude that no ostracism occurred. *Id.* at 774.

Amann has, therefore, failed to show that the evidence convincingly demonstrates that the AG's Office violated any of its promises. Consequently, he is not entitled to a new trial on the breach of contract claim.

B.      Whistleblower Act Claim

Amann similarly requests a new trial on his Whistleblower Act claim, arguing that "[t]he weight of the evidence. . . overwhelmingly showed that . . . Amann was terminated in retaliation for protected whistleblower activity" in violation of the statute. Pl.'s Mot. at 18–25. The jury instructions, which again Amann does not challenge, identified two possible ways in which Amann could prevail on the statutory claim: he could establish either (1) "the [AG's] Office terminated . . . Amann's employment because he made a protected, good faith communication [reporting misconduct]" or (2) "the [AG's] Office terminated . . . Amann because he participated or gave information in an investigation, hearing, court proceeding, legislative or other inquiry, or other form of administrative review held by the public body." Jury Instructions at 48–49; Pl.'s Mot. at 18.

Amann has failed to meet his burden of showing that the evidence overwhelmingly establishes these elements. For example, there is ample evidence supporting the conclusion that Amann was not terminated because of protected whistleblower activities. Romano and Green testified that their termination recommendation and decision were based on their conclusions that Amann had sent the NCFI packet and had committed other policy violations having nothing to do

18

with protected whistleblower activity.[8] Trial Tr. Vol. 4 at 878–90 (Romano's testimony); Trial Tr. Vol. 5 at 969–74 (Green's testimony). Amann's suggestion that the court should discredit this testimony based on nothing but circumstantial evidence disregards the constitutionally protected role of the jury.[9] *See United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1226 (10th Cir. 2000) ("The jury . . . has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact.") (quoting *Kitchens v. Bryan Cnty. Nat. Bank*, 825 F.2d 248, 251 (10th Cir. 1987)).

In light of the evidence suggesting that Amann's termination was not retaliation for protected whistleblower activity, the jury verdict is not against the weight of the evidence, and Amann has not established a basis for a new trial.

C.      Sympathy

Next, Amann argues for a new trial on the grounds that "[the AG's Office] presented testimony about . . . Poulson's personal life history" that "likely clouded [the jury's] ability to decide the case impartially." Pl.'s Mot. at 26–28. Amann does "not suggest that this testimony was

---

[8] Amann never contended that the sending of the NCFI packet constituted protected activity.

[9] Amann attempts to discredit this testimony based mainly on the following allegations: (1) Amann's computer had been forensically examined in an earlier investigation into leaked information; (2) White's investigation into Amann was inadequate and included information unrelated to the NCFI packet; (3) Romano highlighted entries in White's reports that were unrelated to the NCFI packet and considered extensive documents unrelated to the NCFI packet in the investigation; (4) Romano was aware of Amann's whistleblowing activities and expressed some hostility to the conduct; (5) Green failed to adequately explain his decision; and (6) Green is biased in light of his firm's subsequent financial relationship with the State of Utah. Pl.'s Mot. at 19–25; Pl.'s Reply at 26. But none of these allegations are necessarily inconsistent with the Office's non-retaliatory explanation for Amann's termination. In short, they do not establish that the non-retaliatory explanation is clearly or overwhelmingly inconsistent with the evidence.

allowed . . . as part of an incorrect evidentiary ruling" and acknowledges that his counsel failed to object to this testimony at trial. *Id.* at 27–28. But he contends that this testimony was only introduced for the improper purpose of appealing to the jury's "passion or prejudice" and thus warrants a new trial. *Id.* at 28. Because of the strong presumption against granting a new trial on "grounds not called to the court's attention during the trial," Amann must demonstrate that the introduction of Poulson's testimony resulted in "gross injustice." *Cyprus Fed. Credit Union*, 638 F. App'x at 754 n.1 (quoting *Walton,* 909 F.2d at 924).

Amann does not come close to meeting this demanding standard. For starters, Amann does not explain why any sympathy the jury may have had for Poulson—a non-party with no financial interest in the outcome—would have resulted in influencing the jury's decision on whether to award damages against the AG's Office. Moreover, the testimony about Poulson's personal history was relevant to a host of issues, providing crucial context about why the Office concluded that the sender of the NCFI packet had engaged in harassment of Poulson. Finally, any improper prejudicial effect of the testimony was addressed by the court's instruction, which told the jury that it "must not be influenced by any personal likes or dislikes, opinions, or sympathy." Jury Instructions at 23. *See Bland v. Sirmons*, 459 F.3d 999, 1015 (10th Cir. 2006) ("The jury is presumed to follow its instructions."). And Amann's failure to raise this issue at trial, despite ample notice and opportunity to do so outside the presence of the jury, undercuts any finding of injustice.[10] Thus, this case is easily distinguishable from the case cited by Amann where a court

---

[10] Amann's claim that his counsel was "caught off guard" by Poulson's testimony rings hollow because the Office's opening statement described Poulson's personal history at length and indicated that it would be shared through Poulson's testimony. Pl.'s Mot. at 27; Trial Tr. Vol. 1 at 45–47.

ordered a new trial after finding that counsel had made "repeated attempts to prejudice the jury by introducing irrelevant evidence and making inflammatory statements." *Moody v. Ford Motor Co.*, 506 F. Supp. 2d 823, 847 (N.D. Okla. 2007); Pl.'s Mot. at 28.

In summary, Amann has failed to show that there was any injustice involved in the introduction of Poulson's testimony about her personal history, let alone a gross injustice warranting a new trial.

## III.    The Reyes Subpoena

Amann finally argues for a new trial on the grounds that the court erroneously quashed the trial subpoena to Attorney General Reyes. Pl.'s Mot. at 28–33.

During discovery, the court granted Amann's motion to compel Reyes's deposition, but the Tenth Circuit granted a writ of mandamus and vacated the court's order, holding that Amann had failed to satisfy his burden under the extraordinary circumstances test. ECF No. 224 ("Order Sustaining in Part Pl.'s Objections"); *In re Off. of the Utah Att'y Gen.*, 56 F.4th 1254, 1255–65 (10th Cir. 2022) (per curiam). The extraordinary circumstances test requires that a "party seeking the deposition of a high-ranking government official must show: (1) the official has first-hand knowledge related to the claim being litigated; (2) the testimony will likely lead to the discovery of admissible evidence; (3) the deposition is essential to the party's case; and (4) the information cannot be obtained from an alternative source or via less burdensome means." *Off. of the Utah Att'y Gen.*, 56 F.4th at 1264 (citation modified). The Tenth Circuit stated that it "appear[ed] that . . . Amann ha[d] made a sufficient showing as to the first two factors" but held that Amann had not "made the requisite showing as to the third and fourth factors." *Id.* Specifically, it held that the third factor required a showing that the requested deposition "is not only relevant[] but *necessary*" *Id.* (citation modified) (emphasis in original). And with respect to the fourth factor, it found that

Amann's ability to depose Romano and Green constituted alternative and, in fact, "*better* sources of information concerning [Amann's] termination given that they both testified [that] Reyes had *no* involvement or influence in the decision to terminate . . . Amann." *Id.* (emphasis in original).

Notwithstanding the Tenth Circuit's opinion, Amann thereafter subpoenaed Reyes to appear and testify at trial, and the AG's Office moved to quash the subpoena under the extraordinary circumstances test. ECF No. 420 ("Def.'s Eighth Mot. in Limine"). The court granted the Office's motion to quash, holding that the extraordinary circumstances test also applied to the trial subpoena and that Amann had again failed to make a sufficient showing with respect to the third and fourth factors.[11] Order on Mots. in Limine at 21–23. Amann does not question that Reyes's trial subpoena required him to satisfy the extraordinary circumstances test but argues that court wrongly held that his showing was insufficient and, by doing so, prejudiced his case. Pl.'s Mot. at 28–33.

The court disagrees, finding that its order to quash was justified based on Amann's failure to demonstrate that Reyes's testimony was essential to his case. While this court had initially been persuaded to allow a deposition and was skeptical of the extraordinary circumstances test, the Tenth Circuit adopted the test and strictly applied the third factor, emphasizing that "[s]omething is essential if it is not only relevant, but *necessary*" and that "information must be absolutely needed to be deemed essential." Order Sustaining in Part Pl.'s Objections at 8–9; *Off. of the Utah Att'y Gen.*, 56 F. 4th at 1264 (citation modified) (emphasis in original). Because both Romano and

---

[11] This order was conditioned on the AG's Office's stipulating to the authenticity and admissibility of certain documents that Amann claimed were authored by Reyes. It appears that AG's Office so stipulated, and Amann does not contend otherwise. *See* Pl.'s Trial Exs. 4, 11–12, 23, 29, 63, 72, 75 (documents that were allegedly authored by Reyes and received into evidence).

Green appeared at trial and testified that they—not Reyes— made the termination decision, Amann has failed to show that Reyes's testimony was essential.[12] Indeed, Amann's claim that Reyes's testimony was essential to his case is undercut by his extensive arguments contending that the evidence at trial "presented strong, uncontroverted evidence supporting each element of his case." Pl.'s Mot. at 13; Pl.'s Reply at 28. While Amann has every right to make arguments in the alternative, the trial evidence that he marshals in support of his claims undermines his assertion that Reyes's testimony was essential to his case.

Additionally, the court's order quashing the subpoena was justified based on the fourth factor because of adequate alternative sources of information. In his motion, Amann argues that he had no alternative means of obtaining information about the context and meaning of Reyes's documents and the extent of Reyes's knowledge. Pl.'s Mot. at 29–31. But the Tenth Circuit's opinion suggests the relevant question is whether Amann had an adequate alternative means of obtaining information about Reyes's role in the termination more generally, regardless of whether Amann could acquire more specific information *from* Reyes. *See Off. of the Utah Att'y Gen.*, 56 F.4th at 1264 (analyzing this factor). Based on this reasoning, the trial testimony of Romano and Green was an adequate, if not better, alternative source of information because they both testified that Reyes played no role in the termination. *Id.*; Trial Tr. Vol. 4 at 906 (Romano's testimony); Trial Tr. Vol. 5 at 966–67 (Green's testimony). Amann responds that their testimony was inadequate because of inconsistencies between Romano's trial and deposition testimony, trial exhibits suggesting that Reyes was annoyed with Amann, and the financial relationship between

---

[12] At best, the evidence Amann presents "raises the reasonable inference that Reyes was involved in [the] decision to terminate Amann." Order Sustaining in Part Pl.'s Objections at 8. But the Tenth Circuit has already rejected such a showing as insufficient.

the State of Utah and Green's firm. Pl.'s Reply at 9. But Amann points to no authority for his implausible position that a source of information is inadequate simply because it is amenable to impeachment. Separately, Amann fails to provide a persuasive response to the Office's argument that Reyes's interrogatory responses provided an adequate alternative source of information from Reyes himself. Def.'s Opp'n at 35–36; Pl.'s Reply at 8–9.

None of these conclusions are undermined by the newly discovered evidence, which Amann emphasizes in his reply memorandum.[13] Pl.'s Reply at 5–9. While Reyes's note may suggest that he once thought Amann may have been the source of the leak to the blogger back in 2014, it does not suggest that Reyes played any role in the decision to terminate Amann in 2016, which was based on the conclusion that Amann had sent the NCFI packet. New Evidence. Thus, it fails to demonstrate that Reyes's testimony was essential, or even relevant, to Amann's case or that other sources of information on the issue were inadequate.[14]

---

[13] The Tenth Circuit held that Amann "may renew his request for a deposition" of Reyes if this court "finds that . . . Reyes has failed to make a good faith effort to respond [to interrogatories]." *See Off. of the Utah Att'y Gen.*, 56 F.4th at 1264 n.7. Amann suggests that the newly discovered evidence shows Reyes failed to respond in good faith to the interrogatories and thus implicates the Tenth Circuit's holding. Pl.'s Reply at 9. Conspicuously, he fails to even consider the much more likely possibility that any failure to disclose the note was simply an inadvertent mistake and does not reflect any bad faith on the part of Reyes.

[14] For similar reasons, the court rejects any argument raised in Amann's reply memorandum that the newly discovered evidence warrants a new trial under Rule 59. "A party seeking a new trial [based] on newly discovered evidence must show (1) the evidence was newly discovered since the trial; (2) the moving party was diligent in discovering the new evidence; (3) the newly discovered evidence could not be merely cumulative or impeaching; (4) the newly discovered evidence was material; and (5) that a new trial, with the newly discovered evidence, will probably produce a different result." *Joseph v. Terminix Int'l Co.*, 17 F.3d 1282, 1285 (10th Cir. 1994) (citation modified). Here, Amann has failed to show that a trial with the new evidence would likely produce a different outcome because the note fails to link Reyes to the termination decision. Indeed, it is unclear whether the note is even relevant, especially given the uncertainty about when it was

Finally, Amann fails to show that any error regarding the Reyes subpoena was prejudicial. Amann's argument to the contrary presupposes that Reyes's testimony would provide "evidence of [the Office's] retaliatory motive and pretext." Pl.'s Mot. at 33. But even after considering the newly discovered evidence, it is likely that his testimony would have been unhelpful and perhaps even harmful to Amann's case. Consequently, even if the court erred in quashing the subpoena, there is no basis for concluding that any error was prejudicial. In summary, Amann has failed to identify prejudicial error with respect to the Reyes trial subpoena that would justify a new trial.

*    *    *

The court has carefully considered all of Amman's claimed justifications for a new trial in light of the evidence, both documentary and testimonial, received over the course of the eight-day trial. *See Bill Barrett Corp. v. YMC Royalty Co.*, No. 1:15-CV-02177-DME, 2018 WL 10207979, at *4 (D. Colo. Jan. 24, 2018), *aff'd sub nom. Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760 (10th Cir. 2019) ("[I]n considering a motion for a new trial, . . . the [c]ourt is not only free to weigh the evidence presented at trial, but is *required* to do so.") (emphasis added). Having observed the trial and after examining all the evidence and arguments presented, the court concludes that any alleged errors, even if established, are harmless and did not dictate the outcome. *See Plaut v. Est. of Rogers*, 959 F. Supp. 1302, 1305 (D. Colo. 1997) ("In granting a new trial a showing of prejudice *is essential*.") (citation modified) (emphasis added). At bottom, none of the alleged errors—whether with respect to comparator evidence, Poulson's testimony, or Reyes's availability—undermine the crucial fact that the jury had ample credible evidence to simply

---

drafted. Insofar as Amann contends that the note contradicts Reyes's interrogatory responses, he is relying on an impeachment purpose that is insufficient to justify a new trial under Rule 59.

disbelieve Amann's trial testimony that he did not send the NCFI packet and conclude that Amann was, therefore, lawfully terminated for harassing a fellow employee. Trial Tr. Vol. 2 at 344. In short, Amann has failed to identify any error that "affect[ed]" his "substantial rights" and his post hoc objections "must [be] disregard[ed]." FED. R. CIV. P. 61.

## CONCLUSION AND ORDER

For the reasons above, the court DENIES Amann's motion for a new trial under Rule 59.

DATED March 31, 2026

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge